Kyle W. Parker, ABA No. 9212124
William G. Cason, ABA No. 2009083
HOLLAND & HART LLP
1029 W. 3rd Avenue, Suite 550
Anchorage, Alaska 99501
Telephone:    (907) 865-2600
Facsimile:    (907) 865-2680
kwparker@hollandhart.com
wgcason@hollandhart.com

*Attorneys for Alaska Industrial Development
and Export Authority, North Slope Borough and
Arctic Slope Regional Corporation*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY, NORTH SLOPE BOROUGH, and ARCTIC SLOPE REGIONAL CORPORATION, | Civil Action No. 3:21-cv-00245-SLG |
| *Plaintiffs*, | **FIRST AMENDED COMPLAINT** |
| v. | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, UNITED STATES DEPARTMENT OF THE INTERIOR, DEB HAALAND, in her official capacity as Secretary of the Department of Interior, LAURA DANIEL-DAVIS, in her official capacity as Principal Deputy Assistant Secretary, Land and Minerals Management, BUREAU OF LAND MANAGEMENT, TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management, and THOMAS HEINLEIN, in his official capacity as Director of the Bureau of Land Management Alaska Office, | |
| *Defendants.* | |

Plaintiffs Alaska Industrial Development and Export Authority ("AIDEA"), North Slope Borough ("Borough"), and Arctic Slope Regional Corporation ("ASRC") hereby bring this civil action against the above-listed Defendants for declaratory and injunctive relief. Plaintiffs allege as follows:

## INTRODUCTION

1. Defendants have defied a direct congressional mandate to facilitate development of oil and gas resources on the Coastal Plain of Alaska. Rather than follow the law and the science, Defendants have engaged in a politically driven, systematic campaign to prevent any Coastal Plain development.

2. After decades of debate and with the widespread support of Alaskans, Congress passed legislation in 2017, which the President signed into law, directing the Secretary of the Interior to implement the specific provisions of the Alaska National Interest Lands Conservation Act authorizing oil and gas leasing and exploration and development activities on discrete lands within the Coastal Plain. Congress expressly directed the Secretary to conduct at least two Coastal Plain lease sales, including one by December 22, 2021, and to issue any rights-of-way or easements necessary to carry out oil and gas operations on the Coastal Plain.

3. In August 2020, the Bureau of Land Management completed an extensive environmental review process for the congressionally mandated Coastal Plain oil and gas leasing program.

4. In January 2021, the Bureau of Land Management finalized the first of the congressionally mandated Coastal Plain lease sales.

5.     AIDEA was the successful bidder for the majority of the leases sold in the January 2021 Coastal Plain lease sale.

6.     On his first day in office, January 20, 2021, President Biden issued an executive order directing the Secretary of the Interior to "place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program." Executive Order 13990, § 4(a).

7.     Invoking that Executive Order, the Secretary of the Interior ordered "a temporary halt on all Department [of the Interior] activities related to the [Coastal Plain] Program." Secretarial Order 3401. The Secretary further directed the Department of the Interior, including the Bureau of Land Management, not to "take any action to authorize any aspect of the Program" until the Department conducts a comprehensive environmental review process that is estimated to take well over a year. The Secretary's order constitutes a moratorium, issued via administrative fiat, on all federal approvals of oil and gas operations on the Coastal Plain.

8.     Executive Order 13990, Secretarial Order 3401, and the subsequent actions of the Department of the Interior, directly contravene Congress's mandate on development of the Coastal Plain's oil and gas resources. First, the President's order for a moratorium on all federal approvals of oil and gas operations on the Coastal Plain was ultra vires. Second, by issuing and implementing this unlawful moratorium, the Department of the Interior has violated, and continues to violate, the Administrative Procedure Act, Alaska National Interests Land Conservation Act, and the Tax Cuts and Jobs Act of 2017.

9.     Accordingly, as a result, Section 4(a) of Executive Order 13990, Secretarial Order 3401, and all federal actions in furtherance thereof, must be vacated and enjoined. In addition, the

Department of the Interior, including the Bureau of Land Management, must be ordered to carry out its congressionally prescribed duties to facilitate development of the Coastal Plain's oil and gas resources.

## PARTIES

10.     Plaintiff AIDEA is a public corporation of the State of Alaska. AIDEA was created in 1967 to "promote, develop and advance the general prosperity and economic welfare of the people of Alaska, to relieve problems of unemployment, and to create additional employment." A.S. § 44.88.070. Through its development project finance programs, AIDEA leverages valuable public resources to support significant private-sector investment, catalyzing enterprise growth to protect the long-term economic health of the State and its citizens. From its inception, AIDEA has worked with Alaska Native Corporations, tribal organizations and indigenous village communities to increase job opportunities and encourage the economic growth of the State, particularly in rural and remote areas, including the North Slope region of Alaska. AIDEA is specifically authorized by the Alaska Legislature to promote and provide financing for Arctic infrastructure development and to enter into lease agreements with government entities necessary to fulfill these purposes (A.S. § 44.88.070).

11.     The North Slope Borough ("Borough) is a Home Rule Borough that serves as the regional government for eight villages spread across northern Alaska. The Borough's jurisdiction stretches from the United States-Canada border across to the western border of Alaska, and its coastline extends across the Beaufort and Chukchi Seas. The Borough's jurisdiction includes roughly 18,500 square miles within the Arctic National Wildlife Refuge ("ANWR"), including the entire Coastal Plain and the city and village of Kaktovik, which is the only permanent settlement

within ANWR. The Borough's authority is analogous to, or greater than, that of county governments in other states. Pursuant to Alaska Statute § 29.04.010, Home Rule Boroughs are municipal corporations incorporated under the laws of the State of Alaska and political subdivisions with "all legislative powers not prohibited by law or charter." As such, the Borough has authority over the planning, platting, permitting, and zoning of lands within its boundaries, and for directing appropriate development in a manner that promotes the public health, safety, welfare, and economic stability of Borough residents and communities. This includes protecting access to subsistence resources, managing fish and wildlife species, and mitigating the impacts of development activity on wildlife and the natural environment. With this authority, the Borough has successfully managed oil and gas activities on the North Slope for over 40 years. Through its Planning Department, the Borough has permitted, zoned, and approved every oil and gas project on the North Slope. This permitting process involves substantial input from the Borough's Wildlife Department biologists and subsistence resource experts, as well as from other Borough personnel and local residents, resulting in significant remedial measures that protect the Arctic's residents, environment, and wildlife. Over 74 percent of Borough residents are Native Alaskan Iñupiat. The Iñupiat and other indigenous peoples of the region have depended on the subsistence resources of ANWR's lands and waters for their physical health, cultural well-being, and survival for many generations.

12.     Plaintiff Arctic Slope Regional Corporation is one of twelve land-owning regional Alaska Native Corporations established pursuant to the Alaska Native Claims Settlement Act of 1971 ("ANCSA"). 43 U.S.C. § 1601 *et seq.* Under ANCSA, Congress created Native corporations, including ASRC, "to provide benefits to its shareholders who are Natives or

descendants of Natives or to its shareholders' immediate family members who are Natives or descendants of Natives to promote the health, education or welfare of such shareholders or family members." 43 U.S.C. § 1606(r). ASRC's region is the North Slope of Alaska, which spans 55 million acres and is the northernmost region of the United States. Within the North Slope region, ASRC also holds title to approximately five million acres of land conveyed to it under ANCSA for the purpose of development and use on behalf of its shareholders, much of it with energy, mineral and other resource potential. Among many other efforts, ASRC, on behalf of its shareholders, pursues and benefits from natural resource development on and near its lands. Its shareholders also depend on subsistence resources from the land as well as the rivers and ocean, as they have for millennia.

13.     ASRC also represents the business interests of the Iñupiat of the Arctic Slope and is the largest Alaskan-owned and operated company, spanning six major business segments. ASRC is committed both to providing sound financial returns to its shareholders in the form of jobs and dividends, and to preserving the Iñupiat way of life, culture and traditions, including  the preservation of a subsistence way of life to ensure the communities are able to support its shareholders. A portion of ASRC's revenues is invested in initiatives that promote and support an educated shareholder base, healthy communities, and sustainable local economies. ASRC's perspective is based on the dual realities that its Iñupiat culture and communities depend upon a healthy ecosystem and subsistence resources as well as natural resource development as the foundation of a sustained North Slope economy.

14.     Defendant Joseph R. Biden, Jr., is the President of the United States. He is sued in his official capacity.

FIRST AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 6 of 35

15.     Defendant United States Department of the Interior ("DOI") is an agency within the executive branch of the United States government.

16.     Defendant Deb Haaland is the Secretary of the Interior ("Secretary").  She is sued in her official capacity.

17.     Defendant Laura Daniel-Davis is the Principal Deputy Assistant Secretary for Lands and Minerals Management, DOI.  She is sued in her official capacity.

18.     Defendant Bureau of Land Management ("BLM") is an agency within DOI.

19.     Defendant Tracy Stone-Manning is the Director of BLM.  She is sued in her official capacity.

20.     Defendant Thomas Heinlein is the Acting Director of the BLM Alaska Office.  He is sued in his official capacity.

## JURISDICTION AND VENUE

21.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States.  *See* 28 U.S.C. §§ 1331, 2201; 5 U.S.C. §§ 701-706.

22.     Venue is proper in this District because Defendants are United States agencies or officers sued in their official capacities, Plaintiffs are residents of this District, and a substantial part of the events or omissions giving rise to the Complaint occurred within this District.  *See* 28 U.S.C. § 1391(e)(1).

# BACKGROUND

## I.  RELEVANT STATUTORY PROVISIONS

### A.  Administrative Procedure Act

23.  The Administrative Procedure Act ("APA") provides that persons "adversely affected or aggrieved by agency action" are entitled to judicial review thereof.  5 U.S.C. § 702.

24.  "[R]egulations subject to the APA cannot be afforded the 'force and effect of law' if not promulgated pursuant to the statutory procedural minimum found in" the APA.  *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979).

25.  Pursuant to the APA, a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

26.  If the reviewing court finds that an agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the court must hold the action unlawful and set it aside.  5 U.S.C. § 706(2)(A).

27.  If the reviewing court finds that an agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," the court must hold the action unlawful and set it aside.  5 U.S.C. § 706(2)(C).

28.  If the reviewing court finds that an agency action is "without observance of procedure required by law," the court must hold the action unlawful and set it aside.  5 U.S.C. § 706(2)(D).

29.  Before issuing a substantive rule, an agency must follow specific procedures, including (1) publication of notice of the proposed rule in the Federal Register, (2) providing a period for interested individuals to comment on the proposed rule, and (3) publication of the

adopted rule not less than thirty days before its effective date.  5 U.S.C. § 553.  These procedures are commonly referred to as notice-and-comment requirements.

30.     The notice-and-comment requirements do not apply to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice," or when the agency makes a written finding and reasoned explanation that the notice-and-comment procedure is "impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553 (b)(3).  However, these exceptions to the APA's notice-and-comment requirements are "narrowly construed and only reluctantly countenanced."  *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984).

31.     "Interpretive rules simply clarify or explain existing law or regulations.  They do not conclusively affect the rights of private parties.  Substantive rules, in contrast, create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress."  *Yesler Terrace Comm. Council v. Cisneros*, 37 F.3d 442, 449 (9th Cir. 1994) (internal citation omitted).

32.     "The critical factor to determine whether a directive announcing a new policy constitutes a rule or a general statement of policy is the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case."  *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987) (alterations in original; internal quotations and citation omitted).  If a policy "narrowly limits administrative discretion" or establishes a "binding norm," it is a substantive rule subject to the notice-and-comment requirements.  *Id.*; *see also Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666-67 (D.C. Cir. 1978) ("If it appears that a so-

called policy statement is in purpose or likely effect one that narrowly limits administrative discretion, it will be taken for what it is—a binding rule of substantive law.").

### B.     Alaska National Interest Lands Conservation Act

33.    In 1960, President Eisenhower designated 8.9 million acres in northeastern Alaska as a federally protected wildlife refuge, initially named the Arctic National Wildlife Range and later the Arctic National Wildlife Refuge ("ANWR").

34.    In 1980, Congress passed the Alaska National Interest Lands Conservation Act, Pub. Law 96-487, 94 Stat. 2390 ("ANILCA").

35.    ANILCA was intended to strike a balance between conservation interests and the future economic and social needs of Alaska and its residents. Section 101(d) of ANILCA states that the "designation and disposition of the public lands in Alaska pursuant to this Act are found to represent a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition." PL 96-487, § 101(d); 16 U.S.C. § 3101(d).

36.    Congress sought to protect the balance struck by ANILCA by providing that any executive action that "withdraws more than five thousand acres, in the aggregate, of public lands within the State of Alaska," is not effective "until notice is provided in the Federal Register and to both Houses of Congress." PL 96-487, § 1326(a), 16 U.S.C. § 3213(a).

37.    In keeping with its broad policy objectives, ANILCA dramatically expanded ANWR from 8.9 million acres to 19.3 million acres; designating 8 million acres as wilderness, and setting aside a small portion (approximately 1.5 million acres) for potential oil and gas development. PL 96-487, § 702(3), 16 U.S.C. 1132; PL 96-487, § 1002, 16 U.S.C. § 3142.

38.     These 1.5 million acres, which comprise less than 10 percent of the expanded refuge, are identified in Section 1002 of ANILCA, and are commonly referred to as either the Coastal Plain or the "1002 Area." PL 96-487, § 1002; 16 U.S.C. § 3142.

39.     Under section 1002(h), Congress required the Department of Interior to prepare a report assessing the impacts of possible oil and gas exploration on the Coastal Plain within five years. PL 96-487, § 1002(h); 16 U.S.C. § 3142(h).  Following completion of the 1002(h) report, Congressional authorization is required prior to any oil and gas leasing, exploration or development activities in the 1002 Area.  PL 96-487, § 1003; 16 U.S.C. § 3143.

40.     The Department's report (referred to as the "Legislative Environmental Impact Statement" or "LEIS") was completed on April 20, 1987, and "culminate[d] more than 5 years of biological baseline studies, surface geological studies, and two seasons of seismic exploration surveys." Informed by extensive scientific study, it concluded that "[i]mpacts predicted for exploration and development drilling were minor or negligible on all wildlife resources on the 1002 area," and that production of oil would be "expected to directly affect only 12,650 acres or 0.8 percent of the 1002 area."

41.     As a result of the Department's findings, Secretary Hodel recommended that Congress enact legislation to authorize the Department to conduct "an orderly oil and gas leasing program for the entire 1.5- million- acre 1002 area."

**C.      Tax Cuts and Jobs Act of 2017**

42.     After decades of debate and public scrutiny, Congress lifted ANILCA's Section 1003 prohibition and expressly opened the Coastal Plain up for oil and gas development in 2017.

This legislation was part of the Tax Cuts and Jobs Act of 2017, Public Law 115-97 ("2017 Tax Act"), which President Trump signed into law on December 22, 2017.

43.     The 2017 Tax Act expressly provides that "Section 1003 of [ANILCA] shall not apply to the Coastal Plain," thereby repealing ANILCA's temporary prohibition of oil and gas development.  PL 115-97, § 20001(b)(1).

44.     Section 20001(b)(2)(A) of the 2017 Tax Act provides: "The Secretary shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain."  PL 115-97, § 20001(b)(2)(A).

45.     Section 20001(b)(2) of the 2017 Tax Act amended Section 303(2)(B) of ANILCA to provide a fifth purpose for ANWR:  "to provide for an oil and gas program on the Coastal Plain." PL 115-97, § 20001(b)(2).

46.     Through the 2017 Tax Act, Congress mandated that the Secretary take various steps to promote the exploration and development of oil and gas resources within the Coastal Plain.

47.     Section 20001(c) of the 2017 Tax Act directs the Secretary to conduct at least two Coastal Plain lease sales by December 22, 2024, including the first by December 22, 2021, and provides that each sale must include at least 400,000 acres of the highest hydrocarbon potential lands within the Coastal Plain.  PL 115-97, § 20001(c).

48.     Section 20001(c) further provides:

> (2) RIGHTS-OF-WAY.—The Secretary shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section.

PL 115-97, § 20001(c)(2).  This provision is a directive; such rights-of-way and easements are not at the Secretary's discretion.

49.     Section 20001(c) further provides:

> (3) SURFACE DEVELOPMENT.—In administering this section, the Secretary shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section.

PL 115-97, § 20001(c)(3).

50.     Except as otherwise provided in Section 20001, "the Secretary shall manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations)."  PL 115-97, § 20001(b)(3).

### D.     Federal Land Policy and Management Act

51.     The Federal Land Policy and Management Act ("FLPMA") authorizes the Secretary of the Interior to withdraw small tracts (less than 5,000 acres) of public lands and temporarily withdraw large tracts of land.  43 U.S.C. § 1714(c), (d).

52.     For a withdrawal of either a large or a small tract, the Secretary must publish notice of the proposed withdrawal in the Federal Register, afford an opportunity for notice and comment, and obtain the consent of any other department or agency involved in the administration of the lands proposed for withdrawal.  43 U.S.C. § 1714(b), (h), (i).

53.     Congress imposed additional requirements for temporary large-tract withdrawals. Such withdrawals are limited to no more than 20 years.  In addition, no later than the effective date

of the withdrawal, the Secretary must provide Congress a detailed report addressing twelve separate elements related to the withdrawal.  43 U.S.C. § 1714(c)(2).

II.    FACTUAL BACKGROUND

A.    The Coastal Plain's Oil and Gas Resources

54.    Those who live in and around the Coastal Plain have a uniquely important voice regarding the future use of the area.  Notably, the Alaska Native residents who live in and around the Coastal Plain support oil and gas development.  The Native Village of Kaktovik ("Kaktovik") is the only federally recognized community on the Coastal Plain, and it participated in the environmental review process as a cooperating agency alongside BLM.  Kaktovik, along with more than twenty other Alaska Native organizations and corporations in and around the Coastal Plain, has consistently advocated for responsible oil and gas development on Alaska's North Slope (which includes the Coastal Plain).  These organizations include: Kaktovik Iñupiat Corporation, City of Kaktovik, North Slope Borough, Arctic Slope Native Association, City of Anaktuvuk Pass, City of Point Hope, Native Village of Atqasuk, Olgoonik Corporation, City of Atqasuk, City of Wainwright, Native Village of Point Lay, Tikigaq Corporation, Atqasuk Corporation, City of Utqiaġvik, Iḷisaġvik College, Ukpeaġvik Iñupiat Corporation, Nunamiut Corporation, Native Village of Point Hope, Arctic Slope Regional Corporation, Wainwright Tribal Council, Iñupiat Community of the Arctic Slope, Native Village of Barrow, and North Slope Borough School District.

55.    Support for the responsible development of the Coastal Plain's oil and gas resources is not limited to Alaska Natives.  Recent statewide polling indicates that 65 percent of all Alaskans support oil and gas exploration and production on the Coastal Plain.  Reflective of this widespread

public support, Alaska Governor Mike Dunleavy, all members of Alaska's congressional delegation, and a majority of the members the Alaska Legislature support responsible development of the Coastal Plain.

56. Alaskans on the North Slope benefit greatly from the development of the North Slope's oil and gas resources. This development has sparked tremendous economic growth in the area over the last several decades. Coinciding with North Slope development, between 1980 and 2014, the life expectancy of North Slope residents increased at a rate far surpassing the national average over the same period. Laura Dwyer-Lindgren, MPH, *et al.*, "Inequalities in Life Expectancy Among US Counties," 1980-2014, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION (May 8, 2017), *available at* https://jamanetwork.com/journals/jamainternalmedicin e/fullarticle/2626194.

57. The United States Geological Survey estimated that approximately 7.687 billion barrels of recoverable oil and 7.04 trillion cubic feet of recoverable natural gas are contained within the Department's leasing program area.

58. The House Committee on Natural Resources has estimated that development of the Coastal Plain will create 55,000 to 130,000 jobs.

59. By increasing royalties, income taxes, production taxes, and property taxes, oil and gas development on the Coastal Plain will result in increased revenues for the North Slope Borough, the State of Alaska, and the federal government (estimated up to $50 billion in total future royalties, according to the nonpartisan Congressional Budget Office).

60.     Oil production from the Coastal Plain leases will promote new infrastructure development and sustain existing federally identified critical energy infrastructure, including the Trans-Alaska Pipeline System.

61.     Oil and gas development on the Coastal Plain will result in increased economic activity in the community of Kaktovik, a "disadvantaged community" as defined by Executive Order 14008.

62.     Oil and gas development on the Coastal Plain will result in increased revenues and economic activity for Alaska Native corporations and the people they represent.

B.     **Methods to Assess Hydrocarbon Potential**

63.     The United States Geological Survey developed its estimate of the Coastal Plain's hydrocarbon potential based upon the geology of the area, identifying ten petroleum "plays" which have geologic parameters that are associated with petroleum potential. The United States Geological Survey then made probabilistic assumptions regarding the geological attributes of each play.

64.     To assess the actual hydrocarbon potential of any portion of the Coastal Plain, additional site-specific exploration is required to test the assumptions made in the United States Geological Survey estimate.

65.     Site-specific exploration geophysical methods to assess the hydrocarbon potential of a given tract or area include seismic surveys, remote sensing, geochemical analyses, magnetic surveys, and gravity surveys.

## C. Initial Implementation of Congress's Mandate to Facilitate Development of the Coastal Plain

66. Following the enactment of the 2017 Tax Act and pursuant to Congress's mandate, DOI, through BLM, initiated a thorough environmental review of the Coastal Plain Oil and Gas Leasing Program (the "Leasing Program"). As part of this process, BLM held a 60-day scoping period, issued a Draft Environmental Impact Statement ("DEIS"), and then held another 75-day comment period on the DEIS. During the scoping and public comment periods, BLM received over 1.8 million public comments on more than 8,000 discrete topics. BLM also held several public meetings and met with representatives of various stakeholders, including local and state governments, tribes, local indigenous communities, Alaska Native corporations, industry organizations, and environmental organizations. In developing the Leasing Program and analyzing its environmental impacts, BLM also carefully coordinated with other government agencies and entities, including the U.S. Environmental Protection Agency, the U.S. Fish and Wildlife Service, the National Marine Fisheries Service, and the State of Alaska.

67. BLM modified the DEIS based on the comments received, and in September 2019, BLM issued a robust 515-page Final Environmental Impact Statement ("FEIS") for the Leasing Program. This FEIS includes BLM's responses to comments regarding the DEIS.

68. BLM subsequently received and considered comments in response to the FEIS.

69. In August 2020, BLM issued an 88-page Record of Decision approving the Leasing Program and responding to comments regarding the FEIS. The Record of Decision acknowledges that Section 20001 of the 2017 Tax Act "require[s] the Secretary of the Interior (Secretary), acting through the Bureau of Land Management (BLM), to establish and administer a competitive oil and gas program for the 'leasing, development, production, and transportation of oil and gas in and

Case 3:21-cv-00245-SLG   Document 7   Filed 12/08/21   Page 17 of 35

from the Coastal Plain.'"  The Record of Decision further acknowledges that Section 20001 "also includes additional mandates to the Secretary, acting through the BLM, to expedite and provide certainty toward establishment and development of the program in order to meet the statute's revenue-generating purpose."

70.     The Record of Decision summarizes Congress's mandate in the 2017 Tax Act as follows:

> In summary, exercising its plenary authority over the management of federal lands, Congress's enactment of Section 20001 of PL 115-97 decided the question of whether activities related to leasing, exploration, development, production and transportation of oil and gas would take place on the Coastal Plain.  In doing so, Congress, among other things: (1) directed the Secretary, acting through the BLM, to "establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain"; (2) included a Coastal Plain oil and gas program as a refuge purpose on equal footing with the other refuge purposes; (3) directed the Secretary, acting through the BLM, to manage the program in a manner similar to the administration of lease sales on the National Petroleum Reserve-Alaska (the NPR-A); (4) directed the Secretary, acting through the BLM, to issue rights-of-way or easements "for the exploration, development, production, or transportation necessary" to carry out the program; and (5) directed the Secretary, acting through the BLM, to authorize up to 2,000 surface acres to be covered by production and support facilities.

71.     The Record of Decision notes the uncertainty of the impacts of future exploration and development on the Coastal Plain.  As a result, the Record of Decision explains that "[a]t some future stage in the administration of the oil and gas program where impacts from proposed actions are actually reasonably foreseen, *i.e.*, if and when the BLM is presented with proposals for exploration or development, those decisions by the BLM for specific authorizations will also be subject to project-specific analysis, including compliance with NEPA and other laws."  The Record

of Decision further clarifies that future on-the-ground actions may be subject to additional project-specific terms and conditions, in addition to the terms and conditions of the governing lease.

72. The Record of Decision expressly acknowledges the five statutory purposes of ANWR and carefully ensures that the purpose of oil and gas development "does not defeat the other four" purposes.

73. The Record of Decision also acknowledges that the "plain language of" Section 20001(c)(2) of the 2017 Tax Act requires BLM to authorize rights-of-way necessary to carry out the Coastal Plain oil and gas program. Such authorization is not "at the BLM's discretion."

74. The Record of Decision analyzes four alternatives (A, B, C, and D) in detail. These alternatives focus on (i) which areas of the Coastal Plain to make available for oil and gas leasing, and (ii) what terms and conditions to apply in order to avoid, minimize, and mitigate adverse environmental impacts. BLM ultimately selected Alternative B, which opens all of the Coastal Plain to potential leasing and imposes numerous lease stipulations and required operating procedures aimed at protecting ANWR's resources and uses set forth in ANILCA.

75. The Record of Decision states that "making all of the 'program area' available for leasing provides maximum flexibility for future decision-making and innovation for project proposals by potential lessees" and further explained that "[u]ntil exploration drilling occurs, the BLM cannot reasonably foresee which areas of the Coastal Plan have the highest prospects for oil and gas discoveries." The Record of Decision further states that "given the limited geophysical information that currently exists for the Coastal Plain, the BLM has determined that making the entire program area available for leasing is the *only* way to ensure that the areas having the highest

Case 3:21-cv-00245-SLG   Document 7   Filed 12/08/21   Page 19 of 35

potential for the discovery of oil and gas can be offered in the first two lease[] sales, as required by Section 20001(c)(1)(B)(i)(II) of PL 115-97." (Emphasis added.)

**D.    AIDEA's Lease Purchases**

76.    On December 7, 2020, BLM published in the Federal Register a Detailed Statement of Sale for the Leasing Program.  On December 18, 2020, after receipt and consideration of over 40,000 comments, BLM published an amended Detailed Statement of Sale, which removed Tracts 1-8, Tract 11 and Tract 12 totaling nearly 475,000 acres from the lease sale process.  BLM accepted bids between December 21, 2020, and December 31, 2020.

77.    BLM opened the submitted bids for the Coastal Plain lease sale on January 6, 2021.

78.    AIDEA was the successful bidder on nine of eleven tracts for which bids were submitted.

79.    AIDEA secured lease agreements with BLM for seven tracts, collectively covering 365,775 acres within the Coastal Plain.  All of these lease agreements are for an initial term of ten years with an effective date of January 1, 2021.

80.    AIDEA chose to participate in the Coastal Plain lease sale to further its mission to increase job opportunities and otherwise encourage the State's economic growth, including access to and development of its natural resources.  AIDEA anticipates multiple benefits related to the timely exploration and development of its Coastal Plain leases, including direct employment for exploration and development of oil and gas resources; indirect employment related to exploration and development activities; revenues paid to local and state governments, Alaska Native corporations, and native villages; and profits to AIDEA from its development investment and re-investment of those profits into future economic development projects in Alaska.

81.     Inclusive of the first year's lease payments, AIDEA has initially incurred over $12,800,000 in costs in acquiring its Coastal Plain leases.

**E.     Defendants' Violation of Congress's Mandate to Facilitate Development of the Coastal Plain.**

82.     On January 20, 2021, President Biden was sworn into office and immediately took action to unlawfully thwart Congress's mandate to facilitate oil and gas development on the Coastal Plain.

83.     On his first day in office, President Biden issued Executive Order 13990, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, 86 Fed. Reg. 7037 (Jan. 25, 2021). Section 4(a) of Executive Order 13990 states:

> In light of the alleged legal deficiencies underlying the program, including the inadequacy of the environmental review required by the National Environmental Policy Act, the Secretary of the Interior shall, as appropriate and consistent with applicable law, place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program, as established by the Record of Decision signed August 17, 2020, in the Arctic National Wildlife Refuge. The Secretary shall review the program and, as appropriate and consistent with applicable law, conduct a new, comprehensive analysis of the potential environmental impacts of the oil and gas program.

84.     Executive Order 13990 provides no explanation of the vaguely stated "alleged legal deficiencies underlying the [Leasing Program]," nor does this Executive Order provide an explanation of how or why the President determined that such "alleged legal deficiencies" warrant a moratorium on the implementation of the Leasing Program. Likewise, Executive Order 13990 provides no explanation of why the "alleged legal deficiencies" warrant a comprehensive environmental review analysis, even though BLM had already completed such an analysis and

Defendants had already taken the position in other litigation that such analysis fully complied with NEPA.

85. On June 1, 2021, the Secretary of the Interior issued Order No. 3401 (the "Secretarial Order"). The Secretarial Order expressly states that it "is taken in furtherance of Section 4(a) of [Executive Order 13990]."

86. The Secretarial Order states that the Secretary "has identified multiple legal deficiencies in the underlying record supporting the leases, including, but not limited to: (1) insufficient analysis under the National Environmental Policy Act (NEPA), including failure to adequately analyze a reasonable range of alternatives in the environmental impact statement (EIS); and (2) failure in the August 17, 2020, Record of Decision (ROD) to properly interpret Section 20001 of Public Law 115-97 (Tax Act)." The Secretarial Order provides no further elaboration on the alleged shortcomings of the alternatives analysis or on the nature of the allegedly improper interpretation of Section 20001.

87. The Secretarial Order provides that the Department of the Interior "will conduct a new, comprehensive analysis of the potential environmental impacts of the [Leasing] Program and address the identified legal deficiencies. While that analysis is pending, I direct a temporary halt on all Department activities related to the [Leasing] Program in the Arctic Refuge."

88. The Secretarial Order directs the Assistant Secretary for Land and Minerals Management, in conjunction with the Assistant Secretary for Fish and Wildlife and Parks and the Solicitor's Office, to publish, within 60 days, a notice of intent in the Federal Register to "initiate the process to conduct a comprehensive environmental analysis, complete necessary consultation, and correct the identified legal deficiencies."

89.     The Secretarial Order provides that until the analysis referenced in Paragraph 77 is complete, "the Directors of the [BLM] and the U.S. Fish and Wildlife Service shall not take any action to authorize any aspect of the Program, including, but not limited to, any leasing, exploration, development, production, or transportation, and shall not process any pending or future applications for such activities."

90.     The Secretarial Order strips DOI (including BLM) officials of discretion and imposes an unconditional mandate not to process any leases or applications for oil and gas operations on the Coastal Plain.

91.     The Secretarial Order constitutes a moratorium on all federal approvals of oil and gas operations on the Coastal Plain (the "Moratorium"). The Moratorium is a substantive rule because it has the force of law and is binding on agency personnel.

92.     The Moratorium did not undergo the mandatory notice-and-comment requirements. 5 U.S.C. § 553. Moreover, the Secretary made no finding, let alone provide the necessary statement of purpose and need, that the notice-and-comment procedures are inapplicable to the Moratorium. *See* 5 U.S.C. § 553(a)(3)(B).

93.     On June 2, 2021 (the day following issuance of the Secretarial Order), the DOI's Principal Deputy Assistant Secretary for Land and Minerals Management sent AIDEA a notice, dated June 1, 2021, of Suspension of Operations and Production ("SOP"). This SOP provides that it is effective as of June 1, 2021, and states that "[w]hile this SOP is in place, no lease operations may transpire on the leases, the terms of the leases are tolled, and lease rentals are suspended."

94.     The SOP implements and furthers the Moratorium issued by the Secretary.

95.     Both the Secretarial Order and the SOP are final agency actions under the APA because they "mark the consummation of the agency's decision making process" and "legal consequences" will flow from them.  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016).

96.     The Secretarial Order and the SOP directly contravene Congress's mandate to conduct the first lease sale by December 22, 2021, and to "issue *any* rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out" Section 20001 of the 2017 Tax Act.  PL 115-97, § 20001(c)(2) (emphasis added).

97.     In August 2021, BLM notified multiple contractors for AIDEA that BLM would delay the processing of the contractors' permit applications to complete archeological surveys on AIDEA's Coastal Plain leases until the Supplemental EIS process is complete.  These notifications expressly referenced the Secretarial Order as the basis for refusing to process permit applications. While completing archeological surveys is a necessary first step in any exploration program, including making application for "any rights-of-way or easements," archeological surveys are not "lease operations" and no BLM lease is required to undertake such surveys.  BLM's categorical refusal to process applications for undertaking archeological surveys – surveys for which no BLM lease is required – implements the Secretary's moratorium and directly contravenes Congress's mandated that the Secretary take steps to promote the exploration and development of oil and gas resources within the Coastal Plain.

98.     BLM's categorical refusal to process applications constitutes final agency action. In addition, this categorical refusal implements the Secretary's Moratorium and directly contravenes Congress's mandate to conduct the first lease sale by December 22, 2021, and to

Case 3:21-cv-00245-SLG   Document 7   Filed 12/08/21   Page 24 of 35

"issue *any* rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out" Section 20001 of the 2017 Tax Act. PL 115-97, § 20001(c)(2) (emphasis added).

99.     The Moratorium, and DOI's (including BLM's) implementation thereof, preclude the actions, such as geological and geophysical surveys, necessary to determine "those areas that have the highest potential for the discovery of hydrocarbons," as required by Section 20001(c)(1)(B)(i)(II) of the 2017 Tax Act. PL 115-97, § 20001(c)(1)(B)(i)(II).

100.    The Moratorium, and DOI's (including BLM's) implementation thereof, preclude AIDEA from developing its lawfully acquired leases, in contravention of Congress's mandate in the 2017 Tax Act.

F.     Supplemental Environmental Review Process

101.    On August 4, 2021, BLM published in the Federal Register a Notice of Intent to Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program ("Notice of Intent").

102.    The Notice of Intent demonstrates the Defendants' intent to re-open the January 2021 Lease Sale by examining alternatives that could impact the validity of, or alter the terms of, the leases that were issued in that lease sale. The alternatives include "[d]esignat[ing] certain areas of the Coastal Plain as open or closed to leasing; permit[ting] less than 2,000 acres of surface development throughout the Coastal Plain; prohibit[ing] surface infrastructure in sensitive areas, and otherwise avoid[ing] or mitigate[ing] impacts from oil and gas activities."

103.    The Notice of Intent provides a scoping period that closed on October 4, 2021. AIDEA submitted scoping comments on October 4, 2021.

104. The Notice of Intent states that BLM estimates it will complete a Draft Supplemental EIS ("Draft SEIS") approximately six to eight months after the scoping period ends.

105. The Notice of Intent states that a public comment period of at least 45 days will follow the issuance of the Draft SEIS.

106. The Notice of Intent states that BLM will complete a Final Supplement Environmental Impact Statement ("Final SEIS") approximately six months after the Draft SEIS comment period ends.

107. The Notice of Intent provides that a Record of Decision "selecting a program alternative from the Final Supplemental SEIS" will be issued no sooner than 30 days after issuance of the Final SEIS.

108. Taken together, the Notice of Intent provides that the supplemental environmental review process will last an indefinite time, estimated at well over a year.

109. Pursuant to BLM's own statements, the Final SEIS will not be issued until after Congress's December 22, 2021, deadline for conducting the first lease sale on the Coastal Plain.

110. Because BLM has stated its intent to consider alternatives that could affect the validity of or change the terms of previously issued leases, the January 2021 lease sale cannot be considered final in compliance with the 2017 Tax Act until, at the earliest, BLM's supplemental environmental review process is complete and a new "program alternative" has been selected in a new Record of Decision.

G. **DOI's Reversal on the Adequacy of the Initial Environmental Review Process**

111. Various organizations filed suit challenging the August 2020 Record of Decision approving the Leasing Program.

FIRST AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 26 of 35

112.    In the various lawsuits challenging the Record of Decision, Defendants took the position that the environmental analysis underlying the Record of Decision was legally adequate and fully compliant with the requirements of NEPA.

113.    In the Secretarial Order, the Secretary provided no basis for DOI's reversal of its position regarding the adequacy of the Record of Decision.  *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position.  An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."); *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021) (in changing its position, an agency must: (1) display awareness of its changing position, (2) show the new policy is permissible under the law, (3) believe the new policy is better, and (4) provide "good reasons" for the new policy); *ConocoPhillips Co. v. EPA*, 612 F.3d 822, 833 (5th Cir. 2010) ("An agency may not reconsider its own decision if to do so would be arbitrary, capricious, or an abuse of discretion.").

114.    In its June 1, 2021 SOP to AIDEA, DOI provided no basis for the reversal of its position regarding the adequacy of the Record of Decision.

## COUNT ONE
### SECRETARY'S MORATORIUM: VIOLATION OF THE APA FOR FAILURE TO FOLLOW NOTICE-AND-COMMENT REQUIREMENTS

115.    Plaintiffs hereby incorporate and restate all preceding paragraphs.

116.    A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

117. The Moratorium is a substantive rule that was issued without the notice-and-comment procedures required by 5 U.S.C. § 553.

118. The Moratorium does not fit an exception to the notice-and-comment requirements in 5 U.S.C. § 553.

119. As a result, the Moratorium was issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The Moratorium therefore must be vacated and enjoined.

## COUNT TWO
### SECRETARY'S MORATORIUM: VIOLATION OF THE APA FOR ACTION CONTRARY TO LAW

120. Plaintiffs hereby incorporate and restate all preceding paragraphs.

121. A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 706(2)(A), (C).

122. "[A]n administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000).

123. Congress did not grant DOI the authority to issue or implement a moratorium on all federal approvals of oil and gas operations on the Coastal Plain. Indeed, the Secretary's Moratorium, and DOI's implementation thereof, directly contravene Congress's mandate to issue lease sales, including one by December 22, 2021, and to issue "any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary" by prohibiting all access for oil and gas activities during the moratorium. PL 115-97, § 20001(c)(2).

124.    Congress did not grant DOI unfettered discretion to determine which lands within the Coastal Plain to make available to oil and gas development.  Rather, Congress directed the Secretary to develop the lands with "the highest potential for the discovery of hydrocarbons," which BLM has already stated cannot be determined based upon currently available geophysical data.  PL 115-97, § 20001(c)(1)(B)(i)(II).

125.    In ANILCA Congress required the President or the Secretary to undertake specific steps to provide notice to the public and Congress prior to effecting any withdrawal over 5,000 acres.

126.    The Moratorium is a withdrawal within the meaning of ANILCA and is greater than 5,000 acres.

127.    On information and belief, the Defendants did not comply with ANILCA's statutorily mandated steps prior to announcing the Moratorium.

128.    In FLPMA, Congress required the Secretary to undertake specific steps, including providing opportunity for public notice and comment and providing a detailed report to Congress, prior to implementing any temporary withdrawal of a tract larger than 5,000 acres.

129.    The Moratorium is a temporary large-tract withdrawal within the meaning of FLPMA.

130.    On information and belief, the Defendants did not comply with these statutorily mandated steps prior to announcing the Moratorium.

131.    Because the Moratorium is not in accordance with law and is in excess of statutory jurisdiction, authority, and limitations, it must be vacated and enjoined.

## COUNT THREE
### DOI's Actions Implementing the Secretary's Moratorium: Violation of the APA for Action Contrary to Law

132.     Plaintiffs hereby incorporate and restate all preceding paragraphs.

133.     Because DOI's (including BLM's) actions in furtherance of the Moratorium, including the SOP, the categorical refusal to process AIDEA's contractors' applications, and the reopening of the January 2021 lease sale are not in accordance with law and are in excess of statutory jurisdiction, authority, and limitations, such actions must be vacated and enjoined.

## COUNT FOUR
### Secretary's Moratorium: Violation of the APA for Agency Action Unlawfully Withheld or Unreasonably Delayed

134.     Plaintiffs hereby incorporate and restate all preceding paragraphs.

135.     A "reviewing court shall [] compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

136.     In issuing the Moratorium, the Secretary has unreasonably and unlawfully withheld and delayed the issuance of leases, rights-of-way, and easements for the exploration, development, production, and transportation necessary to carry out Section 20001 of the 2017 Tax Act.

137.     DOI has stated that the Moratorium will remain in place until the supplemental environmental review process is complete, which BLM estimates will take well over a year.  Thus, the Moratorium is scheduled to remain in effect for an indefinite period that will run well past Congress's deadline of December 22, 2021, to conduct the first lease sale on the Coastal Plain.

138.     This Court should invalidate the Moratorium as an unlawful withholding and unreasonable delay of congressionally mandated action.

Case 3:21-cv-00245-SLG   Document 7   Filed 12/08/21   Page 30 of 35

**COUNT FIVE**
**DOI's Actions Implementing the Secretary's Moratorium: Violation of the APA for Agency Action Unlawfully Withheld or Unreasonably Delayed**

139.     Plaintiffs hereby incorporate and restate all preceding paragraphs.

140.     Acting in reliance on the Secretarial Order, DOI (including BLM) has unlawfully and unreasonably withheld and delayed the issuance of leases, rights-of-way, and easements for the exploration, development, production, and transportation necessary to carry out Section 20001 of the 2017 Tax Act.

141.     DOI's SOP, which expressly suspends the existing Coastal Plain leases, is scheduled to remain in effect well past Congress's December 22, 2021 deadline to conduct the first Coastal Plain lease sale.

142.     This Court should invalidate DOI's (including BLM's) actions in furtherance of the Moratorium, including the SOP and the categorical refusal to process AIDEA's contractors' applications, as an unlawful withholding and unreasonable delay of congressionally mandated action.

**COUNT SIX**
**Secretary's Moratorium: Violation of the Administrative Procedure Act for Arbitrary and Capricious Action**

143.     Plaintiffs hereby incorporate and restate all preceding paragraphs.

144.     In prior litigation, Defendants took the position that the environmental review process for the Leasing Program satisfied the requirements of NEPA.

145.     The Moratorium is based on the Secretary's conclusion that the Leasing Program environmental review is marked by legal deficiencies that violate NEPA.  Thus, the Moratorium constitutes a reversal of the position DOI has previously taken.

146.    DOI has failed to articulate any basis for reversing its prior finding that the Leasing Program environmental review was fully compliant with the law.  Instead, DOI's reversal appears to be the direct result of the President's unlawful instructions in Executive Order 13990.  As a result, DOI's reversal in position is arbitrary and capricious.

147.    The Secretary's vague reference to alleged "deficiencies" in the original environmental review process does not identify any basis for reversing DOI's prior findings and provides no reasoned basis for agency action.  For these additional reasons, DOI's reversal in position is arbitrary and capricious.

148.    As a result of such arbitrary and capricious action, the Secretary's Moratorium should be vacated and enjoined.

## COUNT SEVEN
### EXECUTIVE ORDER 13990: ULTRA VIRES ACTION BEYOND THE AUTHORITY CONFERRED BY CONGRESS

149.    Plaintiffs hereby incorporate and restate all preceding paragraphs.

150.    Through Section 4(a) of Executive Order 13990, the President directed the Secretary of the Interior to "place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program."

151.    No act of Congress authorizes the President to unilaterally impose a moratorium, or to direct federal agencies to impose a moratorium, on all federal approvals of oil and gas operations on the Coastal Plain.  In fact, the Moratorium—demanded by Executive Order 13990 and issued by the Secretary—directly contravenes Congress's mandate to conduct lease sales, including one by December 22, 2021, and to issue "any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary."  PL 115-

97, § 20001(c)(2).  As a result, Section 4(a) of Executive Order 13990 is ultra vires as it is beyond the President's authority and should be set aside as unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue:

a.      A declaratory judgment holding that Section 4(a) of Executive Order 13990 is ultra vires;

b.      A declaratory judgment holding that the Moratorium issued by the Secretary is procedurally invalid under the APA because the Secretary failed to promulgate the Moratorium pursuant to the APA's notice-and-comment requirements;

c.      A declaratory judgment holding that the Moratorium is contrary to ANILCA and the 2017 Tax Act;

d.      A declaratory judgment holding that the Moratorium constitutes an unlawful withholding and unreasonable delay of agency action, in violation of the APA, ANILCA, and the 2017 Tax Act;

e.      A declaratory judgment holding that the Moratorium is arbitrary and capricious under the APA;

f.      A declaratory judgment holding that DOI's (including BLM's) actions in furtherance of the Moratorium are contrary to ANILCA and the 2017 Tax Act;

g.      A declaratory judgment holding that DOI's (including BLM's) actions in furtherance of the Moratorium constitute an unlawful withholding and unreasonable delay of agency action, in violation of the APA, ANILCA, and the 2017 Tax Act;

h.      A permanent injunction vacating Section 4(a) of Executive Order 13990;

i.      A permanent injunction vacating the Moratorium;

j.      A permanent injunction vacating DOI's (including BLM's) actions in furtherance of the Moratorium, including the SOP and the categorical refusal to process AIDEA's contractors' applications;

k.      A permanent injunction prohibiting Defendants from taking any actions based on Section 4(a) of Executive Order 13990, the Moratorium, or the SOP;

l.      An order compelling Defendants to proceed with leasing and development as prescribed by Congress in ANILCA and the 2017 Tax Act;

m.      All other relief to which Plaintiffs are entitled, including but not limited to attorneys' fees and costs.

Dated this 8th day of December, 2021

HOLLAND & HART LLP
Attorneys for Alaska Industrial Development
and Export Authority, North Slope Borough and
Arctic Slope Regional Corporation

 /s/ Kyle W. Parker
Kyle W. Parker, ABA No. 9212124
William G. Cason, Alaska Bar No. 2009083
1029 W. 3rd Avenue, Suite 550
Anchorage, Alaska 99501
Telephone:     (907) 865-2600
Facsimile:      (907) 865-2680
kwparker@hollandhart.com
wgcason@hollandhart.com

## CERTIFICATE OF SERVICE

I hereby certify on December 8, 2021, I caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification and electronic service of the same to all counsel of record.

HOLLAND & HART LLP

*/s/ Kyle W. Parker*
