TREG R. TAYLOR
ATTORNEY GENERAL
Ronald W. Opsahl (Alaska Bar No. 2108081)
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Fax: (907) 276-3697
Email: ron.opsahl@alaska.gov

Kathleen C. Schroder (*pro hac vice*)
Gail L. Wurtzler (*pro hac vice*)
Mark E. Champoux (*pro hac vice*)
Davis Graham & Stubbs LLP
1550 Seventeenth St., Suite 500
Denver, CO 80202
Telephone: (303) 892-9400
Fax: (303) 893-1379
Email: katie.schroder@dgslaw.com
        gail.wurtzler@dgslaw.com
        mark.champoux@dgslaw.com

*Attorneys for the State of Alaska*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY, *et al.*, | ) ) ) | Case No. 3:21-cv-00245-SLG |
| Plaintiffs, | ) ) | **STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT** |
| and | ) ) | |
| STATE OF ALASKA, | ) | |
| Intervenor-Plaintiff, | ) ) | |
| v. | ) ) | |
| JOSEPH R. BIDEN, JR. *et al.*, | ) ) | |
| Defendants. | ) ) | |

*AIDEA, et al. v. Biden, et al.*                    Case No. 3:21-cv-00245-SLG
STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT              Page 1 of 37
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 1 of 37

Pursuant to Federal Rule of Civil Procedure 56, Intervenor-Plaintiff State of Alaska (the "State") hereby moves for summary judgment on each of its claims against the Federal Defendants.

## INTRODUCTION

This case addresses whether and to what extent the President and his federal agency appointees can, upon changing of political administrations, abruptly suspend, rescind, or otherwise disregard final agency actions and decisions that, prior to the change in leadership, had been fully developed and issued pursuant to express Congressional direction and in accordance with all necessary processes. It is far from the first case to raise this issue, and the established case precedents show a steep hill to climb for any administration attempting to suddenly reverse course on already-binding final agency actions.[1]

The context for that question in this case centers on lands within the State of Alaska. In its 1980 legislation establishing the 19 million-acre Arctic National Wildlife Refuge ("ANWR"), Congress expressly reserved for itself the question of whether oil and gas development should occur in one particular section of ANWR, designated as the Coastal Plain. After years of study and debate, Congress affirmatively decided that question in

---

[1] *See, e.g.*, *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, __ U.S. __, 140 S.Ct. 1891 (2020) (vacating agency rescission of Deferred Action for Childhood Arrivals immigration program); *California v. Bernhardt*, 472 F. Supp. 3d 573 (N.D. Cal. 2020) (vacating rule that replaced 2016 rule governing prevention of waste from federal oil and gas leases); *League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013 (D. Alaska 2019) (vacating portion of executive order revoking withdrawals of land from disposition under the Outer Continental Shelf Lands Act).

*AIDEA, et al. v. Biden, et al.*  Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT** Page 2 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 2 of 37

2017 when it directed the Department of Interior ("DOI") to establish an oil and gas leasing program in the Coastal Plain and proceed with an initial lease sale by December 22, 2021. Following these statutory orders, DOI undertook a multi-year process in compliance with applicable federal statutes to evaluate environmental impacts, receive and address public input, and otherwise determine the specifics of the Coastal Plain leasing program consistent with Congress's directives. That process culminated in a 2020 Record of Decision ("ROD")—announced by DOI as its "final decision"—that determined the scope of the leasing program and explained the decision in light of the assessment of potential environmental impacts. DOI subsequently moved forward and conducted its first Coastal Plain lease sale on January 6, 2021, as required by Congress.

Just two weeks later and within hours after being inaugurated, President Biden issued an executive order directing DOI to institute a "moratorium" on all activities relating to the Coastal Plain program. DOI and the Bureau of Land Management ("BLM") did just that, issuing orders that halted all activities related to the leasing program and stating that additional environmental analysis would determine the fate of the existing leases, including whether they should be voided. In effect, DOI and BLM accomplished the President's desired moratorium by suspending and disregarding the ROD indefinitely.

These actions constitute an egregious abuse of authority by the executive branch and a defiance of Congressional mandates. Federal agencies exist to implement and execute laws as dictated by Congress, not to assist a President in delivering on campaign promises that contradict express legislative direction. Many of the numerous reasons why the moratorium is unlawful are discussed in the Motion for Summary Judgment filed by

*AIDEA, et al. v. Biden, et al.*                    Case No. 3:21-cv-00245-SLG
STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT          Page 3 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 3 of 37

Plaintiffs Alaska Industrial Development and Export Authority ("AIDEA"), North Slope Borough, Arctic Slope Regional Corporation ("ASRC"), and Kaktovik Iñupiat Corporation ("KIC") ("Lessee Plaintiffs' Motion"). The State agrees with and adopts by reference those arguments but, in the interest of avoiding duplicative briefing, does not repeat them in this Motion. Instead, the present Motion focuses on why the moratorium, as a final agency action, should be set aside under the Administrative Procedure Act ("APA") as arbitrary and capricious, not in accordance with the law, or otherwise in excess of statutory authority. In short, the moratorium violates the APA because (a) it disregards and seeks to rescind a ROD without any statutory authority to do so; (b) its purported purpose of considering whether to cancel already-issued leases is legally invalid; and (c) its proffered justifications are entirely unsupported and also inconsistent with DOI's prior findings and decisions.

Accordingly, for the reasons set forth herein, the Court should grant the State's motion for summary judgment, declare the moratorium unlawful, enjoin Defendants from further implementation of the moratorium, and direct Defendants to resume all activities necessary for the continuation of the Coastal Plain oil and gas leasing program as required by Congress.

## **BACKGROUND**

### I.     **History of Oil and Gas Development in the Arctic National Wildlife Refuge**

The Arctic National Wildlife Range was established in 1960 by Public Land Order 2214. In the 1980 Alaska National Interest Lands Conservation Act ("ANILCA"), Congress renamed the range as the Arctic National Wildlife Refuge ("ANWR"), expanded its borders, and designated portions of ANWR as wilderness. Congress, however, excluded

from this wilderness designation an approximately 1.56 million-acre area on Alaska's northern coast that had the greatest potential for hydrocarbon exploration and development. For this area, known as the "Coastal Plain" or "Section 1002 Area," Congress expressly reserved to itself the decision whether to allow oil and gas leasing and production. 16 U.S.C. §§ 3142, 3143 (ANILCA § 1002, 1003). Congress directed the study of the Coastal Plain's resources and preparation of a report with the Secretary of the Interior's (the "Secretary") recommendations regarding "further exploration for, and the development and production of, oil and gas within the coastal plain."[2] *Id.* § 3142(c) & (h)(6). Under ANILCA's terms, however, oil and gas leasing in the Coastal Plain was prohibited until authorized by a subsequent act of Congress. *Id.* § 3143.

This prohibition lasted for more than 35 years, until 2017, when Congress expressly ordered DOI to initiate an oil and gas leasing and development program in the Coastal Plain. Specifically, as part of the Tax Cuts and Jobs Act, Pub. L. 115-97, Congress directed that "[t]he Secretary shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." Tax Cuts and Jobs Act § 20001(b)(2)(A) ("Tax Act"), Pub. L. No. 115-97, 131 Stat. 2054, 2235–37 (2017). Congress further directed the Secretary to conduct at least two lease sales of at least 400,000 acres each, the first to occur no later than December 22,

---

[2] DOI completed this report in 1987 and recommended energy development. *See* DOI, Fish and Wildlife Service, Geological Survey, and BLM, *Arctic National Wildlife Refuge, Alaska, Coastal Plain Resource Assessment*, Report and Recommendation to the Congress of the United States and Final Legislative Environmental Impact Statement (1987).

*AIDEA, et al. v. Biden, et al.*                                    Case No. 3:21-cv-00245-SLG
STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT                        Page 5 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 5 of 37

2021 and the second no later than December 22, 2024. *Id.* § 20001(c)(1). The Coastal Plain Oil and Gas Leasing Program (the "Program" or "Leasing Program") is to be administered "in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976." *Id.* § 20001(c)(3). The Tax Act entitles the State to receive fifty percent of all bonus, rental, and royalty receipts derived from the Program. *Id.* § 20001(b)(5)(A).

## II.     Environmental Review of the Leasing Program

As a result of the Tax Act, DOI, through BLM, initiated a robust environmental review of the Program in accordance with the National Environmental Policy Act ("NEPA"). 83 Fed. Reg. 17,562 (Apr. 20, 2018) (Notice of Intent To Prepare an Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program, Alaska). BLM held an initial 60-day scoping period during which it received public comment. In December 2018, BLM published a Draft Environmental Impact Statement ("DEIS") and held a 75-day comment period on it. AR0028. During the scoping and public comment periods, BLM received over 1.8 million public comments on more than 8,000 topics. AR3147. BLM held public meetings to receive comments in Anchorage, Arctic Village, Fairbanks, Fort Yukon, Kaktovik, Utqiagvik, Venetie, and Washington, DC. AR0028. BLM responded to all substantive written comments submitted during the public comment period. *See* AR1036–AR1869; AR1870–AR3134. BLM also coordinated and cooperated with a broad range of stakeholders, including local and state governments, tribes, the Canadian government, Alaska Native corporations, and industry and environmental organizations. AR3147.

*AIDEA, et al. v. Biden, et al.*                                          Case No. 3:21-cv-00245-SLG
STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT                              Page 6 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 6 of 37

In September 2019, BLM issued a Final Environmental Impact Statement ("FEIS") for the Program. AR0001–AR0515. The FEIS analyzed in detail four alternative courses of action, including a no-action alternative. AR3156. The alternatives focused on (i) which areas of the Coastal Plain BLM would make available for oil and gas leasing, and (ii) what terms and conditions BLM would apply to avoid, minimize, and mitigate potential adverse environmental impacts. AR3156. In the FEIS, BLM also adjusted its analysis specifically to address comments received and other stakeholder feedback.

Nearly a year after issuance of the FEIS, in August 2020, BLM completed its environmental review of the Program by issuing a ROD that approved the Program and responded to comments received on the FEIS. AR3138–AR3225. In the ROD, DOI elected to make the entire Program area available for leasing, subject to stipulations and required operating procedures that will be applied to all future activities authorized by BLM within the Coastal Plain.[3] AR3147; AR3189. Secretary David Bernhardt signed the ROD as the final decision of DOI. AR3140.

---

[3] The ROD stated that "making all of the 'program area' available for leasing provides maximum flexibility for future decision-making and innovation for project proposals by potential lessees" and further explained that "[u]ntil exploration drilling occurs, the BLM cannot reasonably foresee which areas of the Coastal Plain have the highest prospects for oil and gas discoveries." AR3160. The ROD further stated that "given the limited geophysical information that currently exists for the Coastal Plain, making the entire program area available for leasing ensures that the areas having the highest potential for the discovery of oil and gas can be prioritized for offering in the first two lease sales, as required by Section 20001(c)(1)(B)(i)(II) of PL 115-97." AR3160.

*AIDEA, et al. v. Biden, et al.*                                    Case No. 3:21-cv-00245-SLG
STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT                      Page 7 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 7 of 37

## III.    The Coastal Plain Lease Sale

On December 7, 2020, BLM published a notice of competitive sale for oil and gas leases on the Coastal Plain. AR3227–AR3228. Shortly thereafter, a coalition of citizen groups sought a temporary restraining order and preliminary injunction to prevent DOI from relying on the FEIS and ROD to issue the leases. *See* Mot. for TRO and Prelim. Inj. (ECF No. 47), *Gwich'in Steering Comm. v. Bernhardt*, No. 3:20-cv-00204-SLG (D. Alaska filed Dec. 15, 2020). The United States defended the adequacy of the FEIS and ROD and the propriety of issuing the leases. Federal Defs.' Combined Mem. in Opp'n to Pls.' Mots. for Prelim. Inj. (ECF No. 59), *Gwich'in Steering Comm.*, No. 3:20-cv-00204-SLG (D. Alaska filed Dec. 30, 2020). This Court denied the motion after finding that the plaintiffs did not establish they were likely to suffer imminent irreparable harm absent a preliminary injunction. *Gwich'in Steering Comm.*, No. 3:20-cv-00204-SLG, 2021 WL 46703 (D. Alaska Jan. 5, 2021).

BLM then conducted its first Coastal Plain lease sale on January 6, 2021. AR3314–AR3316. AIDEA was one of the successful bidders, securing lease agreements for seven tracts with BLM totaling 365,755 acres within the Coastal Plain for an initial lease term of 10 years, effective January 1, 2021, for approximately $14.4 million in bonus bids. AR3315. The State was entitled to 50 percent of these bonus bids ($7.2 million).

*AIDEA, et al. v. Biden, et al.*                                    Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**                          Page 8 of 35

Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 8 of 37

Additionally, the State was entitled to 50 percent of the first year's rentals totaling approximately $5.5 million ($2.75 million).[4] *Id.*

## IV. The Moratorium on Implementing the Program

### A. Executive Order 13990

On January 20, 2021, inauguration day, President Biden issued Executive Order 13990 (the "Executive Order"), titled "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis." AR3349–AR3355. Section 4(a) of the Executive Order directed the Secretary to "place a temporary moratorium on all activities" relating to the implementation of the Program. AR3351. As a purported basis for this moratorium, the Executive Order alleged unspecified "legal deficiencies" underlying the program, including the "inadequacy of the environmental review." *Id.* The Executive Order further directed the Secretary to review the Leasing Program and "conduct a new, comprehensive analysis" of its potential environmental impacts. *Id.* In essence, as relevant here, the Executive Order suspended the Program and required completion of a Supplemental Environmental Impact Statement ("SEIS").

---

[4] Under the terms of oil and gas leases, rentals are due annually prior to discovery of oil or gas on the lease. *See generally* 43 C.F.R. § 3133.1; AR3321. First year's rentals must be paid before BLM will issue a lease. *Id.* § 3132.3. Annual rentals for the Coastal Plains leases are $10 per acre. AR3232. Once the lessee achieves production in paying quantities, royalties are due on such production. 43 C.F.R. §§ 3133.1, 3133.2.

*AIDEA, et al. v. Biden, et al.*                                    Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**                    Page 9 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 9 of 37

### B. The Administrative Response to the Executive Order

#### 1. Secretarial Order 3401

On June 1, 2021, in response to the Executive Order, the Secretary issued Secretarial Order 3401 (the "Secretarial Order") halting "all [a]ctivities in the Arctic National Wildlife Refuge Relating to the Coastal Plain Oil and Gas Leasing Program." AR3362–AR3363. The Secretarial Order directed BLM and the U.S. Fish and Wildlife Service ("USFWS") to "not take any action to authorize any aspect of the Program," including but not limited to leasing, exploration, development, production, and transportation, as well as processing any pending or future applications for such activities until a new "comprehensive analysis of the potential environmental impacts" was completed. AR3363; AR3362. The Secretarial Order further required BLM to "take appropriate action with respect to existing leases in light of the direction provided herein." AR3363.

As justification for these directions, the Secretary explained that, following an unspecified "review" of the Coastal Plain Leasing Program as directed by the Executive Order, she "identified multiple legal deficiencies . . . including, but not limited to: (1) insufficient analysis under [NEPA], including failure to adequately analyze a reasonable range of alternatives in the environmental impact statement (EIS); and (2) failure in the [ROD] to properly interpret Section 20001 of [the Tax Act]." AR3362.

#### 2. Suspension of Operations and Production for the Leases

On the same day that the Secretary released the Secretarial Order, DOI's Principal Deputy Assistant Secretary, Land and Minerals Management, issued a notice to leaseholders of a Suspension of Operations and Production (the "Suspension") of the

*AIDEA, et al. v. Biden, et al.*                                    Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**      Page 10 of 35

Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 10 of 37

leases. AR3364–AR3365. The Suspension took effect that day and required that "[w]hile this [Suspension] is in place, no lease operations may transpire on the leases, the terms of the leases are tolled, and lease rentals are suspended." AR3365.

In addition to suspending the leases, the Suspension made three significant announcements. First, the Suspension stated that the additional environmental analysis would "determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures." AR3365.

Second, the Suspension provided slightly more explanation of the perceived legal deficiencies identified in the Secretarial Order. AR3365. The Suspension stated that the BLM had not adequately analyzed a reasonable range of alternatives in the FEIS because "it did not analyze an alternative, besides the no action alternative, that involved fewer than 2,000 acres of surface development." *Id.* The Suspension further argued that the BLM had defined this range of alternatives based on an erroneous reading of the Tax Act:

> The Tax Act provides for authorization of up to 2,000 acres to be covered by "production and support facilities." However, inclusion of the phrase "up to" indicates that less than 2,000 acres may be authorized in appropriate circumstances, such as for alternatives that make large areas unavailable for leasing or surface development and thus may require fewer production and support facilities. The explanation in the ROD for not considering such an alternative – that the Tax Act provides a mandate to the BLM requiring it to approve production and support facilities up to that limit – is both implausible and contrary to Congressional intent, which is itself a legal error.

*Id.*

Finally, in addition to the perceived legal deficiencies identified in the Secretarial Order, the Suspension observed that DOI had "identified several areas for which additional analysis may either address a potential legal defect or, at a minimum, serve NEPA's

*AIDEA, et al. v. Biden, et al.*                                      Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**                     Page 11 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 11 of 37

purpose to meaningfully inform the decisionmaker as to the environmental consequences of federal action." AR3364. The areas included the FEIS's treatment of foreign greenhouse gas ("GHG") emissions and compliance with section 810 of the Alaska National Interest Lands Conservation Act ("ANILCA"). *Id.*

On August 19, 2022, months after the initiation of this lawsuit and more than a year after issuance of the Suspension, the Department issued an "Addendum to Suspension of Operations and Production" (the "Suspension Addendum"). *See* AR3404. The Suspension Addendum did not alter the terms of the Suspension but belatedly attempted to provide additional justification for it. The Suspension Addendum cited an August 18, 2021 decision of this Court finding that, in approving another oil and gas project not related to the Leasing Program, BLM improperly excluded foreign greenhouse gas emissions from its alternatives analysis in the environmental impact statement ("EIS") for that project.[5] *Id.* The Department explained that because "BLM also excluded foreign GHG emissions from its analysis of alternatives in the Coastal Plain EIS," this exclusion constitutes "an additional specific legal defect" that justified the Suspension. *See id.*

### 3. Cessation of Further Permitting

In August 2021, BLM advised AIDEA's contractor that BLM would delay the processing of permit applications to conduct archaeological surveys on Coastal Plain leases until the SEIS process was complete. AR3395–AR3396. BLM cited the direction in the

---

[5] Though not referenced by name or citation, the decision is *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*, 555 F. Supp. 3d 739 (D. Alaska 2021).

Secretarial Order that it "not take any action to authorize any aspect of the Program . . . and shall not process any pending or future applications for such activities." AR3395 (quoting AR3363). The Department also declined to process Plaintiff KIC's applications and Plan of Operations for a seismic permit and associated incidental harassment authorization on the same basis. *See* AR3718.

Collectively, the directives in Section 4(a) of the Executive Order and the Secretarial Order, and the actions taken in response, including the Suspension and BLM's cessation of all permitting in furtherance of lease development, constitute a moratorium (the "Moratorium").

### C. BLM's Supplemental Environmental Review of the Program

On August 4, 2021, BLM published a notice of intent to prepare an SEIS for the Leasing Program. AR3368–AR3369. The notice effectively suspended and rescinded the existing ROD and provided that a new ROD "selecting a program alternative from the Final Supplemental SEIS" would be issued no sooner than 30 days after issuance of the Final SEIS. AR3368–AR3369.

BLM opened a scoping comment period from August 4, 2021 to October 4, 2021 following publication of a notice of intent for the SEIS. AR3368. BLM anticipated releasing a Draft SEIS within 10 months and a Final SEIS within 18 months of the scoping notice. AR 3369; Joint Status Report and Defs.' and Ps.' Unopposed Mot. to Extend Stay, ECF No. 76, *Gwich'in Steering Comm. v. Haaland*, No. 3:20-cv-00204-SLG (D. Alaska filed Sept. 9, 2021). BLM has twice revised its anticipated timeline, once in July 2022 and again in November 2022. *See* Defs.' Status Reports on Issuance of Draft Supplemental

*AIDEA, et al. v. Biden, et al.*                                    Case No. 3:21-cv-00245-SLG
STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT                          Page 13 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 13 of 37

Environmental Impact Statement, ECF Nos. 89 and 120, *Gwich'in Steering Comm.*, No. 3:20-cv-00204-SLG (filed July 1, 2022 and Nov. 30, 2022). BLM now expects to release a Draft SEIS sometime in the second quarter of 2023, more than 20 months after the scoping notice. *See* Defs.' Status Report on Issuance of Draft Supplemental Environmental Impact Statement at 2, ECF No. 120, *Gwich'in Steering Comm.*, 3:20-cv-00204-SLG (filed Nov. 30, 2022). If the Final SEIS is correspondingly delayed, BLM would release it no sooner than December 2023, more than two years after the notice of intent to prepare the SEIS. A new ROD announcing a decision regarding the Leasing Program will then be issued at least 30 days following the release of the Final SEIS.

### D. The Moratorium's Effect on the State

The Moratorium has directly harmed the State and its people. The State is currently unable to earn revenue from annual rentals and royalties that would otherwise flow from the leases. *See* Tax Act § 20001(b)(5) (requiring that 50 percent of royalty receipts from the Leasing Program be paid to the State); *cf.* AR3365 ("While this [suspension] is in place, . . . lease rentals are suspended."); Ex. A, Decl. of Vasilios Gialopsos in Supp. of Intervenor-P. State of Alaska's Mot. for Summ. J. p. 2 ¶ 3 ("Gialopsos Decl."). The FEIS estimates that somewhere between one-and-a-half to ten billion barrels of oil could be produced from the Coastal Plain. AR0125. Thus, oil and gas development in the Coastal Plain could generate billions of dollars in direct revenue for the State of Alaska, including from both lease sales and royalties on oil and gas produced. Gialopsos Decl. p. 2 ¶ 2.

The Moratorium also prevents the State from enjoying additional benefits of development of the leases, such as revenue from the economic activity that the Leasing

*AIDEA, et al. v. Biden, et al.*                                      Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**                      Page 14 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 14 of 37

Program would generate. Gialopsos Decl. p. 2 ¶ 5. This economic activity includes increased employment and increased contracting for labor, materials, and equipment; this activity yields increased revenue through corporate income taxes and local taxes. *Id.* p. 2 ¶ 4. The State is unable to use this revenue for various purposes that benefit Alaskans, including the protection of Alaskan wildlife and natural resources. *Id.* p. 3 ¶ 6. In addition, the people of the Alaska are harmed by the Moratorium in numerous ways, including through the loss of employment opportunities, such as well-paying construction and permanent jobs, and economic activity that the Leasing Program would generate. *Id.* p. 3 ¶ 7.

## STANDARD OF REVIEW

The State challenges the Moratorium pursuant to the APA. Among other things, the APA requires a reviewing court to hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations . . . .". 5 U.S.C. § 706(2)(A) & (C). Agency action is arbitrary and capricious if it:

> relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it c[an]not be ascribed to a difference in view or the product of agency expertise.

*Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1034 (9th Cir. 2019) (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

*AIDEA, et al. v. Biden, et al.*                     Case No. 3:21-cv-00245-SLG
STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT                     Page 15 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 15 of 37

## JURISDICTION OVER THE STATE'S CLAIMS

The State's challenge to the Moratorium is properly before the Court. First, the State has standing to challenge the Moratorium. Second, the Court has jurisdiction over the State's challenge because the Moratorium is reviewable under the APA.

## I. The State Has Standing to Challenge the Moratorium.

The State satisfies the threshold requirement that it have standing to challenge the Moratorium. "[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560-61; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)). The State meets each of these three elements.

First, the State has suffered, and continues to suffer, an injury in fact because the State is not receiving any revenue from the Coastal Plain leases. The Supreme Court and U.S. Court of Appeals for the Ninth Circuit have recognized that lost royalty revenue from oil and gas leasing constitutes injury in fact for purposes of standing. *Watt v. Energy Action Educ. Found.*, 454 U.S.151, 160–61 (1981); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015). The Tax Act entitles the State to 50 percent of rental and royalty receipts from the Leasing Program. Tax Act § 20001(b)(5). The Suspension, however, halted the obligation for lessees to pay annual rentals on the leases. AR3365 ("While this [suspension] is in place, . . . lease rentals are suspended."). Additionally, by

*AIDEA, et al. v. Biden, et al.*                    Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**              Page 16 of 35

Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 16 of 37

preventing preparatory work from occurring on the leases, the Moratorium delays royalty revenue the State will receive once the leases are producing.

The State also suffers injury in fact through lost tax revenue from the economic activity that the Leasing Program would generate. Loss of tax revenue constitutes injury in fact for purpose of standing. *E.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 447 (1992) (holding that the loss of specific tax revenues conferred standing); *City of Oakland v. Lynch*, 798 F.3d 1159, 1163-64 (9th Cir. 2015) (recognizing that an expected loss of tax revenues constitutes a "constitutionally sufficient" injury for purposes of standing). Development under the Leasing Program results in economic activity that generates corporate tax revenue for the State. No corporate revenue can be derived from the Leasing Program, however, because the Moratorium prevents any activity—no matter how preliminary—from occurring under the Program. *See* AR3395 (refusing to process application to conduct archeological surveys); AR3399–AR3400 (denying requests for pre-application meetings). The State cannot use this tax revenue for purposes that benefit Alaskans, including the protection of Alaskan wildlife and natural resources. For these reasons, the State satisfies the requirement that it suffer injury in fact.

Second, the State's injuries are "fairly traceable to the challenged conduct" and "likely to be redressed by a favorable judicial decision." The lack of revenue from the leases, and tax revenue from development of the Leasing Program, are the direct result of the Moratorium. *See* AR3364 (citing Moratorium as basis for Suspension); AR3395 (citing Secretarial Order as requiring BLM to cease processing application to conduct archeological surveys); AR3399–AR3400 (citing Suspension as basis for denying request

*AIDEA, et al. v. Biden, et al.*                                   Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**                    Page 17 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 17 of 37

for pre-application meetings). But a decision setting aside the Moratorium would redress the State's injuries. If this Court sets aside the Moratorium, the Suspension will be lifted and annual rentals will again be due under the leases. *See* AR3312 ("Rentals must be paid to the proper office of lessor in advance of each lease year."). Similarly, if this Court sets aside the Moratorium, BLM can allow archaeological surveys and other preparatory work to proceed. *See* AR3395; AR3400. Because the State's injuries are "fairly traceable to the challenged conduct" and "likely to be redressed by a favorable judicial decision," the State has standing to challenge the Moratorium.

## II.     The Moratorium Is Reviewable under the APA.

The Court has jurisdiction over the State's challenge to the Moratorium because the Moratorium is a final agency action that is reviewable under the APA. The APA "provides a right to judicial review of all 'final agency action.'" *Bennett v. Spear*, 520 U.S. 154, 175 (1997); *accord* 5 U.S.C. § 702. Two conditions must be met for agency action to be final: (1) the action must "mark the 'consummation' of the agency's decisionmaking process," and (2) the action must be one by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178. The Moratorium satisfies both conditions.

First, the Moratorium marks the consummation of the administrative decisionmaking process. Although both the Executive Order and Secretarial Order refer to the Moratorium as "temporary," this characterization does not determine whether the agency action is final. Interim agency action "counts as consummation of agency decisionmaking for finality purposes" where it "firmly establishes [the agency's] *current*

*AIDEA, et al. v. Biden, et al.*                                          Case No. 3:21-cv-00245-SLG
STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT                     Page 18 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 18 of 37

position." *NRDC v. Wheeler*, 955 F.3d 68, 79 (D.C. Cir. 2020) (emphasis added). More specifically, an agency statement announcing a moratorium on oil and gas operations, temporary by its very definition, constitutes the consummation of agency decision-making. *Minard Run Oil Co. v. United States Forest Serv.*, 670 F.3d 236, 248 (3rd Cir. 2011) (finding that the U.S. Forest Service's announcement of a moratorium on new drilling operations in a national forest pending further environmental review was the consummation of agency decision-making, and ultimately final agency action).

Second, legal consequences flow the Moratorium. The Moratorium suspends and rescinds the effectiveness of the ROD and the leases, which are valid agency decisions. In this sense, the Moratorium does not differ from the agency actions that initially gave legal effect to the ROD and leases—i.e., the Secretary's approval of the ROD and DOI's issuance of the leases. Moreover, the Moratorium has significant legal consequences for both lessees, like AIDEA, and third-party beneficiaries of the leases, like the State. The Moratorium prevents AIDEA from developing its leases and denies the State the revenue and economic stimulus which would flow from the Leasing Program. Therefore, the Moratorium is a final agency action and reviewable under the APA. For these reasons, the State's challenge to the Moratorium is properly before this Court.

## ARGUMENT

The Moratorium reflects a view of federal agencies as mere tools in the hands of changing presidential administrations to implement at will any preferred policies regardless of, or even in opposition to, existing law that was implemented pursuant to Congressional direction. That view is inconsistent with federal law. Federal agencies are created by

*AIDEA, et al. v. Biden, et al.*                    Case No. 3:21-cv-00245-SLG
STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT                    Page 19 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 19 of 37

Congress to implement and enforce laws enacted by Congress. When agencies themselves make policy decisions, they do so pursuant to express limited authorizations by Congress and must follow a process that Congress set forth in the APA. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 46–57 (1983).

The decisionmaking that comprised the Moratorium violated the APA in multiple, independent ways. First, the Moratorium functionally rejects and suspends a final agency action—the ROD—that is binding on the Federal Defendants unless and until they amend or replace the ROD subject to appropriate statutory authorization and through all required processes, which the Federal Defendants have not done. Second, the core purpose of the Moratorium—to consider cancelling already-issued leases—is a legally invalid course of action for DOI. Finally, the Moratorium's proffered justifications lack any record or factual support and contradict DOI's and BLM's prior factual findings and decisionmaking as well as their attorneys' representations before this Court. For any and all of these reasons, the Moratorium must be set aside.

## I.    The Moratorium's Abrupt Rejection and Suspension of the ROD Is Arbitrary and Capricious and in Excess of DOI's Statutory Authority.

At the outset, the Moratorium violates the APA because it functionally rejects, suspends, and even rescinds the ROD—a valid, final agency decision issued in accordance with NEPA and the APA—and does so without any independent lawful authorization nor with any process that would otherwise be required for such an action. An agency cannot simply abandon an otherwise valid decision.

*AIDEA, et al. v. Biden, et al.*                                    Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**                   Page 20 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 20 of 37

A ROD is a final agency action under the APA. *See Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1118 (9th Cir. 2010) ("Once an EIS's analysis has been solidified in a ROD, an agency has taken final agency action, reviewable under § 706(2)(A)."); *accord* AR3140 (stating that approval of the ROD "constitutes the final decision of the Department of the Interior"). Once this final decision is issued, agencies are bound by the ROD and must implement the actions set forth therein. "Pursuant to generally recognized principles of federal administrative law, agencies will be held accountable for . . . carrying out the actions set forth in the Records of Decision." Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18037 (March 23, 1981) (Question 34d). "This is based on the principle that an agency must comply with its own decisions and regulations once they are adopted." *Id.*; *see also Lee v. U.S. Air Force*, 220 F. Supp. 2d 1229, 1236 (D.N.M. 2002) (observing that agencies are "legally bound by the Record of Decision . . . .").

For DOI or BLM to ignore, suspend, or rescind the ROD rather than comply with it, the agency must have a separate legal basis for doing so and must have followed any processes required under that separate legal basis. *See, e.g.*, *Washington v. United States Dep't of State*, 996 F.3d 552, 564 (9th Cir. 2021) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)); *Michigan v. Envtl. Prot. Agency*, 268 F.3d 1075, 1081 ("[A] federal agency [is] a creature of statute" with "no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress."). But BLM and DOI had no such authority here.

*AIDEA, et al. v. Biden, et al.*                     Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**                     Page 21 of 35

Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 21 of 37

For example, the APA does not provide authority for a binding, final agency decision to be suddenly revoked or suspended. Instead, the APA only allows an agency to postpone the effective date of its decision, rather than suspend a decision that already took effect. *See* 5 U.S.C. § 705 (allowing agencies to postpone the effective date of an action subject to judicial review). The APA also provides a process for agencies to adopt or modify rules pursuant to Congressional authorization, *see* 5 U.S.C. § 553, but even if the Moratorium could somehow be characterized as a rule promulgated pursuant to appropriate statutory authority, the agencies did not engage in required notice and comment processes (as discussed in more detail in Lessee Plaintiffs' Motion for Summary Judgment).

Likewise, NEPA provides no basis for a ROD to be suddenly suspended or rescinded. *See generally* 42 U.S.C. § 4332(C). Instead, NEPA's implementing regulations set out a detailed and extensive process involving input by the public and other stakeholders and culminating in a ROD. *See* 40 C.F.R. §§ 1501–06. Although that process can be used to modify or replace an existing ROD, and although DOI purports to be engaging in such a process now, the Moratorium was decided and implemented without following any such process.

Thus, under the APA and NEPA, the Federal Defendants are bound—just as nonfederal parties are bound—by the ROD that resulted from a multi-year process conducted pursuant to, and in compliance with, DOI's statutory authorities. Those authorities provide no basis for a unilateral rejection and rescission of the ROD. As such, the Moratorium is not only arbitrary and capricious but also constitutes agency action "in excess of statutory . . . authority," in violation of the APA. 5 U.S.C. § 706(2)(C); *see*

*AIDEA, et al. v. Biden, et al.*                                         Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**                    Page 22 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 22 of 37

*Natural Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112-13 (2d Cir. 2018) (holding the Department of Transportation violated the APA by acting in excess of statutory authority when it indefinitely delayed the effective date of a previously-promulgated rule and no statute authorized such a delay); *Air All. Houston v. Envtl. Prot. Agency*, 906 F.3d 1049, 1067 (D.C. Cir. 2018) (holding that the U.S. Environmental Protection Agency ("EPA") violated the APA by delaying, without separate authority, agency action for 20 months to reconsider the action and stating that "the mere fact of reconsideration, alone, is not a sufficient basis to delay promulgated effective dates specifically chosen by EPA on the basis of public input and reasoned explanation"). Therefore, the Moratorium's direction that DOI and BLM cease implementing the Leasing Program, as decided in the ROD, is unlawful. The Moratorium must be set aside on this basis alone.

## II. DOI's Central Purpose for the Moratorium Is Invalid.

Not only is the Moratorium an unlawful agency action, the Moratorium also is founded on an invalid purpose—to allow DOI to prepare a NEPA analysis to determine whether to reaffirm or void the leases. AR3365; AR3404. This purpose runs afoul of both DOI's narrow authority to issue the Coastal Plains leases and DOI's general authority to administer oil and gas leases. Accordingly, the Moratorium must be set aside as arbitrary, capricious, and not in accordance with law, 5 U.S.C. § 706(2)(A), as well as "in excess of statutory . . . authority," *id.* § 706(2)(C).

An agency decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider . . . ." *350 Mont. v. Haaland*, 50 F.4th 1254,

1263 (9th Cir. 2022) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). "Whether agency action is 'not in accordance with law' is a question of statutory interpretation, rather than an assessment of reasonableness in the instant case." *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010) (citing *Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, 537 F.3d 1006, 1014 (9th Cir. 2008)). Thus, when an agency's justifications for its decision are outside of its authority, the decision is arbitrary and capricious, not in accordance with law, and "in excess of statutory . . . authority." *See, e.g.*, *Luminant Generation Co., LLC v. U.S. Envtl. Prot. Agency*, 675 F.3d 917, 926 (5th Cir. 2012).

Here, DOI lacks Congressional authority to implement the stated purpose of the Moratorium—to allow DOI to consider whether to reaffirm or void the leases. In the Suspension, BLM announced that it was suspending the leases and conducting additional NEPA analysis "to determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures." AR3365. BLM characterized the Suspension as an "exercise of the Department's inherent authority to correct legal errors." *Id.* DOI affirmed the purpose of the NEPA analysis in the Suspension Addendum, stating it "is conducting this additional NEPA analysis to determine whether the leases should be affirmed, voided or subject to additional mitigation measures." AR3405.

DOI cannot enact the Moratorium to determine whether to reaffirm or void the Coastal Plain leases, for two reasons. First, cancelling the leases would violate Congress' mandate in the Tax Act to offer leases for sale by December 22, 2021. Second, and more generally, the Department lacks Congressional authority to cancel oil and gas leases because of a NEPA violation at their issuance.

*AIDEA, et al. v. Biden, et al.*                    Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**                    Page 24 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 24 of 37

**A.     Cancellation of the Coastal Plain Leases Would Violate the Tax Act.**

DOI cannot cancel the Coastal Plain leases because to do so would violate the Tax Act. In Section 20001 of the Tax Act, Congress required DOI to conduct at least two lease sales within 10 years after the enactment of the Tax Act, the first to occur within four years of its enactment, i.e., before December 22, 2021. Tax Act § 20001(c)(1)(B)(ii)(I) ("The Secretary shall offer . . . the initial lease sale under the oil and gas program under this section no later than 4 years after the date of enactment of this Act."). DOI satisfied this requirement by offering the leases for sale and issuing them in 2021. DOI cannot now cancel these leases because the time has passed to hold the initial lease sale by the deadline required by the Tax Act.

DOI's purpose of the Moratorium—to conduct additional NEPA analysis to determine whether the leases should be reaffirmed or voided—is outside of DOI's authority. Because DOI cannot void the leases, the Moratorium is arbitrary, capricious, not in accordance with law, and in excess of statutory authority.

**B.     The Department Cannot Cancel Oil and Gas Leases because of a NEPA Violation.**

Not only does the Tax Act preclude DOI from voiding the Coastal Plain leases, DOI also cannot cancel the leases because of a NEPA deficiency. DOI lacks authority to cancel oil and gas leases because of NEPA deficiencies. The Supreme Court has recognized that DOI's statutory authority to manage the public lands includes inherent authority to administratively cancel oil and gas leases that were invalid at inception. *See Boesche v. Udall*, 373 U.S. 472, 476 n.6 (1963) (citing statutes that convey "general managerial

*AIDEA, et al. v. Biden, et al.*                                        Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**                        Page 25 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 25 of 37

powers over the public lands"). BLM later codified the *Boesche* holding in 43 C.F.R. § 3108.3(d), which provides that "[l]eases shall be subject to cancellation if improperly issued."

A deficiency in NEPA analysis, however, does not render a lease "improperly issued" or otherwise invalid at inception. No court has found that a deficiency in NEPA analysis can form the basis for cancellation. *See Solenex, LLC v. Haaland*, No. 13-993, 2022 U.S. Dist. LEXIS 163518, *19 (D.D.C. Sept. 9, 2022). Rather, courts have only found that DOI has authority to cancel oil and gas leases for violations of the Mineral Leasing Act and regulations thereunder. *See id.*; *Winkler v. Andrus*, 614 F.2d 707, 711 (10th Cir. 1980). DOI's improper cancellation of an oil and gas lease would give rise to claims of breach of contract by the lessees and third-party beneficiaries, such as the State. *See, e.g.*, *Solenex LLC v. Bernhardt*, 962 F.3d 520, 530 n.4 (D.C. Cir. 2020) ("an agency decision to cancel a lease does not preclude the owner from raising breach of contract claims in the Court of Federal Claims"); *Griffin & Griffin Exploration, LLC v. United States*, 116 Fed. Cl. 163, 176–77 (2014) (finding no breach of contract occurred when cancellation of oil and gas lease was within Department's authority).

Because DOI lacks the authority to cancel an oil and gas lease for a NEPA violation, DOI's proffered purpose for the Moratorium is invalid. Because DOI cannot lawfully void the leases, the Moratorium instituted for that purpose is arbitrary, capricious, not in accordance with law, and in excess of statutory authority.

*AIDEA, et al. v. Biden, et al.*                                    Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**                    Page 26 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 26 of 37

## III. The Justifications for the Moratorium Lack Factual Support and Contradict DOI's and BLM's Prior Determinations.

Finally, the Moratorium must be set aside because it lacks any rational justification, evidencing that it is nothing more than the product of differing policy preferences of a new political administration. The Supreme Court has recognized that, although an agency may revisit and ultimately change its prior policy, the changes, as with any agency decision, must be "the product of reasoned decisionmaking." *Motor Vehicle Mfrs.*, 463 U.S. at 52 . The agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *accord, e.g.*, *League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014). Moreover, when changing policies, an agency cannot "simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009). Here, the Moratorium is flawed for both reasons—its justifications lack factual support and contradict prior determinations made by DOI and BLM.

### A. The Federal Defendants Justified the Moratorium With Conclusory Statements Rather than Factual Support.

The Moratorium must be set aside because DOI and BLM offer essentially one justification for it—it *may* be legally deficient—and provide no factual findings in support of this rationale. Courts will leave an agency decision intact when the agency's reasoning "may reasonably be discerned." *Alaska Dep't of Envtl. Conservation v. Envtl. Prot.*

*AIDEA, et al. v. Biden, et al.*                    Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**      Page 27 of 35

Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 27 of 37

*Agency*, 540 U.S. 461, 497 (2004) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)). By contrast, courts must find an agency determination to be arbitrary and capricious when the agency "merely provides 'generic statements' to support its conclusion in lieu of evidence that it has actually applied its substantive expertise." *Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 657 (9th Cir. 2022) (quoting *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019)).

Here, the Federal Defendants offered only "generic statements" as justification for the Moratorium without any factual support. The Executive Order vaguely referenced "alleged legal deficiencies underlying the [Leasing] program." AR3351. The Secretarial Order provided scant additional detail, explaining that the Moratorium was necessary to address "(1) insufficient analysis under [NEPA], including failure to adequately analyze a reasonable range of alternatives in the [EIS]; and (2) failure in the August 17, 2020, [ROD] to properly interpret Section 20001 of [the Tax Act]." AR3362. Further, the Principal Deputy Assistant Secretary's Suspension offered a legal interpretation of the Tax Act to support the conclusion that the FEIS did not analyze an adequate range of alternatives. AR3365. Finally, the Suspension added speculative "potential legal defect[s]" related to the treatment of foreign greenhouse gas emissions and compliance with Section 810 of ANILCA as justification for the Moratorium.[6] AR3364.

_____

[6] The Suspension itself acknowledges that the analysis of foreign greenhouse gases is "not identified as a legal defect at this point," and that DOI may only "later identify this issue

*AIDEA, et al. v. Biden, et al.*                                    Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**                    Page 28 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 28 of 37

These vague and conclusory statements are the only contemporaneous rationale that DOI and BLM provided for the Moratorium. The Executive Order, Secretarial Order, and Suspension do not offer any more detail or specific findings. Furthermore, the administrative record lacks any other contemporaneous justification for these findings, except for a memorandum from the Solicitor to the Secretary that the Federal Defendants have withheld from this Court's review under a claim of privilege.[7] *See* AR3356.

These generic and conclusory statements do not provide evidence of a reasoned basis for abruptly halting all activities relating to the Leasing Program and calling into doubt an entire ROD based on years of environmental study and analysis. Instead, they are exactly the kind of vague statements one would expect to see from the Government as a pretext for implementing policies decided in the absence of required processes, and indeed they could fit the bill for calling into question essentially any NEPA-related agency decision. The Supreme Court has opined that agencies cannot justify the rescission of prior decisions on such conclusory statements. In *Motor Vehicle Manufacturers Association*, the

---

as an additional specific legal error." AR3365. More than 18 months after issuance of the Executive Order and a year after issuance of the Suspension, DOI concluded that BLM's analysis of foreign greenhouse gas emissions was a "specific legal defect." AR3404. This *post hoc* rationalization cannot augment DOI's rationale at the time it issued the Suspension, which was mere speculation that a legal defect may exist. *See Dep't of Homeland Sec.*, 140 S. Ct. at 1907 (citing the "foundational principle of administrative law" that judicial review of agency action is limited to "the grounds that the agency invoked when it took the action") (quoting *Michigan v. Envtl. Prot. Agency*, 576 U.S. 743, 758 (2015)).

[7] And, no court has found the ROD or Leasing Program to be legally flawed. *See Gwich'in Steering Comm. v. Bernhardt*, No. 3:20-cv-00204-SLG, 2021 WL 46703 (D. Alaska Jan. 5, 2021) (denying motions for preliminary injunction based on alleged NEPA deficiencies).

*AIDEA, et al. v. Biden, et al.*                                    Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**          Page 29 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 29 of 37

Court observed that "[r]ecognizing that policymaking in a complex society must account for uncertainty . . . does not imply that it is sufficient for an agency to merely recite the terms 'substantial uncertainty' as justification for its actions." *Motor Vehicle Mfrs.*, 463 U.S. at 52. Rather, "the agency must explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

Heeding this direction, lower courts have found unsubstantiated conclusions to be inadequate to support agency decisionmaking. For example, in *Los Padres ForestWatch*, the Ninth Circuit Court of Appeals rejected the Forest Service's determination that trees of a certain size were "generally small" within the meaning of the Roadless Rule. *Los Padres Forest Watch*, 25 F.4th at 657. The Court of Appeals observed that the administrative record contained only a "bare assertion" that the tree size was consistent with the Roadless Rule "with no supporting analysis." *Id.*; *see also California v. Bernhardt*, 286 F. Supp. 3d 1054, 1065–68 (N.D. Cal. 2020) (setting aside suspension of regulation because the record did not support the suspension). The Moratorium suffers from an identical flaw. Without additional explanation and factual support, DOI's and BLM's generic and conclusory allegations of potential legal deficiencies associated with the ROD and Leasing Program are similarly inadequate to support the Moratorium.

### B. The Cited Justifications for the Moratorium Contradict Prior Findings and Representations by the Federal Defendants.

Not only does the Moratorium rest on conclusory justifications, these justifications contradict findings by DOI and BLM without acknowledgment or explanation of the

contradiction. "Unexplained inconsistency" between agency actions is "a reason for holding an interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). Thus, when an agency acts contrary to or wholly disregards previous factual findings, the "absence of a reasoned explanation . . . violates the APA." *Organized Vill. of Kake*, 795 F.3d at 969.

The justifications offered for the Moratorium directly contradict findings that DOI and BLM made just months earlier in the ROD and FEIS. First, with respect to Secretary Haaland's allegation that the BLM's NEPA analysis was "insufficient" and did not analyze a reasonable range of alternatives, the BLM expressly determined otherwise. In the FEIS, the BLM responded to public comments related to the range of alternatives analyzed in the DEIS and particularly rejected assertions that the range of alternatives was inadequate. *See generally* AR1116–AR1258; *see, e.g.*, AR1134 (Row 48); AR1147 (Row 72); AR1149 (Row 76); AR1157 (Row 95); AR1185 (Row 136); AR1200 (Row 157); AR1212 (Row 179); AR1250 (Row 232); AR1263 (Rows 257 and 258). BLM specifically responded to comments that it did not analyze an alternative that involved fewer than 2,000 acres of surface development. *E.g.*, AR1132 (Row 45). Then, in the ROD, Secretary Bernhardt affirmed the range of alternatives analyzed in the DEIS and FEIS. *See* AR3156–AR3159.

Second, with respect to Secretary Haaland's and the Principal Deputy Assistant Secretary's allegations that the ROD did not properly interpret Section 20001 of the Tax Act, DOI had already determined otherwise. The ROD set forth a detailed interpretation of this legislation. AR3148–AR3156.

Finally, with respect to the statements in the Suspension that the FEIS's treatment of foreign GHG emissions and compliance with Section 810 of ANILCA were deficient, these statements contradict specific findings in the FEIS and ROD. In the ROD, the Secretary specifically affirmed the FEIS's treatment of foreign GHG emissions. *See* AR3179–AR3181 ("The rigorous modeling that informed the [FEIS's] quantitative analysis of GHG impacts already constitutes a hard look at the Proposed Action's potential contributions to GHG emissions and adequately informs decision-making."); *see also* AR1626–AR1627 (responding to similar comments in FEIS). In the ROD, the Secretary also detailed DOI's compliance with Section 810 of ANILCA. *See* AR3167–3170. The justifications set forth in the Executive Order, Secretarial Order, and Suspension contradict these findings.

Not only do the justifications offered for the Moratorium directly contradict findings in the ROD and FEIS, they contradict express representations by the Department of Justice ("DOJ") on behalf of DOI and BLM in litigation before this Court. The DOJ repeatedly denied allegations that the BLM did not analyze an adequate range of alternatives as required by NEPA, did not correctly interpret and apply the Tax Act, or did not comply with Section 810 of ANILCA. Defs.' Answer to First Am. Compl. (ECF No. 28) ¶¶ 198, 199, 202, 227, 213, *Gwich'in Steering Comm.*, No. 20-cv-00204-SLG (D. Alaska filed Nov. 24, 2020). Furthermore, in a memorandum advocating that this Court allow the lease sale to proceed, DOJ represented that DOI and BLM "[c]omplied with NEPA's [p]rocedural [r]equirements," by analyzing a reasonable range of alternatives, correctly interpreting the Tax Act, and examining impacts from greenhouse gas emissions, and

*AIDEA, et al. v. Biden, et al.*                    Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**            Page 32 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 32 of 37

"[p]roperly [i]nterpreted and [a]pplied [Section 810 of] ANILCA." Federal Defs.'
Combined Mem. in Opp'n to Ps.' Mots. for Prelim. Inj. (ECF No. 59) at 32, 34–40, 42–46,
49, *Gwich'in Steering Comm.*, No. 3:20-cv-00204-SLG (filed Dec. 30, 2020).

Despite the prior agency findings and statements that contradict the justifications
for the Moratorium, DOI and BLM have not acknowledged them or attempted to reconcile
the Moratorium with them. Thus, the Moratorium both "ignores" and "countermands"
DOI's "earlier factual findings without reasoned explanation for doing so." *See Organized
Vill. of Kake*, 795 F.3d at 966 (quoting *Fox*, 556 U.S. at 537 (Kennedy, J., concurring)).
"An agency cannot simply disregard contrary or inconvenient factual determinations that
it made in the past, any more than it can ignore inconvenient facts when it writes on a blank
slate." *Fox*, 556 U.S. at 537; *see also Organized Vill. of Kake*, 795 F.3d at 969 (quoting
same). The Moratorium is arbitrary and capricious for this reason.

Finally, DOI and BLM have a heightened need to explain why they are departing
from their prior findings in the light of the Tax Act's mandates. The obligation to provide
reasoned analysis for a reversed position is "all the more pronounced where the agency's
reversal is at odds with a clear statutory mandate governing the agency's actions." *Greater
Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 189 (D.C. Cir. 2010). Here, the
Moratorium is directly at odds with the Tax Act's clear mandate to conduct the first Coastal
Plain lease sale "not later than 4 years after the date of enactment of this Act," i.e., not later
than December 22, 2021. Yet, even given this "more pronounced" obligation to render
reasoned analysis, the Defendants have wholly failed to provide any coherent explanation
for their complete disregard of the BLM's prior NEPA analysis. Given the lack of

*AIDEA, et al. v. Biden, et al.*                                    Case No. 3:21-cv-00245-SLG
STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT                              Page 33 of 35
Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 33 of 37

explanation of DOI's and BLM's changed position, coupled with the lack of any rational justification for the Moratorium, the Moratorium must be set aside as arbitrary and capricious.

## CONCLUSION

After more than 35 years since passage of ANILCA, Congress decided to proceed with leasing the Coastal Plain for oil and gas development. With the Moratorium, however, the Federal Defendants thwart Congress' express direction and instead pursue political aims with no legal basis. For the foregoing reasons, the State respectfully requests that the Court grant this motion for summary judgment and grant the declaratory and injunctive relief requested herein, including by declaring the Moratorium unlawful and setting it aside, and by enjoining Defendants from further implementation of the Moratorium and ordering Defendants to promptly resume all activities necessary for the continuation of the Leasing Program as mandated by Congress.

Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 34 of 37

DATED: December 5, 2022.

TREG R. TAYLOR
ATTORNEY GENERAL

By:     */s/ Ronald W. Opsahl*
Ronald W. Opsahl (Alaska Bar No. 2108081)
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 279-2834
Email:  ron.opsahl@alaska.gov

By:     */s/ Kathleen C. Schroder*
Kathleen C. Schroder (*pro hac vice*)
Gail L. Wurtzler (*pro hac vice*)
Mark E. Champoux (*pro hac vice*)
Davis Graham & Stubbs LLP
1550 Seventeenth St., Suite 500
Denver, CO 80202
Telephone: (303) 892-9400
Fax: (303) 893-1379
Email: katie.schroder@dgslaw.com
          gail.wurtzler@dgslaw.com
          mark.champoux@dgslaw.com

*Attorneys for the State of Alaska*

*AIDEA, et al. v. Biden, et al.*                    Case No. 3:21-cv-00245-SLG
**STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**          Page 35 of 35

Case 3:21-cv-00245-SLG   Document 59   Filed 12/05/22   Page 35 of 37

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

This document complies with the word limit of Local Civil Rule 7.4(a)(1) because, excluding the parts of the document exempted by Local Civil Rule 7.4(a)(4), this document contains 9,055 words.

*/s/ Kathleen C. Schroder*

## CERTIFICATE OF SERVICE

I certify that on **December 5, 2022**, the foregoing document was served electronically on all parties listed on the CM/ECF system.

*/s/ Kathleen C. Schroder*