Brook Brisson (AK Bar No. 0905013)
Suzanne Bostrom (AK Bar No. 1011068)
Bridget Psarianos (AK Bar No. 1705025)
Victoria Clark (AK Bar No. 0401001)
TRUSTEES FOR ALASKA
121 W Fireweed Lane, Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
Fax: (907) 276-7110
bbrisson@trustees.org
sbostrom@trustees.org
bpsarianos@trustees.org
vclark@trustees.org

*Attorneys for Intervenor-Defendants Gwich'in Steering
Committee, et al.*

Karimah Schoenhut (*pro hac vice*)
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
50 F St., NW 8th Floor
Washington, DC 20001
Phone: (202) 548-4584
Fax: (202) 547-6009
karimah.schoenhut@sierraclub.org

*Attorney for Intervenor-Defendant Sierra Club*

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY, *et al.*, | Case No. 3:21-cv-00245-SLG |
| Plaintiffs, | |
| and | |
| STATE OF ALASKA, | |
| Intervenor-Plaintiff, | |

v.

JOSEPH R. BIDEN, JR., *et al.*,

               Defendants,

     and

NATIVE VILLAGE OF
VENETIE TRIBAL
GOVERNMENT, *et al.*,

           Intervenor-Defendants.

**INTERVENOR-DEFENDANTS GWICH'IN STEERING COMMITTEE ET AL.'S
RESPONSE IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT**
(Fed. R. Civ. P. 56(a), Local Civ. R. 16.3)

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES............................................................................................. iii

LIST OF SHORT NAMES AND ACRONYMS ................................................................ x

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 2

    I.    The Exceptional Values and History of Protecting the Coastal Plain. ..................... 2

    II.    The Tax Act, Leasing Program, and Lease Sale. ..................................................... 4

    III.    The President's and Secretary's Actions to Review and Fix the Unlawful Leasing Program.................................................................................................................... 6

STANDARDS OF REVIEW ............................................................................................. 9

ARGUMENT.................................................................................................................... 11

    I.    Interior's Actions Complied With ANILCA, the Tax Act, and Interior's Inherent Authority to Address Legal Errors in Oil and Gas Leasing Decisions........................... 12

        A.    Interior's Actions Were Lawful Under ANILCA and the Tax Act.................. 12

        B.    Executive Order 13990 Was Lawful. ............................................................. 18

        C.    Interior Adequately Explained its Decision. .................................................. 19

    II.    Notice and Comment Was Not Required. .............................................................. 24

    III.    The Secretarial Order and Lease Suspensions Do Not Violate FLPMA.............. 27

    IV.    If the Court Finds Legal Violations, The Court Should Remand without Vacating Interior's Actions. ....................................................................................................... 29

CONCLUSION ................................................................................................................ 33

---

Gwich'in Steering Comm. et al.'s Response Brief

*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG            Page ii

# TABLE OF AUTHORITIES

**Cases**

*Alaska v. Jewell*,
2015 U.S. Dist. LEXIS 94574 (D. Alaska July 21, 2015) ........................................ 2, 4

*Albertson v. FCC*,
182 F.2d 397, 399 (D.C. Cir. 1950) ............................................................................ 12

*Alcaraz v. Block*,
746 F.2d 593 (9th Cir. 1984) ...................................................................................... 25

*Belville Mining Co. v. United States*,
999 F.2d 989 (6th Cir. 1993) ...................................................................................... 12

*Bob Marshall All. v. Hodel*,
852 F.2d 1223 (9th Cir. 1988) .................................................................................... 28

*Boesche v. Udall*,
373 U.S. 472 (1963) ............................................................................................ 12, 15

*Brnovich v. Biden*,
562 F. Supp. 3d 123 (D. Ariz. 2022) .......................................................................... 10

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
688 F.3d 989 (9th Cir. 2012) ...................................................................................... 30

*California v. Bureau of Land Mgmt.*,
286 F. Supp. 3d 1054 (N.D. Cal. 2018) ...................................................................... 22

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ................................................................................. 7, 23

*Ctr. for Biological Diversity v. EPA*,
861 F.3d 174 (D.C. Cir. 2017) .................................................................................... 31

*Ctr. for Biological Diversity v. Haaland*,
998 F.3d 1061 (9th Cir. 2021) .............................................................................. 20, 22

*Ctr. for Biological Diversity v. Kempthorne*,
588 F.3d 701 (9th Cir. 2009) ........................................................................................ 9

*Ctr. for Food Safety v. Regan*,
    56 F.4th 648 (9th Cir. 2022) ................................................................ 29, 30

*Ctr. for Food Safety v. Vilsack*,
    734 F. Supp. 2d 948 (N.D. Cal. 2010) ................................................. 31, 32

*Christensen v. Comm'r of Internal Rev.*,
    523 F.3d 957 (9th Cir. 2008) ...................................................................... 15

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402, 420 (1971)) ........................................................................... 21

*City of Arlington v. FCC*,
    569 U.S. 290 (2013) .................................................................................... 18

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021) ................................................................................ 18

*Colwell v. HHS*,
    558 F.3d 1112, 1124 (9th Cir. 2009) .......................................................... 25

*Dalton v. Specter*,
    511 U.S. 462 (1994) .................................................................................... 10

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ........................................................................... 21, 22

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ...................................................................... 10

*Encino Motorcars, L.L.C. v. Navarro*,
    579 U.S. 211 (2016) .................................................................................... 20

*FCC v. Fox TV Stations, Inc.*,
    556 U.S. 502 (2009) ....................................................................... 19, 20, 22

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022) ............................................................... 10, 19

*Good Samaritan Hosp. v. Shalala*,
    508 U.S. 402, 417 (1993) ............................................................................ 20

*Greater Bos. Television Corp. v. FCC*,
    444 F.2d 841 (D.C. Cir. 1970) .................................................................... 23

*Greater Yellowstone Coal. v. Kempthorne,*
    577 F. Supp. 2d 183 (D.D.C. 2008) .......................................................... 20

*Griffith v. Fed. Lab. Rel. Auth.,*
    842 F.2d 487, 493 (D.C. Cir. 1988).......................................................... 10

*Gun S., Inc. v. Brady,*
    877 F.2d 858 (11th Cir. 1989) ........................................................... 12, 15

*Gunderson v. Hood,*
    268 F.3d 1149 (9th Cir. 2001) .................................................................. 10

*Gutierrez De Martinez v. Lamagno,*
    515 U.S. 417 (1995) ................................................................................. 15

*Gwich'in Steering Comm. v. Bernhardt,*
    2021 U.S. Dist. LEXIS 1471 (D. Alaska Jan. 5, 2021) ...................... *passim*

*Hawaii v. Trump,*
    878 F.3d 662 (9th Cir. 2017) .................................................................... 10

*Idaho Farm Bureau Fed'n v. Babbitt,*
    58 F.3d 1392 (9th Cir. 1995) .............................................................. 30, 31

*Ivy Sports Med., L.L.C. v. Burwell,*
    767 F.3d 81 (D.C. Cir. 2014) ................................................................... 12

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.,*
    109 F. Supp. 3d 1238 (N.D. Cal. 2015) ................................................... 30

*Los Padres ForestWatch v. U.S. Forest Serv.,*
    25 F.4th 649 (9th Cir. 2022) .................................................................... 22

*Louisiana v. Biden,*
    2022 U.S. Dist. LEXIS 148570 (W.D. La. 2022) ..................................... 27

*Lute v. Singer Co.,*
    678 F.2d 844 (9th Cir. 1982) .................................................................... 15

*Mada-Luna v. Fitzpatrick,*
    813 F.2d 1006 (9th Cir. 1987) .................................................................. 26

*McFarland v. Kempthorne,*
    545 F.3d 1106 (9th Cir. 2008) .................................................................... 9

---

*Minard Run Oil Co. v. U.S. Forest Serv.*,
  670 F.3d 236 (3d Cir. 2011) .................................................... 26

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ............................................................. 33

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .............................................................. 22

*Nat'l Ass'n of Home Builders v. EPA*,
  682 F.3d 1032, 1038 (D.C. Cir. 2012)......................................... 22

*Nat'l Ass'n of Postal Supervisors, v. U.S. Postal Serv.*,
  26 F.4th 960, 971, 975 (D.C. Cir. 2022)...................................... 10

*Nat'l Audubon Soc'y v. Haaland*,
  Case No. 3:20-cv-00205-SLG (Alaska D. Ct.)................................. 5

*Nat'l Family Farm Coal. v. U.S. EPA*,
  960 F.3d 1120 (9th Cir. 2020) ................................................. 31

*Nat'l Mining Ass'n v. U.S. DOI*,
  177 F.3d 1 (D.C. Cir. 1999) .................................................... 15

*Nat'l Wildlife Fed'n v. Espy*,
  45 F.3d 1337 (9th Cir. 1995) .................................................. 29

*Native Vill. of Venetie Tribal Gov't v. Haaland*,
  Case No. 3:20-cv-00223-SLG (Alaska D. Ct.)................................. 5

*New Mexico v. Watkins*,
  969 F.2d 1122 (D.C. Cir. 1992) ............................................... 28

*NRDC v. U.S. EPA*,
  38 F.4th 34 (9th Cir. 2022) .................................................... 29

*NRDC v. U.S. EPA*,
  526 F.3d 591 (9th Cir. 2008) .................................................. 20

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
  475 F.3d 1136 (9th Cir. 2007) .................................................. 9

*Or. Env't Council v. Kunzman*,
  817 F.2d 484 (9th Cir. 1987) .................................................. 10

*Organized Vill. of Kake v. USDA*,

795 F.3d 956 (9th Cir. 2015) ............................................................... 20, 22

*Pollinator Stewardship Council v. U.S. EPA,*
806 F.3d 520 (9th Cir. 2015) .................................................... 29, 30, 31

*Sacora v. Thomas,*
628 F.3d 1059 (9th Cir. 2010) ........................................................ 25

*Se. Conf. v. Vilsack,*
684 F. Supp. 2d 135 (D.D.C. 2010) ................................................ 28

*S. Cal. Edison Co. v. Fed. Energy Regul. Com.,*
770 F.2d 779 (9th Cir. 1985) .......................................................... 25

*Seila Law L.L.C. v. Consumer Fin. Prot. Bureau,*
140 S. Ct. 2183 (2020) ................................................................... 18

*Sierra Club & Valley Watch, Inc. v. Jackson,*
648 F.3d 848 (D.C. Cir. 2011) ................................................... 15, 17

*Sierra Club N. Star Chapter v. LaHood,*
693 F. Supp. 2d 958 (D. Minn. 2010) ........................................... 20

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.,*
555 F. Supp. 3d 739 (D. Alaska 2021) ............................................ 7

*State of Wash. v. Haaland,*
Case No. 3:20-cv-00224-SLG (Alaska D. Ct.).................................. 5

*Trs. for Alaska v. Watt,*
524 F. Supp. 1303 (D. Alaska 1981) ............................................. 29

*W. Energy All. v. Biden,*
2022 U.S. Dist. LEXIS 171160 (D. Wyo. 2022) ............................. 28

*W. Watersheds Project v. Zinke,*
441 F. Supp. 3d 1042 (D. Idaho 2020) .......................................... 26

**Statutes**

5 U.S.C. § 551(4) ................................................................................ 24

5 U.S.C. § 553 ..................................................................................... 24

5 U.S.C. § 553(b)(3)(A)....................................................................... 25

5 U.S.C. § 704 ..................................................................................... 12

5 U.S.C. § 706 ................................................................................. 17

5 U.S.C. § 706(2) ........................................................................ 9, 29

16 U.S.C. § 668dd ............................................................................ 27

16 U.S.C. § 668dd(a)(1) ................................................................... 29

16 U.S.C. § 810 ........................................................................... 7, 23

16 U.S.C. §§ 3101–3233 ................................................................... 13

16 U.S.C. § 3142 ............................................................................... 4

16 U.S.C. § 3143 ............................................................................... 4

42 U.S.C. § 6506a(k)(2) .............................................................. 14, 28

42 U.S.C. § 6506a(b) ....................................................................... 28

42 U.S.C. §§ 6501–6507 .................................................................. 13

43 U.S.C. § 1702(j) ..................................................................... 28, 29

Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, 94 Stat. 2390
(Dec. 2, 1980) § 303 ................................................................... 4

Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, 94 Stat. 2390
(Dec. 2, 1980) § 304 .................................................................. 27

Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, 131 Stat. 2054, 2235–37 (2017)
§ 20001 ......................................................................... *passim*

**Regulations**

43 C.F.R. § 3132.5 ........................................................................... 16

**Other**

163 Cong. Rec. S7539–40 (daily ed. Nov. 30, 2017).................................. 17

Public Land Order 2214, Establishing the Arctic National Wildlife Range,
25 Fed. Reg. 12,598 (Dec. 9, 1960) ............................................. 3

*Gwich'in Steering Comm. v. Haaland*,
First Am. Compl. (ECF No. 19) ............................................... 5, 7

*Gwich'in Steering Comm. v. Haaland*,
J. Status Rep. & Defs.' & Plfs.' Unopposed Mot. to Extend Stay (ECF No. 85) ... 8, 32

*Gwich'in Steering Comm. v. Haaland*,

Gwich'in Steering Comm. et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                    Page viii

Unopposed Mot. to Stay Proceedings (ECF No. 86)................................................ 8, 13

*Gwich'in Steering Comm. v. Haaland*,
    Defs.' Status Rep. on Issuance of DSEIS (ECF No. 91)......................................... 8, 32

## LIST OF SHORT NAMES AND ACRONYMS

| | |
|---|---|
| AIDEA | Alaska Industrial Development and Export Authority |
| ANILCA | Alaska National Interest Lands Conservation Act |
| APA | Administrative Procedure Act |
| Arctic Refuge or Refuge | Arctic National Wildlife Refuge |
| Assistant Secretary | Principal Deputy Assistant Secretary of Lands and Minerals Management |
| BLM | Bureau of Land Management |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FLPMA | Federal Lands Policy and Management Act |
| FWS | U.S. Fish and Wildlife Service |
| Interior | U.S. Department of the Interior |
| NEPA | National Environmental Policy Act |
| NPRPA | Naval Petroleum Reserves Production Act |
| NWRSAA | National Wildlife Refuge System Administration Act |
| Range | Arctic National Wildlife Range |
| ROD | Record of Decision |
| SEIS | Supplemental Environmental Impact Statement |
| State | State of Alaska |
| Tax Act | Tax Cuts and Jobs Act of 2017 |

The Secretary                        Secretary of the U.S. Department of the Interior

# INTRODUCTION

At the direction of the President, the Secretary of the U.S. Department of the Interior (Secretary) reviewed the legality of the Coastal Plain Oil and Gas Leasing Program (Leasing Program) for the Arctic National Wildlife Refuge (Arctic Refuge or Refuge). The Secretary's review identified multiple legal problems, leading the Secretary to issue a Secretarial Order directing the Bureau of Land Management (BLM) to undertake a supplemental process to adopt a Leasing Program that complies with the law. Because of the legally-flawed Leasing Program, the Principal Deputy Assistant Secretary of Lands and Minerals Management (Assistant Secretary) suspended the existing leases, tolling the lease terms until a lawful Leasing Program could be adopted. Plaintiffs, the Alaska Industrial Development and Export Authority et al. (collectively AIDEA) and Intervenor-Plaintiff State of Alaska (State) claim these actions constitute a "moratorium" of "indefinite" duration that violates various laws.[1] But AIDEA and the State misconstrue the Secretary's actions: Interior simply took the step of identifying legal flaws with the Leasing Program and temporarily suspended leases while the agency undertakes a supplemental process to ensure the Leasing Program is lawful. In doing so, Interior acted consistent with its authority to fix legal problems and manage lands, and no statute imposes other directives or processes with which Interior failed to comply.[2] Accordingly,

---

[1] Pls.' Mot. for Summ. J. at 8, 15, ECF No. 60 (hereinafter "AIDEA"); State of Alaska's Mot. for Summ. J. at 3–4, 13, ECF No. 59 (hereinafter "SOA").

[2] *See generally* Defs.' Response in Opposition to Plaintiffs' and Intervenor-Plaintiff's Mots. For Summ. J., ECF No. 63 (hereinafter "Feds.").

this Court should deny AIDEA and the State's motions for summary judgment and enter judgment in favor of Defendants and Intervenor-Defendants' Gwich'in Steering Committee, et al. (collectively "Gwich'in Steering Committee") and the Arctic Village and Venetie Tribes.

## FACTUAL BACKGROUND

This Court recently considered the Leasing Program on the Coastal Plain of the Arctic Refuge in a related case;[3] the Gwich'in Steering Committee briefly recounts the facts leading up to this litigation below.

## I. THE EXCEPTIONAL VALUES AND HISTORY OF PROTECTING THE COASTAL PLAIN.

The Arctic Refuge is America's largest and northernmost national wildlife refuge. The Arctic Refuge's 1.5-million-acre Coastal Plain is important habitat for wildlife, including caribou, polar bears, and birds.[4] The Porcupine Caribou Herd, which migrates through Alaska and Canada, relies on the Coastal Plain for calving, post-calving, and insect relief habitat, and for high-protein nutrition away from predators.[5] The Arctic Refuge lies at the heart of the traditional homelands of the Gwich'in and Iñupiat and the Coastal Plain is sacred land to the Gwich'in because of its importance to the Porcupine

---

[3] *Gwich'in Steering Committee v. Bernhardt (GSC)*, 2021 U.S. Dist. LEXIS 1471 (D. Alaska 2021) (order denying preliminary injunction to halt lease sale); *see also Alaska v. Jewell*, 2015 U.S. Dist. Lexis 94574 (D. Alaska July 21, 2015) (denying State's proposal to conduct exploration prior to Tax Cuts and Jobs Act).

[4] *GSC*, 2021 U.S. Dist. LEXIS 1471, at *5–6.

[5] AR0215–17.

Caribou Herd.[6] Since time immemorial, the Gwich'in have relied on the Porcupine Caribou Herd.[7] The Gwich'in are "caribou people," and call the Coastal Plain "Iizhik Gwats'an Gwandaii Goodlit" — "the Sacred Place Where Life Begins" — because of the importance of the Coastal Plain as the calving grounds for caribou.[8] Gwich'in traditional indigenous knowledge instructs that caribou will be harmed by oil and gas development on the Coastal Plain.[9]

The majority of the Coastal Plain is also designated critical habitat for denning polar bears because the rivers and hills create unique areas of deep snow drifts ideal for denning.[10] In summer, the abundant plants and insects provide nesting and foraging habitat for many birds, which use the Coastal Plain during annual migrations around the world.[11] The Arctic Refuge's wilderness values are incomparable and offer unique scientific and recreation opportunities.[12]

Because of its values, the Coastal Plain was protected in 1960 as the Arctic National Wildlife Range (Range) "[f]or the purpose of preserving unique wildlife, wilderness and recreational values."[13] When Congress passed the Alaska National

---

[6] AR0326, AR0329–30
[7] AR0290, AR0292.
[8] AR0290.
[9] AR0292, AR0335.
[10] AR0244–47.
[11] AR0182–92.
[12] AR0375.
[13] Public Land Order 2214, Establishing the Arctic National Wildlife Range, 25 Fed. Reg. 12,598 (Dec. 9, 1960); AR0375.

---

Gwich'in Steering Comm. et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                    Page 3

Interest Lands Conservation Act (ANILCA) in 1980, it re-designated the Range as the Arctic National Wildlife Refuge, expanding it south and west, and recognized four additional purposes.[14] Other than authorizing a one-time exploration program that expired, ANILCA prohibited oil and gas activities in the Arctic Refuge.[15]

## II. THE TAX ACT, LEASING PROGRAM, AND LEASE SALE.

This changed in 2017. A provision of the Tax Cuts and Jobs Act (Tax Act) directed the Secretary to adopt an oil and gas leasing program for the Coastal Plain.[16] It added an additional purpose for the Coastal Plain: "to provide for an oil and gas program."[17] It calls for two lease sales — the first by the end of 2021 and the second by the end of 2024.[18] It also limited surface development to a maximum of 2,000 acres.[19] It did not otherwise modify the purposes of the Arctic Refuge, waive any other applicable laws, or impose any other deadlines for the agency to meet when implementing the program.

Interior finalized its decision on the Leasing Program in August 2020.[20] The Gwich'in Steering Committee brought a lawsuit challenging the Leasing Program, alleging violations of ANILCA, the National Environmental Policy Act (NEPA), the Tax

---

[14] ANILCA § 303(2)(A), (B), Pub. L. No. 96-487, 94 Stat. 2390 (Dec. 2, 1980).
[15] 16 U.S.C. §§ 3142(a)–(h), 3143; *Alaska v. Jewell*, 2015 U.S. Dist. Lexis 94574, at *23.
[16] Tax Act § 20001, Pub. L. 115-97, 131 Stat. 2054, 2235–37 (2017).
[17] *Id.* § 20001(b)(2)(B)(iii).
[18] *Id.* § 20001(c)(1)(A), (B)(ii)(I) and (II).
[19] *Id.* § 20001(c)(3); *see also GSC*, 2021 U.S. Dist. LEXIS 1471, at *9.
[20] *GSC*, 2021 U.S. Dist. LEXIS 1471, at *10.

---

Act, the National Wildlife Refuge System Administration Act (NWRSAA), the

Wilderness Act, and the Endangered Species Act (ESA).[21] The lawsuit includes claims

that Interior and BLM failed to consider a reasonable range of alternatives in violation of

NEPA, and failed to lawfully apply Section 20001 of the Tax Act.[22] The Gwich'in

Steering Committee sought, but was denied, a preliminary injunction to halt the lease

sale.[23]

BLM held the first lease sale in early 2021.[24] While BLM offered 21 tracts for

lease, it received bids on eleven, and only nine leases were ultimately issued.[25] AIDEA

received seven leases; two other companies (only one of which was an oil and gas

company) each obtained one lease.[26]

---

[21] *See generally* First Am. Compl., *Gwich'in Steering Committee v. Haaland (GSC v. Haaland)*, Case No. 3:20-vc-00204-SLG (D. Alaska 2020), ECF No. 19.

[22] *Id.* at 61–62, 67–68. There are three additional lawsuits challenging the legality of the Leasing Program. *Native Vill. of Venetie Tribal Gov't v. Haaland*, Case No. 3:20-cv-00223-SLG (Alaska D. Ct.); *Nat'l Audubon Soc'y v. Haaland*, Case No. 3:20-cv-00205-SLG (Alaska D. Ct.); *State of Wash. v. Haaland*, Case No. 3:20-cv-00224-SLG (Alaska D. Ct.).

[23] *GSC*, 2021 U.S. Dist. LEXIS 1471, *25 (noting Plaintiffs may again seek preliminary relief "should BLM approve ground-disturbing activities at the Coastal Plain before the Court determines the merits of Plaintiffs' challenges").

[24] AR3227–28, AR3315.

[25] AR3316–48, AR3689–AR3701.

[26] AR3317, AR3314. Those companies have since relinquished their leases. AR3782–92.

## III. THE PRESIDENT'S AND SECRETARY'S ACTIONS TO REVIEW AND FIX THE UNLAWFUL LEASING PROGRAM.

After taking office, President Biden issued Executive Order 13990, noting the "alleged legal deficiencies" of the Leasing Program, including the inadequacy of the underlying environmental impact statement (EIS).[27] The Executive Order indicated the Secretary should "place a temporary moratorium" on activities implementing the Leasing Program, review the program, and "conduct a new, comprehensive analysis of the potential environmental impacts" of the Leasing Program "as appropriate and consistent with applicable law."[28]

The Secretary reviewed the Leasing Program and issued her findings in Secretarial Order No. 3401.[29] The Secretary identified multiple legal flaws with the Leasing Program, including but not limited to the agency's violation of NEPA for failing to conduct a sufficient analysis, including the failure to analyze a reasonable range of alternatives, and the "failure to properly interpret Section 20001" of the Tax Act.[30] Based on these legal problems, the Secretary directed Interior to undertake a "new, comprehensive analysis of the potential environmental impacts of the Program and address the identified legal deficiencies."[31] She also imposed a temporary halt on

---

[27] AR3351.

[28] *Id.*

[29] AR3362–63.

[30] AR3362.

[31] *Id.*

activities related to the Leasing Program — including exploration activities — until the supplemental analysis is complete.[32]

The Assistant Secretary suspended activities on the leases that same day.[33] The lease-suspension letters reiterated and further explained the NEPA and Tax Act legal deficiencies, and identified that there may be additional legal failings, including problems with BLM's analysis of greenhouse gases under NEPA and compliance with ANILCA Section 810's subsistence provisions.[34] Based on the identified legal defects, Interior concluded it was necessary to suspend the leases while completing the supplemental NEPA analysis.[35] An addendum to the lease-suspension letters confirmed that the greenhouse gas analysis under NEPA was an additional legal deficiency.[36] The lease-suspension letter and addendum also stated that the supplemental NEPA analysis will "determine whether the leases should be affirmed, voided or subject to additional

---

[32] AR3363; *see also* AR3399 & AR3718 (delaying processing of seismic application until supplemental EIS process is complete).

[33] *See, e.g.*, AR3364–65.

[34] *Id.*

[35] AR3365.

[36] AR3404. Two courts, including this one, recently held that similar greenhouse gas analyses under NEPA were invalid, and vacated the agency actions. *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 738–40, 751 (9th Cir. 2020); *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 762–67, 804–05 (D. Alaska 2021). One of the claims in the *Gwich'in Steering Committee* litigation challenges the greenhouse gas analysis for the Leasing Program. First Am. Compl. at 63–65, *GSC v. Haaland*, ECF No. 19. It is logical and laudable that the agency would act to fix this legal issue instead of continuing to defend the flawed analysis. *See* Feds. at 32–33.

mitigation measures."[37] While suspended, the terms of the leases are tolled and the lease rental payments are suspended.[38] Subsequent to the Secretarial Order and lease suspensions, AIDEA applied to conduct exploration-related activities on the Coastal Plain.[39]

As a result of Interior's actions, the Gwich'in Steering Committee's lawsuit challenging the Leasing Program is stayed until BLM completes a supplemental environmental impact statement (SEIS) and adopts a new Leasing Program that complies with the law.[40] AIDEA and the State — both parties to that lawsuit — did not oppose the stay or take issue at that time with Interior's suspension of the leases, stated plans to conduct a supplemental environmental review, and commitment not to issue any permits or authorizations based on its original decisions.[41] Instead of waiting for BLM to conclude that lawful process, AIDEA filed this separate lawsuit and the State intervened.

---

[37] AR3404.

[38] AR3365.

[39] AR3370, AR3396–98, AR3720–32. Kaktovik Iñupiat Corp.'s 2020 application to conduct seismic exploration was previously denied. AR3702–03.

[40] Order re Defs.' and Plfs.' Unopposed Mot. to Stay Proceedings at 1, *GSC v. Haaland*, ECF No. 86 [hereinafter *GSC* Stay]. Interior recently reported that the draft EIS is expected in June. Defs.' Status Rep. on Issuance of Draft Supplement Environmental Impact Statement at 2, *GSC v. Haaland*, ECF No. 91.

[41] J. Status Rep. & Defs.' & Plfs.' Unopposed Mot. to Extend Stay at 3–4, *GSC v. Haaland*, ECF No. 85.

---

They now seek to force Interior to process its application to conduct exploration activities on the Coastal Plain.[42]

## **STANDARDS OF REVIEW**

Agency decisions are reviewed under the Administrative Procedure Act (APA).[43] Pursuant to the APA, a court may "disturb an agency action only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[44] In accordance with this standard, agency decisions will be overturned "only if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[45] This standard is "highly deferential."[46] Where a "reasonable basis exists" for an agency action, the action is presumed to be valid.[47] A reviewing court "may not substitute its judgment for that of

---

[42] As Interior points out, in their briefing to this Court on the Gwich'in Steering Committee's motion for a preliminary injunction, multiple Plaintiffs in this case as well as the State argued that an injunction was unnecessary because Interior had considerable discretion in evaluating any proposals for activities on the Coastal Plain and exploration was uncertain. Feds. at 12–13.

[43] 5 U.S.C. § 706(2).

[44] *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) (citation and internal quotation marks omitted); 5 U.S.C. § 706(2)(A), (D).

[45] *McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008) (citations and internal quotation marks omitted).

[46] *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).

[47] *Id.*

---

the agency concerning the wisdom or prudence of [the agency's] action."[48] Whether an agency action is a rule subject to the APA's notice and comment procedures is a question of law reviewed de novo.[49]

The APA does not provide a cause of action for judicial review of Presidential actions because the President is not an "agency."[50] Instead, judicial review of Presidential action, such as an Executive Order, initiated pursuant to a non-statutory cause of action provided by the Court's equitable authority, is narrow.[51] Courts consider whether the President's action was *ultra vires* — not within the scope of the President's authority — or otherwise in violation of the Constitution.[52] The equitable cause of action for *ultra vires* claims is confined to addressing extreme error, where the decision maker stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant judicial intervention.[53]

---

[48] *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987).

[49] *Gunderson v. Hood*, 268 F.3d 1149, 1154 (9th Cir. 2001).

[50] *Dalton v. Specter*, 511 U.S. 462, 469, 476 (1994); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018).

[51] *Hawaii v. Trump*, 878 F.3d 662, 682 (9th Cir. 2017), *rev'd and remanded on other grounds*, 138 S. Ct. 2392 (2018); *Brnovich v. Biden*, 562 F. Supp. 3d 123, 149 n.15, 149–50, (D. Ariz. 2022).

[52] *Hawaii v. Trump*, 878 F.3d at 682.

[53] *Fed. Express Corp. v. U.S. Dep't of Com*., 39 F.4th 756, 764 (D.C. Cir. 2022) (quoting *Griffith v. Fed. Lab. Rel. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) and *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971, 975 (D.C. Cir. 2022)).

# ARGUMENT

AIDEA and the State take issue with Interior's suspension of AIDEA's leases and processing of exploration permits while the agency undertakes a supplemental EIS to fix legal flaws with the Leasing Program. Their arguments are based on a mischaracterization of the facts and a misunderstanding of the applicable law. When Interior's actions are properly framed and the correct legal standard is applied, AIDEA and the State's arguments fail. Interior did not impose an indefinite moratorium on oil and gas activities on the Coastal Plain or miss deadlines in the Tax Act. The agency simply identified legal flaws with the Leasing Program as adopted and temporarily suspended leases and activities while it fixes those legal violations, a process which is actively proceeding. AIDEA's argument that Interior's actions violate mandatory duties under ANILCA and the Tax Act ignore Interior's inherent authority to fix legal errors in its decisions as well as the discretion afforded Interior to implement the Leasing Program. Because Interior only identified legal errors, suspended the leases and permit processing, and began a supplemental NEPA process to address the legal failings of the Leasing Program, its actions are not a reversal in agency policy, nor a rulemaking subject to the APA. Additionally, because the leases are still in effect and Interior is revising the Leasing Program, Interior did not "withdraw" lands from the operation of oil and gas laws under FLPMA.

---

I. **INTERIOR'S ACTIONS COMPLIED WITH ANILCA, THE TAX ACT, AND INTERIOR'S INHERENT AUTHORITY TO ADDRESS LEGAL ERRORS IN OIL AND GAS LEASING DECISIONS.**

A. **Interior's Actions Were Lawful Under ANILCA and the Tax Act.**

Interior's actions to address the legal problems with the Leasing Program, including suspending the leases, were consistent with the Tax Act and ANILCA. The "power to reconsider is inherent in the power to decide," and agencies have inherent authority to reconsider their decisions and address legal errors when done in a timely fashion and where Congress has not foreclosed or set out specific procedures for the agency to follow to rectify its mistakes.[54] The Supreme Court has also specifically recognized that the Secretary's general powers of management over public lands include the authority to cancel a lease where it was invalid at its inception, unless such authority has been expressly withdrawn by a statute.[55]

---

[54] *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (quoting *Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950)); *see also Gun South v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989) (recognizing general rule that agencies possess implied authority "to reconsider and rectify errors even though the applicable statute and regulations do not expressly provide for such reconsideration"); *Belville Mining Co. v. U.S.*, 999 F.2d 989, 997 (6th Cir. 1993) (discussing agency's inherent authority to reconsider decisions where there are legal deficiencies).

[55] *Boesche v. Udall*, 373 U.S. 472, 476 (1963). The State argues Interior cannot cancel the leases under the Tax Act or where there is only a NEPA violation. SOA at 25–26. This argument is premature because Interior did not cancel the leases; it only suspended them. 5 U.S.C. § 704. In addition, the State's characterizations of *Boesche* as being limited to only violations of the Mineral Leasing Act, SOA at 25, ignores that the *Boesche* opinion relied on Interior's general management authority over public lands, which the Court found to include the authority to address legal errors in leasing decisions. 373 U.S. at 476. The State also ignores that Interior violated not only NEPA, but also the

---

AIDEA and the State fail to show Interior's actions were contrary to the agency's inherent authority to address such legal errors and neither directly confront Interior's legal authority to do so. Nothing in the plain language of the Tax Act, ANILCA, or the Naval Petroleum Reserves Production Act (NPRPA) limits the agency's inherent authority to correct legal errors or sets out specific procedures the agency must follow to fix such errors.[56] Indeed, contrary to AIDEA's and the State's assertions that there was not an adequate basis for Interior's reconsideration,[57] the record shows Interior reasonably identified that there were significant legal errors with the agencies' prior decisions for the Leasing Program, including violations of the Tax Act, NEPA, and ANILCA.[58] As a result, Interior timely initiated a good faith process to address those legal errors.[59]

Interior also has the authority to suspend the improperly issued leases while addressing the legal errors. The Tax Act provides that the Secretary is to manage the Coastal Plain oil and gas program in a manner similar to how it administers lease sales

_____

Tax Act and potentially other laws when adopting the Leasing Program. AR3362–65, AR3404–05.

[56] Tax Act § 20001; 42 U.S.C. §§ 6501–6507 (NPRPA); 16 U.S.C. §§ 3101–3233 (ANILCA).

[57] AIDEA at 27; SOA at 27–30.

[58] *See, e.g.*, AR3362–65, AR3404–05.

[59] *GSC* Stay at 1–2. AIDEA's arguments also mischaracterize Interior's reconsideration process as indefinitely delaying implementing the statute. AIDEA at 29. That is contradicted by Interior's current efforts to address its legal errors through a supplemental NEPA process with estimated milestones. *GSC* Stay at 1–2.

_____

under the NPRPA and its regulations.[60] The NPRPA expressly provides the Secretary with the authority to "direct . . . the suspension of operations and production on any lease or unit."[61] AIDEA cites no support in the Tax Act or the NPRPA for its assertions that the Tax Act overrode this authority or that it is limited to site-specific considerations.[62] The statutory language is broad and contains no limitation for site-specific considerations or even a requirement that the agency make specific findings prior to suspending activities on any leases.[63] Nor does any other provision of the Tax Act limit Interior's ability to exercise its lease-suspension authority or indicate Congress intended to exclude that provision when making the NPRPA provisions generally applicable to the Leasing Program.[64] In addition to that statutory, because the Secretary has the authority to cancel leases that were invalid at their inception, as recognized in *Boesche*, it also follows that Interior has the corollary authority to take the more limited action of suspending activities

---

[60] Tax Act § 20001(b)(3).

[61] 42 U.S.C. § 6506a(k)(2).

[62] AIDEA at 28 n.8. AIDEA's argument that the leases provide no basis for suspension also fails because the lease terms themselves reflect that the rights granted are subject to applicable laws, which include the suspension authority in the NPRPA. *See, e.g.*, AR3320.

[63] 42 U.S.C. § 6506a(k)(2).

[64] Tax Act § 20001. AIDEA's argument appears to focus on the alleged "mandate" for an oil and gas program in the Tax Act, AIDEA 28 n.8, but the NPRPA contains language similar to the Tax Act about Interior administering an oil and gas program. 42 U.S.C. § 6506a(a). The Tax Act language directing Interior to administer the oil and gas program does not show Congress intended to divest Interior of the authority it otherwise made applicable to the program, including the authority to suspend leases to correct legal errors.

on the leases while engaging in a process to address the legal errors with the Leasing Program.[65]

AIDEA relies on isolated occurrences of the word "shall" in the Tax Act to argue that Interior violated multiple Tax Act mandates.[66] These arguments continue to ignore Interior's inherent authority to correct legal errors. Regardless, the use of the word "shall" does not necessarily give rise to a mandatory, nondiscretionary duty; the court must look to the broader context of those provisions.[67] Even where a statute uses the word "shall," it does not create a nondiscretionary duty when the statute provides no specific direction on what actions the agency must take.[68]

Here, the plain language and context of the Tax Act indicate BLM still retains broad discretion in implementing the Leasing Program. The plain language of the Tax

---

[65] *See, e.g.*, *Gun South*, 877 F.2d at 862 (indicating agency retains the power to correct an erroneous approval, as well as the corollary power to suspend other actions); *Nat'l Mining Ass'n v. U.S. Dep't of the Interior*, 177 F.3d 1, 9 (D.C. Cir. 1999) (indicating authority to deny a permit in the first instance includes authority to suspend improperly issued permit); *Boesche*, 373 U.S. at 476; *cf. Lute v. Singer Co.*, 678 F.2d 844, 846 (9th Cir. 1982) (providing there is corollary authority to rescind implicit in the authority to reconsider).

[66] AIDEA at 24–25.

[67] *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995); *Christensen v. Comm'r of Internal Rev.*, 523 F.3d 957, 960 (9th Cir. 2008) (indicating the court should not look at words in isolation and meaning should be derived from context). As Interior points out, both Interior and the State recognized the discretionary and speculative nature of future activities when they opposed the Gwich'in Steering Committee's motion for a preliminary injunction in the parallel lawsuit challenging the Leasing Program. Feds. at 12–13.

[68] *Sierra Club & Valley Watch, Inc. v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011) (indicating use of "shall" without detailed direction is not sufficient to provide standards for judicial review of a decision not to act).

---

Act requires Interior to hold two lease sales within ten years after the passage of the Tax Act, including one by the end of 2021.[69] BLM satisfied that mandate by holding the first lease sale in 2021.[70] The fact that Interior suspended the leases to address legal errors does not mean that Interior did not satisfy its lease-sale obligations. The Tax Act does not otherwise override Interior's discretion over whether to issue any leases following the sales or mandate Interior approve proposals for oil and gas activities.[71] Even to the extent the Tax Act charges Interior with administering an oil and gas program, that language does not override Interior's discretion in implementing the program or contain any particular timeframes for specific actions beyond holding two lease sales.[72] The 2,000-acre limitation in Section 20001(c)(3) similarly does not mandate Interior authorize all development activities or eliminate Interior's discretion in deciding how and when activities moves forward; it instead sets a cap on the footprint of development that can be allowed.[73]

The Tax Act also does not mandate the issuance of rights-of-way and easements.[74] The plain language of the right-of-way provision indicates the Secretary shall issue any rights-of-way or easements "necessary to carry out this section."[75] Although Congress

---

[69] Tax Act § 20001(c).
[70] AR3227–28, AR3315.
[71] Tax Act § 20001; 43 C.F.R. § 3132.5(b) (stating in the NPRPA regulations that the government "reserves the right to reject any and all bids received for any tract").
[72] *See* Tax Act § 20001(b)(2)(A).
[73] *Id.* § 20001(c)(3).
[74] AIDEA at 27–28.
[75] Tax Act § 20001(c)(2).

used the word "shall," the corresponding use of the word "necessary" demonstrates Interior still retains discretion to make that determination. Because Congress did not specify what is "necessary," that language does not give rise to a nondiscretionary duty or override the agency's discretion to make that determination itself.[76] Contrary to AIDEA's characterization,[77] the right-of-way provision must also be carried out consistent with a broad range of other statutes, including NEPA, the NWRSAA, the ESA, the Marine Mammal Protection Act, and other provisions of ANILCA. The Tax Act did not override these other legal obligations.[78]

For these same reasons, AIDEA's argument that Section 20001(c) of the Tax Act mandates actions that should be compelled under APA Section 706(1) as an unlawfully withheld agency action is also flawed.[79] The only mandated action in Section 20001(c) was to hold the first lease sale by the end of 2021, and BLM did that.[80] Relatedly, Interior is not bound to implement a legally-flawed record of decision, despite the State's assertions.[81] Forcing Interior to implement a legally-flawed Leasing Program would be

---

[76] *See, e.g.*, *Jackson*, 648 F.3d at 856 (indicating Congress' use of the word "necessary" without further parameters leaves the agency with discretion over how to define what actions are necessary).

[77] AIDEA at 27–28.

[78] Tax Act § 20001; 163 Cong. Rec. S7539–40 (daily ed. Nov. 30, 2017) (Murkowski Floor Statement) ("We have not preempted the environmental review process . . . . All [] relevant laws, regulations, and Executive Orders will apply under our language . . . . [W]e did not waive NEPA or any other environmental laws.").

[79] AIDEA at 39–40.

[80] Tax Act § 20001(c). As explained in more depth by Interior, the Court can only compel discrete agency actions that the agency is required to take. Feds. at 26–29.

[81] SOA at 20–23.

*ultra vires* and contrary to Interior's broader legal obligations to comply with the Tax Act and other statutory authorities.[82]

Overall, Interior acted consistent with the Tax Act, ANILCA, and its inherent authority to address the legal problems with the Leasing Program and the improperly issued leases.

## B. Executive Order 13990 Was Lawful.

Executive Order 13990 must be affirmed; it is neither unconstitutional nor *ultra vires* because the President has authority to direct the Secretary to take actions within her authority, and the Secretary has authority to suspend the leases and leasing program. The President has Constitutional authority to direct Executive branch officials in implementing the law.[83] As explained, the Secretary has authority to address legal errors with the Leasing Program and leases, and to take actions, including suspension of the

---

[82] *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) ("Both [agencies'] power to act and how they are to act are authoritatively prescribed by Congress, so that when they act improperly, . . . what they do is ultra vires.").

[83] *See, e.g.*, *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197 (2020) (explaining that because President has entire executive power but cannot perform all executive duties alone, Constitution assumes agency officials will carry out executive functions while being accountable to the President); *see also Collins v. Yellen*, 141 S. Ct. 1761, 1784 (2021) (describing President's authority over executive officials as essential to carry out Executive Branch functions while ensuring agencies are both accountable to the public and carrying out the President's policies).

Gwich'in Steering Comm. et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                     Page 18

leases, to ensure the lawfulness of those decisions.[84] Accordingly, the President acted within his authority and the Executive Order is neither *ultra vires* nor unconstitutional.[85]

Moreover, even if the court concludes that the Secretary lacked authority to suspend the program and leases, the Executive Order itself would only be *ultra vires* if it was "utterly unreasonable" for the President to believe the Secretary has such authority, or if it was clear that the suspension would violate a specific statutory mandate or prohibition.[86] Given the Secretary's long-recognized authority to correct legal violations associated with oil and gas leasing under *Boesche*, and the absence of any direct conflict with mandates in the Tax Act, which are merely deadlines for two lease sales, the President's actions were not "utterly unreasonable" or directly contrary to specific statutory mandates.[87] The Executive Order, therefore, was not *ultra vires*.

### C. Interior Adequately Explained its Decision.

As a threshold matter, AIDEA and the State misunderstand the legal framework applicable to Interior's challenged actions. An agency's acknowledgement of legal errors is not a reversal in agency policy subject to the standard set out in *FCC v. Fox Television Stations, Inc (Fox)*.[88] As discussed, administrative agencies have the authority to

---

[84] *Supra* notes 54–55 and accompanying text.

[85] Because the President acted within his Constitutional authority in directing the Secretary to take actions consistent with the legal authority Congress delegated under the Tax Act and other statutes, AIDEA's argument that the Executive Order violates the Property Clause by taking actions reserved to Congress also fails. AIDEA at 20.

[86] *Fed. Express Corp.*, 39 F.4th at 766.

[87] *See also* Feds. at 22–23.

[88] 556 U.S. 502, 515 (2009).

reconsider and address legal problems with their decisions.[89] None of AIDEA's cited cases challenged an agency's interim steps to cure expressly identified legal defects; they are, therefore, not applicable.[90] Nor does AIDEA cite any cases where an agency's attempt to cure a legal error was held an impermissible reversal of policy. The Court should reject this novel proposition.

AIDEA and the State conflate additional legal theories in support of their reversal arguments. For instance, the State asserts that Interior's change in statutory interpretation is an impermissible reversal.[91] But an administrative agency is "not estopped from changing a view [it] believes to have been grounded upon a mistaken legal interpretation," and Courts should defer to an agency's reasonable statutory interpretation.[92] Importantly, the State does not challenge the reasonableness of Interior's

---

[89] *Supra* notes 54–55 and accompanying text.

[90] AIDEA at 37–38, citing *Fox*, 556 U.S. 502 (reversal standard applied to challenge to liability notice and order that relied on changed definition of indecent language); *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061 (9th Cir. 2021) (reversal standard applied to challenge of decision that Pacific walrus no longer qualified for listing under the ESA when agency previously found that species did qualify for listing); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) (reversal standard applied to challenge of final regulation that reversed draft rule and decades of agency practice); *Greater Yellowstone Coalition v. Kempthorne*, 577 F. Supp. 2d 183 (D.D.C. 2008) (reversal standard applied to new winter management plan ROD); *Sierra Club North Star Chapter v. LaHood*, 693 F. Supp. 2d 958 (D. Minn. 2010) (reversal standard applied where agency changed prior position regarding project's Wild and Scenic Rivers Act evaluation); *Organized Village of Kake v. U.S. Dep't of Agric. (Kake)*, 795 F.3d 956 (9th Cir. 2015) (en banc) (reversal standard applied when agency adopted new ROD eliminating previously adopted roadless rule in National Forest).

[91] SOA at 31.

[92] *NRDC v. U.S. EPA*, 526 F.3d 591, 605 (9th Cir. 2008) (citing *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993)) (alteration in original).

---

Gwich'in Steering Comm. et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                                    Page 20

interpretation of the Tax Act. AIDEA also implies Executive Order 13990 and Interior's actions should be rejected because they lack a "genuine justification."[93] But AIDEA does not provide "a strong showing of bad faith or improper behavior" required to set aside agency actions on this basis.[94] In actuality, Interior identified and seeks to address legal errors in its decision, consistent with its authority to cure its own mistakes, requiring evaluation under the standard APA framework.[95]

The Secretary's decision withstands APA review and the State's challenges to the sufficiency of Interior's explanations fail because Interior's decision was not arbitrary or capricious. Interior provided more than speculation or "generic statements" in support of its decision.[96] Indeed, Interior explained that BLM's interpretation of the Tax Act's plain language was "both implausible and contrary to Congressional intent."[97] Because BLM misconstrued the Tax Act's 2,000-acre limit as a mandatory minimum, the range of alternatives in the EIS — including identifying which areas to make available for leasing and infrastructure — was fundamentally flawed.[98] Interior also explained that its analysis of foreign greenhouse gas emissions was implicated in a recent Ninth Circuit opinion and

---

[93] AIDEA at 37 n.14.

[94] *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575–76 (2019) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420 (1971)) (explaining courts do not reject agency decisions simply because they may also be motivated by political or other considerations).

[95] *Supra* notes 43–49 and accompanying text.

[96] SOA at 28.

[97] AR3365.

[98] *Id.*

---

Gwich'in Steering Comm. et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                    Page 21

as a result, Interior needed to reevaluate the analysis done for the Leasing Program.[99] These statements rationally connect the facts found and the choice made and explain why Interior exercised its discretion in the manner it did.[100] Because Interior explained its action, the cases the State cites are inapposite, not "identical."[101]

Assuming arguendo that this was an agency reversal of a policy decision, Interior's actions still meet the standard for a permissible agency reversal. An agency's policy change is ordinarily subject to no more searching review than would otherwise apply under the APA.[102] When changing course, an agency need only: (1) acknowledge the change in position, (2) supply good reasons for the new decision, and (3) otherwise comply with the law.[103] It is "well within an agency's discretion" to reanalyze the facts and law underlying its prior decisions and reach a different conclusion "even on precisely the same record."[104] AIDEA and the State's arguments that Interior's actions represented

---

[99] *Id*. (citing *Ctr. for Biological Diversity*, 982 F.3d at 736–40) (rejecting Interior's model intended to assess downstream greenhouse gas emissions); *see also supra* note 36.

[100] *Supra* notes 43–49 and accompanying text; *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 48 (1983). The State takes issue with the explanation contained in a separate addendum, SOA at 29–30, but there is sufficient justification for Interior's decision without it.

[101] SOA at 30 (citing *Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 658 (9th Cir. 2022) (rejecting conclusory agency findings where record evidence supported the opposite finding); *California v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1065–68 (N.D. Cal. 2020) (rejecting findings with no factual support in the record and which contradicted prior factual findings)).

[102] *Fox*, 556 U.S. at 515.

[103] *Id*.; *Ctr. for Biological Diversity*, 998 F.3d at 1067.

[104] *Kake*, 795 F.3d at 968 (citing *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012)).

---

a "lack of any acknowledgement — let alone a reasoned explanation — for Interior's reversal,"[105] are belied by the record.

First, Interior directly acknowledged its prior actions and the basis for its decision. The Secretarial Order and lease suspensions explained that Interior identified legal defects in the EIS, ROD, and leases and would need to do additional analysis to correct those errors.[106] This indicates that Interior's decisions were being "deliberately changed, not casually ignored."[107] While Interior previously defended its EIS and related decisions,[108] an agency need not recite every instance where it took or defended a prior position to acknowledge that it is changing course.

Second, Interior provided good reasons for its actions. As discussed, Interior identified multiple legal errors in the prior analysis.[109] This included a failure to consider a reasonable range of alternatives, misinterpretation of the Tax Act, a deficient analysis of greenhouse gas emissions, and its potential failure to comply with ANILCA Section 810 regarding subsistence impacts.[110] AIDEA's and the State's characterizations of Interior's decision as "unexplained" are, therefore, without merit.[111]

---

[105] AIDEA at 37; *see also* SOA at 30–31 (stating Interior reversed course "without acknowledgement or explanation").

[106] AR3364–65.

[107] *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970); *contra* SOA at 33 (claiming suspension "ignores" prior Interior actions).

[108] AIDEA at 35–36, SOA at 31–33.

[109] *See supra* notes 34–36.

[110] *Id.*; AR3362–65, AR3404.

[111] AIDEA at 38; SOA at 30–31.

Gwich'in Steering Comm. et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                    Page 23

Finally, Interior's actions otherwise comply with law. AIDEA and the State incorrectly argue that Interior's decision to conduct further NEPA analysis "evades" or is "at odds with" the Tax Act.[112] As explained, the Secretary's actions do not abrogate the Tax Act's mandate to conduct two lease sales by its deadlines, and otherwise further the Leasing Program's compliance with NEPA.[113]

In sum, Interior's actions to address its legal errors were within its authority and adequately explained.

## II. NOTICE AND COMMENT WAS NOT REQUIRED.

The Secretarial Order and lease suspensions, which directed Interior to undertake a process to correct legal errors and suspended the leases while doing so, are not an agency rule subject to APA notice and comment rulemaking.[114] The APA defines a "rule" as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency."[115] Further, notice and comment procedures are not required for all rules; interpretive rules, statements of policy,

_____

[112] AIDEA at 38–39; SOA at 33.
[113] *Supra* notes 54–56, 69–70 and accompanying text. As Interior explains, the State does not distinguish why a NEPA violation cannot form the basis for a lease cancellation while other legal errors can, and regardless, this argument is not ripe. Feds. at 32 n.9.
[114] *See* 5 U.S.C. § 553.
[115] *Id.* § 551(4).

_____

Gwich'in Steering Comm. et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                 Page 24

and rules of agency organization, procedure, and practice are exempt.[116] Only those rules

deemed "substantive" or "legislative" must go through a notice and comment process.[117]

AIDEA asserts that the Secretarial Order and lease suspensions are a substantive

rule because they leave no staff-level discretion to process oil and gas permit applications

for the Coastal Plain.[118] The fact that Interior's actions impact BLM's activities does not

establish that they are a rule under the APA.[119] As the Ninth Circuit explained,

substantive rules requiring notice and comment are those actions that limit discretion or

establish binding norms because they "so fill[] out the statutory scheme that upon

application one need only determine whether a given case is within the rule's criterion, it

effectively replaces agency discretion."[120]

The Secretarial Order and lease suspensions do not "fill out" or impose extra-

statutory obligations beyond the Tax Act's mandates. That is, the actions do not establish

the legal standards by which the agency will evaluate permit applications or otherwise

dictate how it will implement the Leasing Program. Those questions are left for the

---

[116] *Id.* § 553(b)(3)(A).

[117] *S. Cal. Edison Co. v. Fed. Energy Regul. Comm'n*, 770 F.2d 779, 783 (9th Cir. 1985).

[118] AIDEA at 33–35; SOA at 22. This claim cannot apply to the Executive Order because the APA does not apply to the President. *Supra* note 50.

[119] *Alcaraz v. Block*, 746 F.2d 593, 613 (9th Cir. 1984).

[120] *Sacora v. Thomas*, 628 F.3d 1059, 1069–70 (9th Cir. 2010) (quoting *Colwell v. HHS*, 558 F.3d 1112, 1124 (9th Cir. 2009)); *see also S. Cal. Edison Co.*, 770 F.2d at 783 ("For purposes of the APA, substantive rules are rules that create law. These rules usually implement existing law, imposing general, extrastatutory obligations pursuant to authority properly delegated by Congress.").

agencies to decide in the future.[121] They merely instruct the agency to temporarily

disallow activities and suspend the leases while the agency addresses identified legal

errors with the Leasing Program. As Interior explains, these actions were an adjudication

resulting in an order, not a rulemaking.[122] Such actions are also consistent with Interior's

inherent authority to correct legal errors and do not make those actions substantive rules

subject to notice and comment, particularly where nothing in the statute itself mandates

the use of notice and comment procedures for correcting legal errors.[123] As such, the

---

[121] *Supra* notes 29–38 and accompanying text. For this reason, AIDEA's reliance on *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987) is misplaced. AIDEA at 32–33. In that case, the court affirmed that substantive rules fill out statutory schemes, thereby circumscribing agency discretion in future decisions. *Mada-Luna*, 813 F.2d at 1013–14. That is not the case here, where the actions ensure compliance with existing laws. Relatedly, in *Western Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1067–68 (D. Idaho 2020), the court held that an instruction memorandum was a substantive rule because it set specific procedures for public participation processes in oil and gas leasing decisions, where the agency was statutorily directed to adopt those processes via notice and comment rulemaking. *See* AIDEA at 35. *Minard Run Oil Co. v. U.S. Forest Service* (*Minard*), 670 F.3d 236, 254–55 (3rd Cir. 2011), is also inapposite. AIDEA at 35. In that case, the U.S. Forest Service entered a settlement agreement and issued a statement that imposed a new permitting requirement and changed the agency's process for authorizing certain activities. *Minard*, 670 F.3d at 242. In contrast, the Secretarial Order and lease suspensions do not impose requirements for BLM's administration of the Tax Act or otherwise change how the agency will process the application in the future.

[122] Feds. at 35–36.

[123] *See supra* notes 54–55; *see also* Feds. at 36–37. AIDEA cites no case holding an agency's interim actions to correct legal errors are subject to notice and comment absent a statute specifically requiring it for the correction of legal errors, which is not the case here.

---

Gwich'in Steering Comm. et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                              Page 26

Secretarial Order and lease suspensions are not rules subject to APA notice and comment.[124]

### III. THE SECRETARIAL ORDER AND LEASE SUSPENSIONS DO NOT VIOLATE FLPMA.

As a threshold matter, AIDEA fails to explain why the Coastal Plain is subject to FLPMA's withdrawal provisions. National Wildlife Refuges, including the Arctic Refuge, are managed under the National Wildlife Refuge System Administration Act.[125] To date, BLM's position is that FLPMA does not apply to the Coastal Plain.[126] Regardless, the Secretary's action does not constitute a withdrawal subject to FLPMA's procedural requirements because the Secretarial Order and lease suspensions do not take leased areas out of the operation of public land laws.[127]

FLPMA defines "withdrawal" as "withholding an area of Federal land from settlement, sale, location, or entry, under some of all of the general land laws, for the

---

[124] AIDEA's reliance on *Louisiana v. Biden*, 2022 U.S. Dist. LEXIS 148570 (W.D. La. 2022), to support its argument that the suspensions are substantive rules is misplaced, AIDEA at 35, because the Secretarial Order and lease suspensions here are consistent with the Tax Act, within the Secretary's authority to correct legal errors with the Leasing Program, and do not otherwise intrude on the agency's discretion under applicable laws. *Supra* notes 54–56 and accompanying text.

[125] 16 U.S.C. § 668dd & ANILCA § 304(a); *see also* ANILCA § 304(c) (withdrawing National Wildlife Refuge System units in Alaska from operation of public land laws).

[126] AR2252 (responding to comment asking for clarification of FLPMA application stating, "Surface management of the Refuge is covered by the Refuge Administration Act, not FLPMA"); AR0673–74 (FLPMA not included in legal authorities applicable to BLM's administration of the Leasing Program).

[127] AIDEA at 30.

purpose of limiting activities under those laws in order to maintain other public values in the area . . . ; or transferring jurisdiction over an area of Federal land . . . from one department, bureau or agency to another department, bureau or agency."[128] Secretarial Order 3401 placed only a "temporary halt" on Interior's processing of oil and gas activities.[129] Contrary to AIDEA's argument, temporarily suspending oil and gas activities does not effectuate a withdrawal of the Coastal Plain from operation of applicable mineral leasing or public land laws.[130] Interior's actions simply regulate oil and gas activities under the Tax Act[131] and allow for further study of the impacts of the Leasing Program as required by NEPA and ANILCA.[132]

---

[128] 43 U.S.C. § 1702(j); *see also New Mexico v. Watkins*, 969 F.2d 1122, 1124 (D.C. Cir. 1992) (defining withdrawal as an action that "exempts the covered land from the operation of public land laws."); *Se. Conference v. Vilsack*, 684 F. Supp. 2d 135, 143 (D.D.C. 2010) (equating "withdrawal" definition in ANILCA and FLPMA, and explaining "a withdrawal exempts covered land from the operation of laws that otherwise authorize the transfer of federal lands . . . for private use").

[129] AR3362.

[130] AIDEA at 30. *Cf. Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1229–30 (9th Cir. 1988) (explaining that under the Mineral Leasing Act, not offering lands for lease is not a withdrawal but a valid exercise of the Secretary's discretion); *W. Energy All. v. Biden*, 2022 U.S. Dist. LEXIS 171160, at *52–53 (D. Wyo. 2022) (holding lease sale postponements to allow additional NEPA review was not a FLPMA withdrawal).

[131] Tax Act § 20001(b)(3); 42 U.S.C. § 6506a(b) (requiring the Secretary to provide conditions, restrictions and prohibitions on oil and gas activities within the Reserve to protect surface resources); *id*. § 6506a(k)(2) (granting Secretary authority to suspend activities on existing leases).

[132] AR3362, AR3364–65. Congress explained that the Tax Act would not waive other legal requirements. *Supra* note 78.

Additionally, while FLPMA defines "withdrawal" to include "transferring jurisdiction over an area of Federal land" from one agency to another,[133] AIDEA is incorrect that such a transfer occurred here.[134] Both before and after the Secretarial Order, FWS manages the Arctic Refuge while BLM administers the Leasing Program.[135] The Secretarial Order merely requires further study by the same agencies that conducted the original NEPA analysis and, consistent with the Tax Act, tasks BLM with taking action with respect to the issued leases.[136]

In sum, Interior's actions did not constitute a withdrawal.

## IV.    IF THE COURT FINDS LEGAL VIOLATIONS, THE COURT SHOULD REMAND WITHOUT VACATING INTERIOR'S ACTIONS.

While the APA instructs courts to "hold unlawful and set aside [an illegal] agency action,"[137] courts may leave agency actions in place "when equity demands."[138] If this Court finds legal violations, the Court should exercise its equitable discretion and leave the Secretarial Order and lease suspensions in place on remand.

---

[133] 43 U.S.C. § 1702(j).

[134] AIDEA at 30.

[135] 16 U.S.C. § 668dd(a)(1); Tax Act § 20001(a)(2); AR3368–69; *see also Trustees for Alaska v. Watt*, 524 F. Supp. 1303, 1308–10 (D. Alaska 1981) (explaining that the Arctic Refuge is administered by FWS and the Secretary lacks authority to transfer jurisdiction).

[136] AR3363.

[137] 5 U.S.C. § 706(2).

[138] *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 663 (9th Cir. 2022) (citation and internal quotation marks omitted); *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015); *see also Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (noting courts are "not required to set aside every unlawful agency action").

Courts recognize an exception to the remedy of vacatur, remanding agency decisions without vacating in circumstances when there could be serious environmental harm from vacating.[139] Two factors are used to determine if remand without vacatur is warranted: (1) the seriousness of the agency's error, and (2) "the disruptive consequences of an interim change that may itself be changed."[140] Both are met in this case: the errors, if there are any, are not serious and can be remedied on remand, and vacating may lead to considerable environmental harm, while causing significant disruption.

In considering the first factor — the seriousness of the error — courts look at whether the agency could reach the same result on remand.[141] AIDEA's procedural claims — notice and comment requirements under the APA and FLPMA, and providing an adequate explanation for its action — are not "serious errors" warranting vacatur.[142]

---

[139] *See Pollinator Stewardship Council*, 806 F.3d at 532–33 (stating test for remand without vacatur in circumstances where there would be serious environmental harm from vacating and the error is not serious); *Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely [when] serious irreparable environmental injury [will occur if the decision is vacated].").

[140] *Pollinator Stewardship Council*, 806 F.3d at 532. The Ninth Circuit recently articulated this test as a three-factor test. *NRDC v. U.S. EPA*, 38 F.4th 34, 51–52 (9th Cir. 2022). The same issues are considered under both frameworks.

[141] *Ctr. for Food Safety*, 56 F.4th 663–64; *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012).

[142] *See Pollinator Stewardship Council*, 806 F.3d at 532 (explaining procedural violations that, when remedied and can result in the same decision being adopted, do not favor vacatur); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (noting failure to provide notice and comment "is harmless when the agency's mistake had no bearing on the procedure used or the substance of the decision"); *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238,

---

When considering the second factor — the consequences of vacating — the focus is on the harm to the environment and the disruption of vacating.[143] Here, vacating may result in exploration or other activities being allowed on the Coastal Plain, which could harm polar bears and the fragile tundra.[144] The potential for this harm is heightened because Interior has yet to adopt a program that complies with laws intended to protect the Refuge. Because vacating could lead to environmental harm instead of protecting against it, this Court should exercise its equitable discretion to leave the agency actions in place.[145]

Vacating would also be highly disruptive. In the Gwich'in Steering Committee's litigation challenging the Leasing Program, the Gwich'in Steering Committee agreed to an extended stay based on suspension of the Leasing Program and commitments by the Secretary to not rely on the agency documents adopting and implementing the Leasing

---

1244 (N.D. Cal. 2015) (noting courts remand without vacatur when errors are "mere technical or procedural formalities that the [agencies] can easily cure").

[143] *Ctr. for Food Safety*, 56 F.4th at 668; *Nat'l Family Farm Coal. v. U.S. EPA*, 960 F.3d 1120, 1144–45 (9th Cir. 2020); *Pollinator Stewardship Council*, 806 F.3d at 532.

[144] *GSC*, 2021 U.S. Dist. LEXIS 1471, at *17–18 (summarizing Gwich'in Steering Committee's arguments about harms from leasing and seismic exploration).

[145] *See, e.g.*, *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 188 (D.C. Cir. 2017) (not vacating pesticide rule to maintain "the enhanced protection of the environmental values" (citation omitted)); *Idaho Farm Bureau*, 58 F.3d at 1406 (leaving faulty rule in place where vacating could harm snail population); *Ctr. for Food Safety*, 734 F. Supp. 2d at 951 (explaining Ninth Circuit remands without vacating when "serious irreparable environmental injury" may occur if the decision is vacated); *cf. Pollinator Stewardship Council*, 806 F.3d at 532 (vacating unlawful rule because of the "precariousness" of bee populations).

Program in any permitting.[146] AIDEA and the State did not object to those commitments or the Secretary's stated timeline for issuance of the SEIS and adoption of a new ROD. Vacating the Secretarial Order and lease suspensions in this case would undermine the commitments made in the *Gwich'in Steering Committee* case and require the Gwich'in Steering Committee to expeditiously litigate that case.[147] Instead, if the Court remands without vacating, Interior can proceed to address the legal violations with the Leasing Program while also responding to any legal issues recognized in this case, allowing the agency to comprehensively ensure that its actions comply with the law before approving activities on the tundra.

Additionally, BLM and FWS are undertaking a public SEIS process to address issues with the Leasing Program as adopted.[148] Vacating the Secretarial Order and lease suspensions now will cause considerable public confusion about the status of the program and the legal violations as the public seeks to engage in the SEIS process in the near future.

---

[146] J. Status Rep. and Mot. to Extend Stay at 4, 7, *GSC v. Haaland*, ECF No. 85.

[147] AIDEA and the State's arguments that their interests are being harmed by the Secretarial Order and lease suspensions because of the loss of potential revenue and jobs ignore that Interior is not mandated to issue the requested permit. AIDEA at 18–19; SOA at 17–19; *see supra* notes 60–71 and accompanying text. Therefore, even if the Court vacates the Secretarial Order and lease suspensions, the remedy would not redress their alleged harms.

[148] The agencies completed scoping and the draft SEIS is expected to be released to the public in June. Defs.' Status Rep. On Issuance of Draft Suppl. Env't Impact Statement at 2, *GSC v. Haaland*, ECF No. 91.

---

Gwich'in Steering Comm. et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                     Page 32

AIDEA's injunction request should also be denied. AIDEA offers scant argument to satisfy the test for a permanent injunction. Indeed, it cannot meet that test, given that remand with vacatur is inappropriate.[149]

## CONCLUSION

The Court should deny AIDEA's and the State's Motions for Summary Judgment and enter judgment for the Defendants and Intervenor-Defendants Gwich'in Steering Committee and the Arctic Village and Venetie Tribes.

Respectfully submitted this 17th day of February, 2023.

s/ Brook Brisson
Brook Brisson (AK Bar No. 0905013)
Suzanne Bostrom (AK Bar No. 1011068)
Bridget Psarianos (AK Bar No. 1705025)
Vicki Clark (AK Bar No. 0401001)
TRUSTEES FOR ALASKA

*Attorneys for Intervenor-Defendants Gwich'in Steering Committee, et al.*

s/ Karimah Schoenhut (consent)
Karimah Schoenhut (pro hac vice)
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM

*Attorney for Intervenor-Defendant Sierra Club*

---

[149] AIDEA at 40; *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010) (explaining vacatur is "less drastic" remedy than injunction).

Gwich'in Steering Comm. et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                    Page 33

**CERTIFICATE OF SERVICE**

I certify that on February 17, 2023, I caused a copy of the INTERVENOR-DEFENDANTS' RESPONSE IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT to be electronically filed with the Clerk of the Court for the U.S. District Court of Alaska using the CM/ECF system.

<u>s/ Brook Brisson</u>
Brook Brisson