Matthew N. Newman (AK Bar No. 1305023)
Megan R. Condon (AK Bar No. 1810096)
NATIVE AMERICAN RIGHTS FUND
745 West 4th Avenue, Suite 502
Anchorage, AK 99501
Phone: 907-276-0680
mnewman@narf.org
mcondon@narf.org

*Lead Counsel for Intervenor-Defendants Native Village of Venetie*
*Tribal Government, Arctic Village Council, and Venetie Village Council*

Peter H. Van Tuyn (AK Bar No. 8911086)
Karen E. Schmidt (AK Bar No. 1211113)
BESSENYEY & VAN TUYN, LLC
310 K Street, Suite 200
Anchorage, AK 99501
Phone: 907-278-2000
peter@bvt-law.com
karen@bvt-law.com

*Co-Counsel for Intervenor-Defendants Native Village of Venetie*
*Tribal Government, Arctic Village Council, and Venetie Village Council*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY, *et al.*, | Case No. 3:21-cv-00245-SLG |
| Plaintiffs, | |
| and | |
| STATE OF ALASKA, | |
| Intervenor-Plaintiff, | |
| v. | |
| JOSEPH R. BIDEN, JR., *et al.*, | |

Defendants,

and

NATIVE VILLAGE OF
VENETIE TRIBAL
GOVERNMENT, *et al*.,

Intervenor-Defendants.

**INTERVENOR-DEFENDANTS NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT, ARCTIC VILLAGE COUNCIL, AND VENETIE VILLAGE COUNCIL'S RESPONSE IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT**
(Fed. R. Civ. P. 56(a), Local Civ. R. 16.3)

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................... ii

TABLE OF AUTHORITIES................................................................................... iii

INTRODUCTION .................................................................................................. 1

FACTUAL BACKGROUND .................................................................................. 3

   I.   The Gwich'in Tribes, the Coastal Plain of the Arctic Refuge, and
       the Wildlife that Depend on It. ...................................................................... 3

   II.   THE ARCTIC REFUGE'S PURPOSES AND PROCEDURAL HISTORY OF
       THE COASTAL PLAIN LEASING PROGRAM.  .................................................. 4

   III.   THE PRESIDENT'S AND THE SECRETARY'S ACTIONS TO REVIEW
       AND SUPPLEMENT THE LEASING PROGRAM. .................................................. 6

STANDARD OF REVIEW ..................................................................................... 8

ARGUMENT ......................................................................................................... 9

I.   DOI'S ACTIONS DO NOT VIOLATE ANY APPLICABLE LAWS............................ 9

      A.    DOI's Actions Were Lawful Under the Tax Act. ........................... 10

      B.    DOI's Actions Were Lawful Under ANILCA. ............................... 12

  II.   NOTICE AND COMMENT WAS NOT REQUIRED. ........................................... 15

  III.   THE DOI'S ACTIONS ARE NOT AN UNLAWFUL CHANGE IN
       POSITION. ................................................................................................... 19

CONCLUSION ..................................................................................................... 22

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                Page ii

Case 3:21-cv-00245-SLG    Document 65    Filed 02/17/23    Page 3 of 30

# TABLE OF AUTHORITIES

## CASES

*Alcaraz v. Block*, 746 F.2d 593 (9th Cir. 1984)..................................................................... 18

*Atochem North America, Inc. v. EPA*, 759 F. Supp. 861 (D.D.C. 1991) .......................... 17

*Boesche v. Udall*, 373 U.S. 472 (1963) ....................................................................... 11, 14

*Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061 (9th Cir. 2021)......................... 20

*Dalton v. Specter*, 511 U.S. 462 (1994) ........................................................................... 15

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016).......................................... 20, 22

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........................................ 19, 21

*Gun South, Inc. v. Brady*, 877 F.2d 858 (11th Cir. 1989) .................................................. 14

*Gwich'in Steering Comm. v. Bernhardt*, No. 3:20-CV-00204-SLG, 2021 WL
46703 (D. Alaska Jan. 5, 2021)................................................................................ 3

*Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81 (D.C. Cir. 2014)....................................... 14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463
U.S. 29 (1983)............................................................................................................ 8

*Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010 (D.C. Cir. 2016)............................................ 17

*Nat'l Labor Relations Bd. v. Bell Aerospace Co.*, 416 U.S. 267 (1974)............................ 17

*Neustar, Inc. v. FCC*, 857 F.3d 886 (D.C. Cir. 2017) ....................................................... 17

*Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136 (9th Cir.
2007) .......................................................................................................................... 9

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956
(9th Cir. 2015)......................................................................................... 19, 20, 21, 22

*Providence Yakima Medical Center v. Sebelius*, 611 F.3d 1181 (9th Cir. 2010). ............ 17

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                                              Page iii

Case 3:21-cv-00245-SLG    Document 65    Filed 02/17/23    Page 4 of 30

*S. Cal. Edison Co. v. Fed. Energy Regulatory Comm'n*, 770 F.2d 779 (9th Cir. 1985). ....................................................................................................... 18

*Se. Conf. v. Vilsack*, 684 F. Supp. 2d 135 (D.D.C. 2010) .................................. 14

*Securities and Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947) .................... 17

*Sierra Club North Star Chapter v. LaHood*, 693 F. Supp. 2d 958 (D. Minn. 2010) .................................................................................................... 20

*Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994) ......................... 16

**STATUTES**

5 U.S.C. § 551 .......................................................................................... 16

5 U.S.C. § 553 .................................................................................... 15, 18

5 U.S.C. § 706 ............................................................................................ 8

16 U.S.C. § 3143 ........................................................................................ 5

42 U.S.C. § 6506a ..................................................................................... 11

Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, § 303, 94 Stat. 2371 (1980) .......................................................................... 5, 13

Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 20001, 131 Stat. 2054, 2236 (2017) .................................................................................... 5, 10

**FEDERAL REGISTER**

Pub. Land Order 2214, Establishing the Arctic National Wildlife Range 25 Fed. Reg. 12,598, 12,598–99 (Dec. 6, 1960). .............................................. 4

**MISCELLANEOUS**

Compl. *Native Vill. of Venetie Tribal Government v. Haaland*, Case No. 3:20-cv-00223-SLG (ECF No. 1) ........................................................... 1, 13

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                    Page iv

Case 3:21-cv-00245-SLG    Document 65    Filed 02/17/23    Page 5 of 30

Order Granting Defs.' Unopposed Mot. to Stay Proceedings, *Native Vill. of Venetie Tribal Government v. Haaland*, Case No. 3:20-cv-00223-SLG (ECF No. 65) ...................................................................................................... 6

Defs.' Status Report on Issuance of Supplemental Environmental Impact Statement, *Native Vill. of Venetie Tribal Government v. Haaland*, Case No. 3:20-cv-00223-SLG (ECF No. 84) ................................................................................. 8

# INTRODUCTION

For many years Intervenor-Defendants Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council (collectively "the Tribes") have participated in and raised concerns with the process leading to the Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") for the Coastal Plain Oil and Gas Leasing Program ("Leasing Program") for the Arctic National Wildlife Refuge ("Arctic Refuge" or "Refuge"), including the Tribes' initiation of a lawsuit against the Department of Interior ("DOI").[1] As a result of those concerns, and at the direction of the President via Executive Order, the Secretary of the U.S. Department of the Interior ("Secretary") reviewed the legality of the Leasing Program. The Secretary's review identified numerous legal problems, leading the Secretary to order the Bureau of Land Management ("BLM") to undertake a process to supplement its analysis under the National Environmental Policy Act ("NEPA") and other laws to adopt a Leasing Program that complies with the law. During this process, the Principal Deputy Assistant Secretary for Lands and Minerals Management ("Assistant Secretary") suspended the existing leases, tolling the lease terms until a new Leasing Program could be adopted. These actions led to a stay of the Tribes' lawsuit against the Leasing Program pending completion of the required analyses.

---

[1] Compl. *Native Vill. of Venetie Tribal Government v. Haaland*, Case No. 3:20-cv-00223-SLG (ECF No. 1).

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                              Page 1

This Supplemental EIS process, and associated processes under the National Historic Preservation Act ("NHPA") and Alaska National Interest Lands Conservation Act ("ANILCA") are still underway today with the Tribes as active participants through roles as cooperating agencies and consulting parties. The Tribes' brief will focus narrowly on the need for these supplemental processes, the status of these supplemental processes, and the legality of DOI's actions in undertaking these supplemental processes and maintaining the status quo in the interim. The Tribes also incorporate by reference, as though fully set forth herein, the arguments and evidence set forth by the Defendants and the other Intervenor-Defendants.[2]

The Plaintiffs challenge the actions taken by the President, Secretary, and Assistant Secretary as an unlawful "moratorium" of oil and gas activities in violation of both substantive and procedural law.[3] Plaintiffs' arguments, however, are based on fundamental misapprehensions of both the executive actions taken as well the process now underway to supplement the analyses conducted by the BLM from 2018 to 2020. It is well within the Secretary's discretion to order such a supplementation as well as to protect the public resources at issue by issuing a temporary suspension of leases to maintain the status quo ante while the supplemental EIS process is undertaken.[4] The

---

[2] *See* Defs.' Resp. in Opp'n to Pls' and Intervenor-Pls' Mots.. For Summ. J. (ECF No. 63) (hereinafter "Defs.' Response") and Intervenor-Defs. Gwich'in Steering Committee et al.'s Resp. in Opp'n to Mots. For Summ. J. (ECF No. 64).

[3] Pls.' Mot. for Summ. J. at 8, 15 (ECF No. 60) (hereinafter "AIDEA"); State of Alaska's Mot. for Summ. J. at 3–4, 13 (ECF No. 59) (hereinafter "SOA").

[4] *See generally* Defs.' Response.

Secretary's authority to implement a supplemental environmental analysis, based on her finding of legal deficiencies in the underlying EIS, is well established, and nothing in the 2017 Tax Cuts and Jobs Act ("Tax Act"), ANILCA, or other federal law limits or otherwise hinders the Secretary's actions in this instance. Accordingly, this Court should deny Plaintiffs and the Intervenor-Plaintiff's motions for summary judgment and enter judgment in favor of Defendants, Intervenor-Defendants Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council, and Intervenor-Defendants Gwich'in Steering Committee, et al.

## FACTUAL BACKGROUND

The underlying facts of the Coastal Plain Leasing Program have been before this Court before.[5] The Tribes provide an abbreviated account of the pertinent facts leading to the instant case.

## I. The Gwich'in Tribes, the Coastal Plain of the Arctic Refuge, and the Wildlife that Depend on It.

The Coastal Plain of the Arctic Refuge is a biological wonder and is the cultural cornerstone for the Gwich'in Tribes.[6] The Porcupine Caribou Herd migrates about 2,700 miles annually through Alaska and Canada to reach the Coastal Plain because it offers uniquely high-quality habitat for calving, rearing young, seeking relief from insects,

---

[5] *Gwich'in Steering Comm. v. Bernhardt*, No. 3:20-CV-00204-SLG, 2021 WL 46703 (D. Alaska Jan. 5, 2021) (order denying preliminary injunction to halt lease sale).
[6] Margorie Gemmill Decl. ¶¶ 4,7 (ECF No. 23-4); Robert Sam Decl. ¶¶ 3,7 (ECF No. 23-5); Paul Tritt Decl. ¶ 4 (ECF No. 23-6).

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                    Page 3

foraging, and avoiding predators. The Coastal Plain is sacred to the Tribes and other Gwich'in communities because of their deep cultural and spiritual connection to the Porcupine Caribou Herd.[7] Gwich'in call themselves "Caribou People," and they refer to the Coastal Plain as "Iizhik Gwats'an Gwandaii Goodlit" the "Sacred Place Where Life Begins."[8] The abundance of the Coastal Plain also attracts hundreds of thousands of migratory birds from six continents, and it supports a multitude of other wildlife. The Tribes rely on these migratory birds and other wildlife as part of their traditional subsistence way of life.[9] Archaeological and cultural resources tied to the Gwich'in's shared history in the Coastal Plain can still be found today. The Coastal Plain and the caribou permeate throughout Gwich'in songs, dance, and oral histories.[10]

## II. The Arctic Refuge's Purposes and Procedural History of the Coastal Plain Leasing Program.

The Arctic Refuge was first granted federal protection through a public land order in 1960.[11] It was then known as the Arctic National Wildlife Range ("the Range"), and was established for the purposes of "preserving unique wildlife, wilderness and recreational values."[12] In 1980, Congress enacted ANILCA, renaming the Range as the Arctic National Wildlife Refuge, expanding its acreage, and recognizing four Refuge-

---

[7] Gemmill Decl. ¶ 8; Sam Decl. ¶ 7.

[8] Gemmill Decl. ¶ 7; Sam Decl. ¶ 8.

[9] Gemmill Decl. ¶¶ 10–11; Tritt Decl. ¶ 6.

[10] Gemmill Decl. ¶ 7

[11] *See* Pub. Land Order 2214, Establishing the Arctic National Wildlife Range 25 Fed. Reg. 12,598, 12,598–99 (Dec. 6, 1960).

[12] *Id*. at 12,598.

specific purposes in addition to those established through the 1960 public land order. [13] The four Refuge-specific purposes for the Arctic Refuge are: "(i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, the Porcupine caribou herd . . . , polar bears, grizzly bears, muskox, Dall sheep, wolves, wolverines, snow geese, peregrine falcons and other migratory birds and Arctic char and grayling; (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats; (iii) to provide . . . the opportunity for continued subsistence uses by local residents; and (iv) to ensure . . . water quality and necessary water quantity within the refuge."[14]

Until recently, ANILCA prohibited oil and gas leasing and development anywhere in the Arctic Refuge.[15] Through tax legislation in 2017, however, Congress added a new Refuge-specific purpose—"to provide for an oil and gas program on the Coastal Plain"— and directed the Secretary to establish and administer an oil and gas leasing and development program there.[16] Importantly, in the Tax Act Congress did not modify the pre-existing purposes of the Arctic Refuge or waive any otherwise applicable laws.

The BLM subsequently conducted an environmental, subsistence, and historic property review. The BLM issued its Final EIS and ANILCA Section 810 Evaluation in

---

[13] *See* Pub. L. No. 96-487, § 303(2), 94 Stat. 2371 (1980).
[14] *Id.* § 303(2)(B).
[15] 16 U.S.C. § 3143.
[16] Tax Cuts and Jobs Act of 2017 ("Tax Act"), Pub. L. No. 115-97, § 20001(b)(2)(A) & (B)(iii), 131 Stat. 2054, 2236 (2017).

September 2019 and their ROD in August 2020.[17] The ROD disclosed that BLM may

undertake a Supplemental EIS prior to holding a second lease sale:

> Prior to the second and any subsequent sales, the BLM will evaluate the Leasing EIS to determine whether it remains adequate or requires supplementation based on new circumstances or information, or substantial changes to the leasing program (see 40 CFR 1502.9(c)(1) and 43 CFR 46.120(c)).[18]

Four lawsuits were filed in August and September 2020 challenging these federal

agency actions, all of which have been stayed pending BLM's work on the supplemental

analysis currently underway.[19] BLM held its first lease sale in January 2021.[20]

## III. The President's and the Secretary's Actions to Review and Supplement the Leasing Program.

On January 20, 2021, President Biden issued Executive Order 13990.[21] The order

identified "alleged legal deficiencies" of the Leasing Program, including the deficiencies

in the environmental analysis underlying the Leasing Program alleged by the Tribes and

other litigants in lawsuits challenging the Leasing Program.[22] Executive Order 13990

directed the Secretary to "place a temporary moratorium" on activities implementing the

Leasing Program, review the program, and "conduct a new, comprehensive analysis of

---

[17] AR0001, 0686, 3138.
[18] AR3161.
[19] Order Granting Defs.' Unopposed Mot. to Stay Proceedings, *Native Vill. of Venetie Tribal Government v. Haaland*, Case No. 3:20-cv-00223-SLG (ECF No. 65).
[20] AR3227–28, 33314–15.
[21] AR3349.
[22] AR3351.

the potential environmental impacts" of the Leasing Program "as appropriate and consistent with applicable law."[23]

The Secretary conducted the review directed by Executive Order 13990 and issued her findings in Secretarial Order No. 3401.[24] The Secretary identified several legal flaws with the Leasing Program, including the BLM's failure to analyze a reasonable range of alternatives under NEPA and the failure "to properly interpret" the Tax Act.[25] Based on this legal review, the Secretary directed BLM to undertake a supplemental environmental analysis of the Leasing Program.[26] To maintain the status quo while the supplemental NEPA process was underway, the Secretary placed a temporary halt on activities related to the Leasing Program.[27]

Lease-suspension letters issued by the Assistant Secretary suspended the existing leases and provided greater detail on the legal defects identified by the Secretary's Order.[28] The lease-suspension letters made clear to leaseholders that the action was temporary, and outlined the goal of the additional analysis to "determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures."[29] Additionally, the lease-suspension letters stated that DOI would suspend rental payments

---

[23] AR3351.
[24] AR3362–63.
[25] AR3362.
[26] AR3362.
[27] AR3363.
[28] AR3364–65,
[29] AR3365.

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                                    Page 7

to the existing leases during the pendency of the supplemental analysis process.[30] Only after DOI took these actions did Plaintiff Alaska Development and Export Authority ("AIDEA") apply to conduct exploration-related activities in the Coastal Plain.[31]

## STANDARD OF REVIEW

Courts review agency actions under the Administrative Procedure Act (APA).[32] The APA permits a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[33] An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[34] This is a "highly deferential"

---

[30] AR3365. The supplemental analysis process is actively underway, and the Tribes are currently participating as cooperating agencies. Gemmill Decl. ¶ 16; Sam Decl. ¶ 12; Tritt ¶ 11. Release of a Draft Supplemental EIS is expected in the second quarter of 2023. Defs.' Status Report on Issuance of Supplemental Environmental Impact Statement, *Native Vill. of Venetie Tribal Government v. Haaland*, Case No. 3:20-cv-00223-SLG (ECF No. 84).

[31] AR3370–71, AR3396–98.

[32] 5 U.S.C. § 706(2).

[33] *Id.* § 706(2)(A).

[34] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

standard of review and an agency action is presumed valid "if a reasonable basis exists for its decision."[35]

## ARGUMENT

## I.     DOI's Actions Do Not Violate Any Applicable Laws.

The Leasing Program remains in place today amidst an ongoing process to fix specific legal deficiencies as identified by DOI. The agency is acting well within its inherent authority to address legal deficiencies through a supplemental process and to suspend AIDEA's leases and pause exploration permit processing in the interim to ensure any oil and gas program activities will fully comply with the law. DOI's ongoing processes did not place a permanent moratorium on AIDEA's leases, did not violate the Tax Act, and did not withdraw any of the lands within the Arctic Refuge from the requirements of ANILCA. Moreover, the Executive Order and Secretarial Order initiating DOI's ongoing process did not violate the APA as these actions were not rulemakings and did not constitute an unlawful reversal of the agency's position. Indeed, as DOI's ROD disclosed to all parties, the agency reserved the right to reevaluate the 2020 Leasing Program EIS to determine, prior to a second lease sale, whether to undertake a supplementation process under NEPA and other laws.[36]

---

[35] *Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting *Independent Acceptance Co. v. California,* 204 F.3d 1247, 1251 (9th Cir. 2000)).

[36] AR3161.

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                                    Page 9

## A.     DOI's Actions Were Lawful Under the Tax Act.

The DOI's actions—supplementing its past analysis to address identified legal deficiencies and suspending leases until that analysis is completed—are within the agency's authority and are consistent with the Tax Act.

The Tax Act adds a purpose for the Refuge, "to provide for an oil and gas program," and directs the Secretary to "establish and administer a competitive oil and gas program" on the Coastal Plain.[37] Though the Tax Act includes certain specific directives, such as targeted timelines for lease sales,[38] the direction to manage the Coastal Plain Leasing Program in a manner similar to the National Petroleum Reserve-Alaska,[39] and the 2,000-acre surface disturbance limit,[40] it does not reduce or otherwise limit the Secretary's broad authority to administer an oil and gas program or exempt the Leasing Program from compliance with other laws, including NEPA, NHPA, and ANILCA.

At the outset, Plaintiffs' arguments alleging that DOI acted outside the Tax Act in suspending the leases fail in the face of the Tax Act's plain language. The Tax Act directs the Secretary to manage the Coastal Plain Leasing Program in a manner similar to how it administers lease sales under the Naval Petroleum Reserves Production Act ("NPRPA").[41] The NPRPA expressly provides the Secretary with the authority to

---

[37] Tax Act § 20001(b)(2)(A) & (B)(iii).
[38] *Id.* § 20001(c)(1)(B)(ii). The BLM satisfied the requirement to offer the first lease sale in January 2021. AR3227–28, 33314–15.
[39] Tax Act § 20001(b)(3).
[40] *Id.* § 20001(c)(3).
[41] *Id.* § 20001(b)(3).

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                                    Page 10

Case 3:21-cv-00245-SLG     Document 65     Filed 02/17/23     Page 16 of 30

"direct . . . the suspension of operations and production on any lease or unit."[42] DOI thus acted well within its authority and Plaintiffs cite no language in the Tax Act to support the contention that the Act supersedes or limits the broad authority provided under the NPRPA.[43]

Furthermore, the United States Supreme Court has long recognized the Secretary's authority, under her "general powers of management over the public lands" to cancel a lease that is invalid at its inception, unless the power is withdrawn by statute.[44] There is nothing in the Tax Act, NPRPA or other law limiting the Secretary's general power to cancel leases that were improperly issued. It follows that the Secretary would have the power to take the more limited action of suspending activities on the improperly issued leases while undertaking a process to fix the errors.

Here, the Secretary identified several legal deficiencies—including insufficient analysis under NEPA and improper interpretation of the Tax Act in the ROD—and ordered the BLM to conduct new, comprehensive analyses of the Leasing Program to address the legal deficiencies.[45] In the lease-suspension letters, the Assistant Secretary further explained that the FEIS failed to consider a reasonable range of alternatives under NEPA because it did not analyze an action alternative "that involved fewer than 2,000

---

[42] 42 U.S.C. § 6506a(k)(2).
[43] AIDEA at 27–28; SOA at 25.
[44] *Boesche v. Udall*, 373 U.S. 472, 476 (1963).
[45] AR 3362.

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                                   Page 11

Case 3:21-cv-00245-SLG    Document 65    Filed 02/17/23    Page 17 of 30

acres of surface development."[46] The BLM's decision to not include such an alternative was "itself a legal error" because it was based on the flawed interpretation "that the Tax Act provides a *mandate* to the BLM requiring it to approve production and support facilities up to that limit" which "is both implausible and contrary to Congressional intent."[47] Based on the identified legal deficiencies in the environmental analysis underlying the leases, the DOI suspended the leases in an exercise of its inherent authority to correct legal errors.[48] The DOI's actions are a proper exercise of its specific and inherent authority to correct legal errors and do not run afoul of the Tax Act.

**B.    DOI's Actions Were Lawful Under ANILCA.**

DOI's actions to address the legal problems with the Leasing Program, including suspending the leases and undertaking a supplemental process, were consistent with ANILCA. AIDEA and the State's arguments that the agency violated ANILCA are without supporting authority and specificity. Broadly, however, nothing in ANILCA limits the Secretary's specific and inherent authority to suspend activities pending a Supplemental EIS and ANILCA Section 810 Evaluation. Instead, DOI's actions here are

---

[46] AR 3365.
[47] AR 3365.
[48] AR 3365.

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                                    Page 12

intended to remedy a potential violation of ANILCA Section 810,[49] a well-founded legal deficiency for which the Tribes sought relief in the stayed litigation.[50]

As an initial matter, Plaintiffs fail to articulate why or how DOI's actions violate ANILCA, noting only in passing that the Tax Act amended the statutory purposes of the Refuge under ANILCA.[51] To the extent that AIDEA is arguing that DOI violated ANILCA by failing to implement the Tax Act's amendment to the purposes of the Refuge to "provide for an oil and gas program on the Coastal Plain," or that it is acting contrary to that purpose, AIDEA is asking this Court to ignore the other purposes of the Refuge contained in ANILCA. Through ANILCA, Congress added four purposes for the land now included within the Refuge, emphasizing the conservation and subsistence objectives of ANILCA.[52] The text of ANILCA does not place any one purpose of the Refuge above the others, rather, the agency must manage multiple resources of the

---

[49] AR3364 (DOI "identified several areas for which additional analysis may either address a potential legal defect or, at a minimum, serve NEPA's purpose to meaningfully inform the decisionmaker as to the environmental consequences of federal action. These include, but are not limited to, […] compliance with section 810 of the Alaska National Interest Lands Conservation Act (ANILCA).").

[50] Compl. at 62, *Native Vill. of Venetie Tribal Government v. Haaland*, Case No. 3:20-cv-00223-SLG (ECF No. 1). The State argues that the ROD's recitation of compliance with Section 810 of ANILCA contradicts the Executive Order, Secretarial Order, and Lease Suspension. SOA at 32. However, the State ignores that the Tribes' legal challenges to DOI's ROD and ANILCA Section 810 Evaluation remain unresolved in that stayed litigation.

[51] *See* AIDEA at 24.

[52] *See supra* note 14 (Pub. L. No. 96-487 § 303(2)(B)).

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                              Page 13

Case 3:21-cv-00245-SLG   Document 65   Filed 02/17/23   Page 19 of 30

Refuge in line with all statutory purposes and the agency is afforded broad inherent authority to do so.[53]

To the extent that AIDEA argues that DOI's actions violate mandatory duties under ANILCA, such an argument ignores DOI's obligation to adhere to *all* purposes of the Refuge through its authority to implement the Leasing Program and to fix legal errors in its decisions. Should DOI find, as it did here, that legal deficiencies compel new analyses, it has specific authority in the Tax Act[54] and general public land management authority[55] to cancel a lease. More generally, the "power to reconsider is inherent in the power to decide," and agencies have inherent authority to reconsider their decisions and address legal errors where Congress has not otherwise directed the agency.[56]

AIDEA and the State fail to explain how DOI's actions were contrary to the agency's authority to address legal errors or point to any language in ANILCA that limits the agency's specific or inherent authority to suspend leases and correct legal errors. Indeed, contrary to AIDEA's and the State's assertions that there was not an adequate

---

[53] *See*, *e.g.*, *Se. Conf. v. Vilsack*, 684 F. Supp. 2d 135, 144–45 (D.D.C. 2010) (rejecting argument that ANILCA constrained the Forest Service's otherwise broad discretion to balance multiple uses).

[54] *See supra* Section I.A.

[55] *Boesche v. Udall*, 373 U.S. 472, 476 (1963).

[56] *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (quoting *Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950)); *see also Gun South, Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989) (recognizing general rule that agencies possess implied authority "to reconsider and rectify errors even though the applicable statute and regulations do not expressly provide for such reconsideration").

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                    Page 14

Case 3:21-cv-00245-SLG    Document 65    Filed 02/17/23    Page 20 of 30

basis for DOI's actions,[57] the record shows DOI reasonably identified that there were significant legal errors with the agencies' prior decisions for the Leasing Program, including violations of ANILCA Section 810.[58] DOI's actions are consistent with ANILCA and the agency's Tax Act-specific and more general inherent authority to address the legal problems with the Leasing Program and the improperly issued leases.

## II. Notice and Comment Was Not Required.

The DOI's actions do not constitute an agency rule subject to the APA's notice-and-comment requirements.[59] The Secretary's Order directing the agency to undertake a Supplemental EIS and associated processes is not a "rule" at all under the APA. Moreover, contrary to AIDEA's assertions, temporary suspension of the leases does not otherwise create a substantive agency rulemaking.

As an initial matter, AIDEA cannot contend that Executive Order 13990 is a rulemaking subject to the APA's notice-and-comment requirements because Presidential action falls outside of the purview of that Act.[60] Indeed, as the Defendants address, Plaintiffs fail to articulate any valid challenge to the Executive Order.[61]

---

[57] AIDEA at 27; SOA at 27–30.
[58] *See, e.g.*, AR3362–65.
[59] 5 U.S.C. § 553.
[60] *See Dalton v. Specter*, 511 U.S. 462, 469, 476 (1994) (holding that "actions of the President cannot be reviewed under the APA because the President is not an 'agency' under that Act")
[61] *See* Defs.' Response at 14–19.

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                                   Page 15

The Secretarial Order, meanwhile, is an "order" under the APA[62] that merely initiated statutorily defined adjudicatory processes to correct legal errors, processes that are ongoing and themselves contain opportunities for public input and participation. The APA contains distinctions between orders and rules, with different procedural requirements for each. "Rule making" means the "agency process for formulating, amending, or repealing a rule."[63] A "rule" is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency."[64] By comparison, the APA defines an "order" as "the whole or a part of a final disposition . . . of an agency in a matter other than rule making but including licensing"[65] and an "adjudication" as "agency process for the formulation of an order."[66]

Courts broadly construe adjudications resulting in orders as "virtually any agency action that is not rulemaking."[67] In addition, it is well-established that when Congress has not specified a process, the choice between rulemaking and adjudication lies within the

---

[62] 5 U.S.C. § 551(6).
[63] *Id.* § 551(5).
[64] *Id.* § 551(4).
[65] *Id.* § 551(6).
[66] *Id.* § 551(7).
[67] *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994).

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                                    Page 16

Case 3:21-cv-00245-SLG    Document 65    Filed 02/17/23    Page 22 of 30

informed discretion of the agency.[68] Moreover, the effect of an agency action is instructive to whether the action is a rulemaking or an adjudication. Adjudications are "highly fact-specific,"[69] utilize "case-by-case" review,[70] and have immediate concrete effects on specific individuals.[71] By contrast, agency rules are prospective and generally have effect only after being subsequently applied.[72]

Here, the Secretary decision to conduct supplemental NEPA and associated processes, and temporarily suspend the leases was done through the agency's adjudicatory process and not through substantive rule making. The Secretary's Order had an immediate concrete effect on the leaseholders and the parties to the now-stayed litigation and was retrospective. Overall, the Secretary's Order was properly an adjudication rather than a rule making due to its highly fact-specific context.

Alternatively, even if this Court were to agree with AIDEA that the lease suspension and initiation of supplemental NEPA and associated processes were rule makings, the notice and comment requirements of the APA are not required for all rule makings. Indeed, interpretive rules, statements of policy, and rules of agency

---

[68] *Securities and Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 203 (1947); *Nat'l Labor Relations Bd. v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974); *Atochem North America, Inc. v. EPA*, 759 F. Supp. 861, 868–69 (D.D.C. 1991).
[69] *Neustar, Inc. v. FCC*, 857 F.3d 886, 893 (D.C. Cir. 2017).
[70] *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1018 (D.C. Cir. 2016).
[71] *Providence Yakima Medical Center v. Sebelius*, 611 F.3d 1181, 1188 (9th Cir. 2010).
[72] *Id.*

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                    Page 17

Case 3:21-cv-00245-SLG    Document 65    Filed 02/17/23    Page 23 of 30

organization, procedure, and practice are exempt.[73] Only those rules deemed "substantive" or "legislative" must go through a notice and comment process.[74]

AIDEA asserts that the Secretarial Order and lease suspensions are substantive rules because they leave no staff-level discretion to process oil and gas permit applications for the Coastal Plain.[75] But the fact that DOI's actions impact BLM's activities does not establish that they are a substantive rule under the APA. As the Ninth Circuit explained, substantive rules are those actions that "'effect a change in existing law or policy' [and] incrementally impos[e] general, extra-statutory obligations pursuant to authority properly delegated by the legislature."[76]

The Secretarial Order and lease suspensions do not impose extra-statutory obligations beyond the Tax Act's mandates. DOI's actions do not establish the legal standards by which the agency will implement the Leasing Program. Rather, the legal standards by which the agency will implement the Leasing Program are the same today as they were in when the first lease sale was held in 2021—the mandates of the Tax Act, NEPA, ANILCA, NHPA, and the like. DOI's actions merely instruct BLM to temporarily suspend activities and the leases while the agency remedies identified legal errors with the Leasing Program through well-defined statutory and regulatory processes.

---

[73] 5 U.S.C. § 553(b)(3)(A).
[74] *S. Cal. Edison Co. v. Fed. Energy Regulatory Comm'n*, 770 F.2d 779, 783 (9th Cir. 1985).
[75] AIDEA at 33–35; SOA at 22.
[76] *Alcaraz v. Block*, 746 F.2d 593, 613 (9th Cir. 1984) (quoting *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983)).

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                     Page 18

## III. The DOI's Actions Are Not an Unlawful Change in Position.

The Plaintiffs argue that the Secretarial Order is an arbitrary and capricious reversal in the agency's prior position.[77] However, as a threshold matter the DOI's actions do not constitute a change in position subject to the requirements outlined in *Federal Communications Commission v. Fox.* Even assuming *Fox* does apply, DOI has provided adequate explanation for its decision to supplement its previous analysis.

In *Fox*, the Supreme Court outlined a framework to analyze an agency's change in position under the APA.[78] The Court held that there is "no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review."[79] However, an agency cannot simply ignore or disregard a past position and must provide a "reasoned analysis for the change."[80] Therefore, the Court concluded that an agency's change in position "complies with the APA if the agency: (1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy."[81]

---

[77] AIDEA at 35; SOA at 30.

[78] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–16 (2009).

[79] *Id.* at 514.

[80] *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)).

[81] *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quoting *Fox*, 56 U.S. at 515–16)).

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                    Page 19

Case 3:21-cv-00245-SLG    Document 65    Filed 02/17/23    Page 25 of 30

Here, the DOI's actions, namely its decision to conduct supplemental analysis to address identified legal deficiencies, do not constitute a change in position and are in stark contrast to the types of agency action generally subject to the requirements outlined in *Fox*. The Plaintiffs point to no case applying the requirements outlined in *Fox* to an action comparable to the DOI's actions at issue in this case. Rather, a review of those cases illustrate why such a framework should not be applied here. For example, in *Organized Village of Kake v. U.S. Department of Agriculture*, the Ninth Circuit applied *Fox*'s "reasoned explanation" requirement to an agency's decision reversing its previously adopted roadless rule in the Tongass National Forest where the new decision rested on a factual findings contradicting those in the agency's prior decision.[82] Here, in contrast to the cases applying *Fox*'s reasoned explanation requirement, there is no new decision departing from a past position.[83] Rather, the DOI identified a legal error in its past actions and is currently undertaking a process to remedy that error.

---

[82] *Id.* at 967.

[83] *See* AIDEA at 37 citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (applying the "reasoned explanation" requirement to a final regulation interpreting a statutory term that reversed the agency's longstanding prior position); *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021) (applying the "reasoned explanation" requirement to an agency's decision reversing its prior decision that a species warranted protection under the Endangered Species Act); *Sierra Club North Star Chapter v. LaHood*, 693 F. Supp. 2d 958, 973–74 (D. Minn. 2010) (applying the "reasoned explanation" requirement to an agency's position on a Wild and Scenic River evaluation that departed from to its prior policy). *See also* Defs.' Response at 39–40.

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                                Page 20

Case 3:21-cv-00245-SLG    Document 65    Filed 02/17/23    Page 26 of 30

Even assuming the DOI's actions constitute a change in position, the requirements outlined in *Fox* are satisfied. First, DOI acknowledged its past actions and explained the need to correct legal errors in that analysis. Specifically, the Secretarial Order and the Assistant Secretary's lease-suspension letters made clear that DOI had identified several legal deficiencies in its past analysis and new analyses of the Leasing Program was needed to correct those errors.[84] This demonstrates that DOI did not ignore its past actions and made a conscious choice to change direction.[85] It is well within the DOI's discretion to reevaluate the facts and law underlying its past actions and reach a different conclusion, even on the same record.[86] Second, as discussed, DOI's decision is consistent with the Tax Act, ANILCA, and other applicable laws.[87] Finally, DOI provides good reason for its decision, explaining that the FEIS did not consider a reasonable range of alternatives under NEPA, the past analysis did not adequately evaluate potential impacts to subsistence uses under ANILCA Section 810, and the ROD relied on a flawed interpretation of the Tax Act's 2,000-acre surface disturbance limitation.[88] Though Plaintiffs may quibble with DOI's reasons, the agency provided a reasoned analysis for its actions that is a far cry from the unexplained inconsistencies that have been the basis

---

[84] AR3362–65.

[85] The third requirement—that the agency "believes the new policy is better"—is also satisfied when the agency makes a "conscious change of course." *Fox*, 556 U.S. at 515; *see also Organized Vill. of Kake*, 795 F.3d at 967 (assuming that the agency "believes the new policy is better because it decided to adopt it").

[86] *Organized Vill. of Kake*, 795 F.3d at 968.

[87] *See supra* Sections I.A and B.

[88] AR3362, 3364–65.

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                                    Page 21

Case 3:21-cv-00245-SLG    Document 65    Filed 02/17/23    Page 27 of 30

for past cases holding a change to be arbitrary and capricious.[89] DOI's actions do not constitute a change in position of the type to which *Fox* applies, and even if, for the sake of argument, *Fox* did apply, DOI has provided a reasoned explanation for its decision.

## CONCLUSION

For the foregoing reasons, the Court should deny the Plaintiffs and Intervenor-Plaintiff's Motions for Summary Judgment and enter judgement for the Defendants, Intervenor-Defendants Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council, and Intervenor-Defendants Gwich'in Steering Committee, et al.

Respectfully submitted this 17th day of February, 2023.

/s/ Matthew N. Newman
Matthew N. Newman (AK Bar No. 1305023)
Megan R. Condon (AK Bar No. 1810096)
NATIVE AMERICAN RIGHTS FUND
745 West 4th Avenue, Suite 502
Anchorage, AK 99501
Phone: 907-276-0680
mnewman@narf.org
mcondon@narf.org

*Lead Counsel for Intervenor Defendants Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council*

---

[89] *Organized Vill. of Kake*, 795 F.3d at 968–69 (holding a change in policy arbitrary and capricious where the agency's decision rested on a finding that was "a direct, and *entirely unexplained* contradiction" of the agency's previous finding") (emphasis added); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222–23 (2016) (holding a change in position did not meet the "reasoned explanation" requirement where the agency "said almost nothing" to explain the reasons for its change).

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                           Page 22

Case 3:21-cv-00245-SLG   Document 65   Filed 02/17/23   Page 28 of 30

Peter H. Van Tuyn (AK Bar No. 8911086)
Karen E. Schmidt (AK Bar No. 1211113)
BESSENYEY & VAN TUYN, LLC
310 K Street, Suite 200
Anchorage, AK 99501
Phone: 907-278-2000
peter@bvt-law.com
karen@bvt-law.com

*Co- Counsel for Intervenor Defendants Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council*

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                    Page 23

Case 3:21-cv-00245-SLG    Document 65    Filed 02/17/23    Page 29 of 30

<u>Certificate of Service</u>

I hereby certify that on February 17, 2023, a true and correct copy of the INTERVENOR-DEFENDANTS NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT, ARCTIC VILLAGE COUNCIL, AND VENETIE VILLAGE COUNCIL'S RESPONSE IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT was served electronically pursuant to the Court's electronic filing procedures upon the attorneys of record in this lawsuit.

<u>/s/Matthew N. Newman</u>
Matthew N. Newman (AK Bar No. 1305023)

Native Village of Venetie Tribal Government et al.'s Response Brief
*AIDEA v. Biden*, Case No. 3:21-cv-00245-SLG                    Page 24

Case 3:21-cv-00245-SLG    Document 65    Filed 02/17/23    Page 30 of 30