

**THE DEPUTY SECRETARY OF THE INTERIOR**
**WASHINGTON**

SEP 06 2023

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

DECISION

| | | |
|---|---|---|
| Alaska Industrial Development | : | Oil and Gas Leases |
| and Export Authority | : | AA095889 |
| 813 West Northern Lights Blvd. | : | AA095890 |
| Anchorage, Alaska 99503 | : | AA095893 |
| | : | AA095897 |
| | : | AA095898 |
| | : | AA095900 |
| | : | AA095901 |

Lease Cancellation

After careful review of all available information related to the seven oil and gas leases identified in the caption above, the Department of the Interior (Department) has determined that the leases were improperly issued due to pre-leasing legal defects. The record before the Department has confirmed the seriousness of those legal defects in the environmental review supporting the leases, and, in light of the minimal disruptive consequences of cancellation, the Department has determined that cancellation is appropriate. The reasons for that determination are set forth below.

**I.      Background**

   A.  First Lease Sale

Section 20001 of the Tax Cuts and Jobs Act of 2017, Public Law 115-97 (Tax Act) directed the Secretary of the Interior (Secretary), acting through the Bureau of Land Management (BLM), to (1) "establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain"; (2) issue "any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out [the Program]"; and (3) conduct two oil and gas lease sales by December 2021 and December 2024, respectively, of not less than 400,000 acres each.

In September 2019, BLM issued the "Coastal Plain Oil and Gas Leasing Program Environmental Impact Statement" (Coastal Plain EIS) under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4231-4370h. In August 2020, the Secretary signed a record of decision (2020 ROD) approving a leasing program, determining where and under what terms and conditions leasing would occur. Shortly after issuance of the 2020 ROD, 4 lawsuits were filed by 16 environmental groups, 3 Alaska Native tribes and an Alaska Native organization, and 15 States. On January 5,

2021, without discussing whether plaintiffs were likely to succeed on any of their claims, the U.S. District Court for the District of Alaska denied three motions for preliminary injunction seeking to prevent issuance of leases.[1]

During the first required lease sale held on January 6, 2021, BLM received 13 total bids on 11 tracts covering 552,802 acres of the 1,089,053 acres offered. On January 13, 2021, the Department issued seven leases to the Alaska Industrial Development and Export Authority (AIDEA). On January 15, 2021, the Department issued one lease each to Regenerate Alaska, Inc. and to Knik Arm Services, LLC. AIDEA abandoned its qualifying high bids on the two remaining lease tracts. The BLM relied on the Coastal Plain EIS for its NEPA compliance for the lease sale and conducted the lease sale and issued leases in accordance with the 2020 ROD.[2]

    B. Secretary's Order 3401 and Lease Suspensions

On June 1, 2021, the Secretary issued Secretary's Order 3401, which identified "multiple legal deficiencies in the underlying record supporting the leases, including, but not limited to: (1) insufficient analysis under [NEPA], including failure to adequately analyze a reasonable range of alternatives in the [EIS]; and (2) failure in the August 17, 2020, [ROD] to properly interpret [the Tax Act]." Secretary's Order 3401 directed the initiation of a "process to conduct a comprehensive environmental analysis, complete necessary consultation, and correct the identified legal deficiencies" and "as appropriate and consistent with applicable law, take appropriate action with respect to existing leases in light of the direction provided herein."

Also on June 1, 2021, the Department suspended the nine leases, with each suspension decision stating:

> The BLM will undertake this additional NEPA analysis to determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures. The BLM will publish a notice of intent to begin this process to undertake additional analysis, complete necessary consultation, and correct defects in the EIS and ROD. When complete, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the above-referenced leases.

On August 4, 2021, BLM issued a *Notice of Intent to Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program*, 86 Fed. Reg. 41989, which initiated the scoping process to begin the comprehensive analysis of potential environmental impacts, including addressing deficiencies identified in Secretary's Order 3401. On November 4, 2021, AIDEA filed a lawsuit in U.S. District Court for the District of Alaska (*Alaska Industrial*

---

[1] The four cases challenging the 2019 Coastal Plain EIS and 2020 ROD have been stayed prior to any briefing on the merits pending completion of the additional environmental analysis, with a court order of September 13, 2021, directing status reports at key milestones in the new environmental review. The next such status report is required at the issuance of the Draft Supplemental Environmental Impact Statement or no later than September 29, 2023.

[2] While the Department did not promulgate implementing regulations for the Tax Act, the Department generally looks to the NPRPA or its implementing regulations for guidance consistent with the Tax Act's direction that "the Secretary shall manage the oil and gas program in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. § 6501 et seq.) [NPRPA] (including regulations)."

*Development and Export Authority v. Biden*; 3:21-cv-00245-SLG), challenging, among other things, the Department's issuance of Secretary's Order 3401 and the lease suspensions.[3]

Based on an agreement initiated at the request of the lessee to rescind its lease and refund its payments, on April 28, 2022, BLM rescinded and cancelled the lease held by Regenerate Alaska, Inc. and started the process to refund the full bonus bid and first year's rental. A similar request to rescind its lease and refund its payments, was made by Knik Arm Services LLC. On August 16, 2022, BLM rescinded and cancelled the lease and started the process to refund the cash bond, full bonus bid, and first year's rental.

On August 19, 2022, the Department issued to AIDEA, the only remaining leaseholder under the Program, an "Addendum to Suspension of Operations and Production" ("Addendum"), identifying an additional legal defect related to the analysis of foreign greenhouse gas emissions:

> In the Suspension of Operations and Production, dated June 1, 2021, the Department identified two legal defects and also several areas involving a potential legal defect, specifically including the treatment of foreign greenhouse gas (GHG) emissions in the Environmental Impact Statement (EIS). … The Department has concluded that this legal defect provides an additional basis to continue to suspend the above-referenced leases and complete further environmental analysis under NEPA.

The Addendum repeated that "[t]he BLM is conducting this additional NEPA analysis to determine whether the leases should be affirmed, voided, or subject to additional mitigation measures." The Addendum also indicated that the decision on the existing leases might happen prior to the completion of the additional environmental analysis: "Once sufficient information is developed, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the above-referenced leases."

## II. Exercise of Secretary's Lease Cancellation Authority Due to Pre-Leasing Legal Defects

The Secretary has inherent authority, under her general managerial power over public lands, to cancel or suspend oil and gas leases issued in violation of a statute or regulation. *Boesche v. Udall*, 373 U.S. 472 (1963). This authority exists whether the statute or regulation violated is substantive (e.g., a law prohibiting leasing) or procedural (e.g., the National Environmental Policy Act).[4]

---

[3] On August 7, 2023, the court issued a decision rejecting all the claims raised by AIDEA and dismissing the lawsuit. Order Re Motions for Summary Judgment, Slip Op. at 74.

[4] The BLM has occasionally sought to address procedural errors by completing an additional process *post hoc* (e.g., additional NEPA analysis to address a NEPA error), and then determining whether the leases should be cancelled. *See Clayton W. Williams Jr.*, 103 IBLA 192, 203 (1988); *N. Cheyenne Tribe v. Lujan*, 804 F. Supp. 1281, 1285 (D. Mont. 1991); *see also Douglas Timber Operators v. Salazar*, 774 F. Supp. 2d 245 (D.D.C. 2011); *S. Utah Wilderness All. (SUWA)*, 194 IBLA 333, 334, 337 and note 28 (2019) (collecting cases); *Bd. of Cnty. Comm'rs of Pitkin Cnty.*, 186 IBLA 288, 293-295 (2015), *reconsideration denied*, 187 IBLA 328 (2016). Nothing obligates BLM to take such an approach, and, for the reasons set forth below, further process is inappropriate in this case given the gravity of the errors and the minimal consequences of cancellation.

After reviewing the Coastal Plain Oil and Gas Program pursuant to Section 4 of Executive Order 13990, entitled "Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis," January 20, 2021, Secretary's Order 3401 identified two specific legal deficiencies in the record supporting the leases: (1) insufficient analysis under NEPA, including failure to adequately analyze a reasonable range of alternatives in the EIS and (2) failure in the August 17, 2020, ROD to properly interpret the Tax Act.

With respect to the first and second identified defects, the Coastal Plain EIS failed to analyze a reasonable range of alternatives because it did not analyze any alternative—besides the no action alternative—that involved fewer than 2,000 acres of surface development. NEPA requires consideration of a reasonable range of alternatives, 40 C.F.R. § 1502.14, as the "heart" of the environmental impact statement. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1207 (9th Circ. 2004). Here, BLM omitted consideration of an alternative that involved fewer than 2,000 acres to be covered by "production and support facilities" on the grounds that such an alternative would conflict with the direction in the Tax Act. *See* Coastal Plain Oil and Gas Leasing Program Final Environmental Impact Statement (2019) at 2-44; Coastal Plain Oil and Gas Leasing Program Record of Decision (2020) at 10.

This was in error. The Tax Act provides, in relevant part:

> (3) SURFACE DEVELOPMENT.—In administering [the program], the Secretary shall authorize *up to* 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section.

Pub. L. 115-97, § 20001(c)(3) (2017) (emphasis added).

The phrase "up to" plainly indicates that BLM may authorize less than 2,000 acres for production and support facilities, and BLM's conclusion otherwise was incorrect as a matter of law, as well as unreasonable. *See Terumo Ams. Holding, Inc. v. Tureski*, 2015 U.S. Dist. LEXIS 97592, *12 (D. Mass. July 27, 2015) (collecting cases and concluding that "[t]he ordinary meaning of "up to" is one of limitation, implying a maximum cap or limit"); *see also AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1285 (Fed. Cir. 2003); *Ass'n for Cmty. Affiliated Plans v. US Treasury*, 392 F. Supp. 3d 22, 45 (D.C. Dist. 2019). *Accord* 163 Cong. Rec. S7539-40 (daily ed. Nov. 30, 2017) (Sen. Murkowski, floor statement on the Tax Act legislation) ("[T]he environment and local wildlife will always be a concern, always be a priority . . . . That is why surface development will cover *up to*, but no more, than 2,000 Federal acres.") (emphasis added).

The BLM's mistaken interpretation of the Tax Act's 2,000-acre provision constrained analysis of the reasonably foreseeable development scenario and IS—every action alternative evaluated in the 2019 EIS involved exactly 2,000 acres of surface development. By omitting any alternative that evaluated fewer than 2,000 acres of surface development, the EIS failed to adequately inform the decisionmaker and to provide a meaningful basis for comparison of alternatives.[5]

---

[5] While the NEPA process is still ongoing, the Draft Supplemental Environmental Impact Statement, incorporating feedback from the Cooperating Agencies, has resulted in a substantially revised and expanded range of alternatives, including considering varying levels of surface development and the development of a new action alternative that is

The BLM's omission in this case was noteworthy because the statutory purposes of the Arctic National Wildlife Refuge include not merely provision of "an oil and gas program," but also the existing purposes impacted by surface development, including conservation of "fish and wildlife populations and habitats on their natural diversity," "the opportunity for continued subsistence uses by local residents," and "water quality." Alaska National Interest Lands Conservation Act (ANILCA), P.L. 96-487 (1980) § 303(2)(B),[6] *see Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 804 (D. Alaska Aug. 18, 2021) (finding the errors identified by the court to be serious, including "fail[ing] to adequately analyze a reasonable range of alternatives for the Willow Project—a process that is 'the heart of the environmental impact statement.'"); *Ctr. for Biological Diversity v. DOI*, 623 F.3d 633, 642 (9th Cir. 2010) ("'The existence of reasonable but unexamined alternatives renders an EIS inadequate,'" quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998)).

In addition to these specific defects, the Department's June 1, 2021 Suspension Order also identified "several areas for which additional analysis may either address a potential legal defect or, at a minimum, serve NEPA's purpose to meaningfully inform the decisionmaker as to the environmental consequences of federal action." Those areas included, but were not limited to, the EIS's treatment of foreign greenhouse gas (GHG) emissions and compliance with the subsistence analysis required by section 810 of the ANILCA. The Department also noted it was "carefully evaluating its approach to this issue and may later identify this issue as an additional specific legal error depending on the resolution of pending court cases involving similar issues."

On August 19, 2022, in its Addendum to the suspension decision, the Department identified an additional legal error in the record supporting the AIDEA leases. Specifically, the Department noted that, in *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739 (D. Alaska Aug. 18, 2021), the District Court for the District of Alaska had invalidated approval of an oil and gas project that, like the NEPA analysis for the leases here, "did not give a quantitative estimate of the downstream GHG emissions that would result from changes in consumption of oil abroad due to the foreseeable production of Coastal Plain oil . . . [or] sufficiently explain why it could not do so and provide a more thorough discussion of how changes in foreign oil consumption might change the GHG emissions analysis." *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) (holding that the Bureau of Ocean Energy Management's (BOEM) approval of the "Liberty" offshore drilling and production facility failed to comply with NEPA because it did not adequately estimate emissions resulting from increased foreign consumption of oil or sufficiently explain why it could not); *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113

---

significantly different from the action alternatives previously considered. For example, BLM has developed a scalable hypothetical development model which applies proportional adjustments across the range of alternatives to guide the hypothetical number of acres that may be developed. Additionally, BLM has developed revised stipulations and required operating procedures that provide significant new restrictions on where surface development can occur. These changes have impacted the availability for surface development of a large portion of the Program area, including a majority of the area currently under lease. These new stipulations and required operating procedures are included in the analysis of a new alternative, Alternative D, significantly expanding the range of alternatives from that previously considered.

[6] Section 1.1 of the Coastal Plain Oil and Gas Leasing Program Final EIS (September 2019) acknowledges that "[t]he oil and gas leasing program must consider the Arctic Refuge purposes set out in Section 303(2)(B) of ANILCA, as amended by Section 20001 of PL 115-97."

(D.D.C. 2022), *vacated on other grounds* 2023 U.S. App. LEXIS 10554 (D.C. Cir. 2023) (citing *Ctr. for Biological Diversity* and *Sovereign Inupiat* and holding that BOEM's decision to hold an offshore oil and gas lease sale was arbitrary and capricious because it failed to provide a quantitative estimate of downstream GHG emissions resulting from reduced foreign consumption or adequately explain why it could not). *See also Alaska Industrial Development and Export Authority v. Biden*; Order Re Motions for Summary Judgment, Slip Op. at 58-59 (citing *Ctr. for Biological Diversity* and finding that the Coastal Plain EIS failed to consider GHG emissions resulting from foreign oil consumption, in violation of NEPA).

A recent Court of Appeals decision highlighted the importance of quantifying downstream emissions in a NEPA document for a sizable fossil fuel authorization. *350 Montana v. Haaland*, 50 F.4th 1254, 1268 (9th Cir. 2022) ("The omission of combustion-related emissions also contradicts a key premise of the [agency's environmental assessment and finding of no significant impact]—that climate change is a global problem."). The EIS for the leasing decisions at issue here used the same model (MarketSim) as did BOEM and BLM in the cases cited above, which excluded consideration of the impacts of foreign consumption on downstream GHG emissions. Because the emissions from the leasing decisions at issue—like the discrete projects at issue in *Sovereign Inupiat for a Living Arctic* and *350 Montana*—readily lend themselves to quantification of reasonably foreseeable downstream GHG emissions in order to "inform[] the public and ensur[e] agency consideration of the environmental impacts of its actions," the omission of that quantification was serious and tainted the leasing decisions before they were finalized. *350 Montana v. Haaland*, 50 F.4th at 1265. Furthermore, in the Ninth Circuit, vacatur is "the presumptive remedy for agency action that violates the NEPA as reviewed through the [Administrative Procedure Act]." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022) (citation omitted), *cert. denied sub nom. Am. Petroleum Inst. v. Env't Def. Ctr.*, No. 22-703, 2023 WL 3801206 (U.S. June 5, 2023).

For the foregoing reasons, the Department has determined that the legal deficiencies undergirding the original lease sale were sufficiently serious and fundamental to the decision-making process to justify addressing the underlying issues in a completely new analysis rather than trying to rectify past errors through remedial NEPA analysis. While the original suspension order indicated that the Department might complete the NEPA process before deciding whether to cancel the leases, we also noted in the addendum to the original lease suspension that "[o]nce sufficient information is developed, BLM will issue a new decision concerning this suspension of operations." As set forth above, that information has been revealed at the draft Supplemental Environmental Impact Statement stage. In addition, there are practical considerations that support cancelling the invalidly-issued leases now. Specifically, cancelling these leases before consummation of the NEPA process to support a 2024 sale as required by the Tax Act will enable the Department to consider whether some or all of the areas at issue in these leases may be offered in the second lease sale contemplated by the Tax Act. As a general matter, moreover, the Department recognizes the value of finality for all interested parties vis-à-vis the subject leases. Accordingly, there is no reason for further delay in his matter.

The Department has also considered the disruptive consequences of cancellation and finds those consequences to be minimal. Less than 140 days after the AIDEA leases were issued, the Department identified serious pre-leasing legal defects and suspended the leases. Since that time,

the lease terms have been tolled and lease rentals suspended. No approved permits or authorizations for exploration or other activity on the leases were affected by the lease suspension and no ongoing activity will be disrupted.[7] Because AIDEA will receive a full refund of the bonus bid and first year's rentals consistent with this decision to cancel the leases, the consequences from cancellation are minimal.

### III. Conclusion

In consideration of the foregoing, and in accordance with the Secretary's inherent authority under her general managerial power over public lands, the seven leases identified in the caption above are cancelled as being invalidly issued. I reach this decision based on the seriousness of the pre-leasing legal errors given the special legal and factual circumstances of the original leasing decisions, and on the minimal disruptive consequences from cancellation.

Lease payments not previously refunded, comprising lease sale bonus bids and first year rentals totaling $12,801,425 were made in January 2021 for the seven leases. Our cancellation of the seven leases entitles AIDEA to a refund of that amount.

You are not entitled to interest on that amount because the United States cannot pay interest without statutory authorization and there is no applicable authority allowing payment of interest for refunds of lease bonus bid and rental payments.

### IV. Final Agency Action

It is my decision to hereby cancel all seven of AIDEA's leases. You are entitled to a refund of lease payments totaling $12,801,425. You are not entitled to interest on that amount.

My decision constitutes the final decision of the Department and, in accordance with the regulations at 43 C.F.R. § 4.410(a)(3), is not subject to appeal under Departmental regulations at 43 C.F.R. Part 4.

Sincerely,

Tommy P. Beaudreau

---

[7] By way of contrast, this is not a case where the lessee had acquired and held the leases for several years, paying annual rent without notice of pre-leasing legal defects or limitations on development. Nor is it a case where a lessee has spent considerable time and money in exploration activities and invested large amounts in the engineering and preparation of a development plan. In fact, AIDEA has no outstanding reclamation obligations to BLM related to these leases because there has been no development or surface disturbance on the leases.